UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                        :        21 MC 97 (AKH)
IN RE SEPTEMBER 11 LITIGATION                           :
                                                        :
-------------------------------------------------------------X
                                                        :
                                                        :
IN RE SEPTEMBER 11 BUSINESS LOSS                        :        21 MC 101 (AKH)
AND PROPERTY DAMAGE LITIGATION                          :
                                                        :
-------------------------------------------------------------X

## DECLARATION OF RICHARD A. WILLIAMSON
## IN OPPOSITION TO THE MOTION OF THE AVIATION DEFENDANTS
## FOR SO-CALLED "FOCUSED" DISCOVERY FROM THE GOVERNMENT

RICHARD A. WILLIAMSON, an attorney admitted to practice law in the State of New

York and before this Court, declares under the penalties of perjury that the following is true and

correct, pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm Flemming Zulack Williamson Zauderer LLP.  I

submit this declaration on behalf of WTCP Cross-Claim Plaintiffs[1] and all other plaintiffs who

have asserted wrongful death, bodily injury, property damage, or business interruption loss

claims, among other claims, under the 21 MC 97 and/or the 21 MC 101 dockets (collectively

"Plaintiffs"), in order to place certain documents before the Court that are relevant to Plaintiffs'

opposition to the motion of the Aviation Defendants for so-called "focused" discovery from the

government.

2.      Attached as **Exhibit 1** hereto is a true and correct copy of excerpts from the

transcript of the March 22, 2007 status conference in this consolidated case.

_____

[1]  World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade
Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, and 7 World Trade
Company, L.P.

3.      Attached as **Exhibit 2** hereto is a true and correct copy of a May 10, 2007 letter from Marc S. Moller, Esq., to Desmond T. Barry, Jr., Esq., requesting the identities of the government witnesses that the Aviation Defendants wish to depose.

4.      Attached as **Exhibit 3** hereto is a true and correct copy of a May 15, 2007 letter from Desmond T. Barry, Esq., to Marc S. Moller, Esq., concerning depositions of government employees.

5.      Attached as **Exhibit 4** hereto is a true and correct copy of excerpts from the WTCP Cross-Claim Plaintiffs' January 4, 2006 Response to the Aviation Defendants' Second Set of Interrogatories to 21 MC 97 Plaintiffs and Cross-Claim Plaintiffs.

6.      Attached as **Exhibit 5** hereto is a true and correct copy of excerpts from the Amended Cross-Claims by the WTCP Entities Against Certain Defendants in Plaintiffs' Amended Flight 11 Master Liability Complaint.

7.      Attached as **Exhibit 6** hereto is a true and correct copy of excerpts from the Cross-Claims by the WTCP Entities Against Certain Defendants in Plaintiffs' Amended Flight 175 Master Liability Complaint.

8.      Attached as **Exhibit 7** hereto is a true and correct copy of excerpts from the Fifth Amended Master Property Complaint Against Airline and Security Company Defendants.

9.      Attached as **Exhibit 8** hereto is a true and correct copy of excerpts from Plaintiffs' Amended Flight 175 Master Liability Complaint.

10.      Attached as **Exhibit 9** hereto is a true and correct copy of excerpts from Plaintiffs' Flight 77 Master Liability Complaint.

11.      Attached as **Exhibit 10** hereto is a true and correct copy of excerpts from Plaintiffs' Flight 93 Master Liability Complaint.

12.    Attached as **Exhibit 11** hereto is a true and correct copy of excerpts from Plaintiffs' Amended Flight 11 Master Liability Complaint.

13.    Attached as **Exhibit 12** hereto is a true and correct copy of excerpts from the transcript from the February 26, 2007 oral argument on the WTCP Cross-Claim Plaintiffs' Motion for a Protective Order.

14.    Attached as **Exhibit 13** hereto is a true and correct copy of an excerpt from *The 9/11 Commission Report, Final Report of the National Commission on Terrorist Attacks Upon the United States*.

15.    Attached as **Exhibit 14** hereto is a true and correct copy of Case Management Order No. 3, from in *In re World Trade Center Disaster Site Litig.*, No. 21 MC 100.

16.    Attached as **Exhibit 15** hereto is a true and correct copy of excerpts from the transcript of the April 18, 2005 court conference in *In re World Trade Center Disaster Site Litig.*, No. 21 MC 100.

17.    Attached as **Exhibit 16** hereto is a true and correct copy of excerpts from the March 21, 2006 trial transcript in *United States v. Moussaoui*, No. 1:01cr455 (E.D. Va.).

18.    Attached as **Exhibit 17** hereto is a true and correct copy of letters dated March 13, 2006 from Assistant United States Attorney David J. Novak to the Honorable Leonie M. Brinkema and Edward B. MacMahon, Jr., Esq., enclosing and chain of emails among Carla Martin, Esq. (TSA attorney who had appeared in this Court in these actions) and others including descriptions of discussions with her friends Jeffrey Ellis, Esq. (United's counsel in these actions) and Christopher Christensen, Esq. (American Airlines' counsel in these actions).

19.    Attached as **Exhibit 18** hereto is a true and correct copy of a May 7, 2007 letter from Roger E. Podesta, Esq., to Assistant United States Attorney Jeannette A. Vargas, concerning government discovery.

20.    Attached as **Exhibit 19** hereto is a true and correct copy of an excerpt of an October 30, 2000 U.S. Department of Transportation/Federal Aviation Administration ("FAA") Memorandum regarding: "Action: Worldwide Threat Questions and Answers."

21.    Attached as **Exhibit 20** hereto is a true and correct copy of "The Transnational Threat to Civil Aviation" PowerPoint presentation by the Office of Civil Aviation Security Intelligence of the Federal Aviation Administration, current "as of September 2000."

22.    Attached as **Exhibit 21** hereto is a true and correct copy of an excerpt of United Airlines' Air Carrier Standard Security Program (ACSSP), "ACSSP As Of 9/11/01".

23.    Attached as **Exhibit 22** hereto is a true and correct copy of Civil Aviation Security Directive Number SD 108-98-02G, dated July 27, 2001, regarding "Threat to Air Carriers", stating that AVSEC Alert Level III remains in effect.

24.    Attached as **Exhibit 23** hereto is a true and correct copy of a dated July 14, 2006 subpoena for testimony and documents, served upon the Federal Aviation Administration ("FAA") by the Aviation Defendants.

25.    Attached as **Exhibit 24** hereto is a true and correct copy of a July 28, 2006 letter from U.S. Department of Justice Trial Attorney Jeffrey M. Smith to Desmond T. Barry, Jr., Esq., concerning the subpoena served by the Aviation Defendants upon the FAA.

26.    Attached as **Exhibit 25** hereto is a true and correct copy of an April 10, 2007 letter from Assistant United States Attorney Sarah S. Normand to the Court, concerning

Plaintiffs' motion for a protective order with respect to the Rule 30(b)(6) deposition of FAA employee.

27.    Attached as **Exhibit 26** hereto is a true and correct copy of a March 21, 2007 letter from Assistant United States Attorney Beth Goldman to the Court, concerning government discovery.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: May 25, 2007

                                                s/Richard A. Williamson
                                              RICHARD A. WILLIAMSON

Exhibit 1

73MZ911C

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  In Re: 9/11 Property Damage
   and Business Loss Litigation

4

5                                      21 MC 97, 101 (AKH)

6

   ------------------------------x
7
                                       March 22, 2007
8                                      3:30 p.m.

9  Before:

10              HON. ALVIN K. HELLERSTEIN,

11                                     District Judge

12                   APPEARANCES

13  KEITH S. FRANZ

14  ROBERT A. CLIFFORD
    TIMOTHY J. TOMASIK

15

16  LEE GODFREY

17  MARC S. MOLLER

18  BETH GOLDMAN
    SARAH NORMAND
19  JEANETTE VARGAS

20  ROGER PODESTA

21  DOUGLAS J. PEPE

22  DONALD MIGLIORI

23  APPEARANCES: (continued)

24  JEFFREY ELLIS

25  DESMOND BARRY

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

73MZ911C

1    RICHARD A. WILLIAMSON
     CATHI HESSION
2    JASON COHEN

3    FRANKLIN M. SACHS

4    RICHARD CAMPBELL

5    JOSEPH WAYLAND

6    JAMES P. CONNORS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

73MZ911C

1    think any government discovery is relevant any more.  They

2    don't think any depositions of the government are relevant any

3    more, and they're ready to go ahead and try their cases.

4         We think it's obvious on the face of the case that the

5    Government's at the heart of it, and the government discovery

6    is critical to our defenses as we explained to you.

7         I'm prepared to talk at length about why that is, but

8    I don't think it's necessary to do so.  And one of the reasons

9    I don't think it is necessary to do so is because the

10   plaintiffs, themselves, all of them, each one of them signed a

11   document which they submitted to the Eastern District of

12   Virginia, and then went to the Court's Circuit on and said we

13   need all of this government discovery because it is relevant to

14   the claims that's relevant to the defenses and it's relevant to

15   the duties of the, of all of the parties involved.  So I hope I

16   don't have to spend much time because I think before today,

17   everyone recognized the need to take discovery of the

18   government.

19        THE COURT:  Well, the issues I put are Louie Freeh,

20   George Tenet and Richie Clark.

21        MR. WAYLAND:  I think, your Honor, with respect to

22   those three specific requests, the way we proceeded was to

23   begin the process to see what the reaction of the government

24   would be.

25        THE COURT:  They came back with a predictable

73MZ911C

1   response.

2           MR. WAYLAND:  But -- for the individuals, your Honor,

3   but not so much for the subject matter of the testimony that we

4   wanted.  And if you look at the --

5           THE COURT:  All right.  So we have consensus that Mr.

6   Freeh, Mr. Tenet and Mr. Clark will not be witnesses, at least

7   not at the present juncture

8           MR. WAYLAND:  Not at the present time, as long as

9   we -- just as we did the FAA, they provided a 30(b)(6) witness

10  to substitute, so.

11          THE COURT:  All right.  Those notices involving

12  Messrs. Freeh, Tenet and Clark are withdrawn.

13          MR. WAYLAND:  Well, with respect to them individually.

14  With respect to subject matter, just as with the FAA --

15          THE COURT:  If you're looking for 30(b)(6), you can't

16  determine who the people will be.

17          MR. WAYLAND:  You're right, your Honor.  Okay.

18          THE COURT:  So Freeh, Tenet and Clark can go about

19  their business.

20          MR. WAYLAND:  They may, your Honor, but we will

21  pursue --

22          THE COURT:  The will breathe a sigh of relief.

23          30(b)(6) FAA witnesses, is there any objection to

24  this?

25          MS. NORMAND:  No, your Honor.  In fact, we've had an

73MZ911C

1  initial meet and confer with the defendants, and I think it was

2  a very productive meeting.  We agreed on a number of topics

3  that would be appropriate.  There are outstanding issues,

4  however.  We've, for example, made clear to the defendants our

5  view that information, intelligence information known to the

6  FAA or not known to the FAA that was not communicated to the

7  airlines is not relevant to the issues in dispute in this case,

8  and for obvious reasons raises a host of issues for the

9  government.

10          THE COURT:  I've dealt with that issue in connection

11  with World Trade Center applications if I remember correctly

12  and I'll deal with them again, and I think those parties

13  pushing for that need to know the record.

14          MR. MOLLER:  We will, your Honor.

15          THE COURT:  By I anticipate that I would rule that

16  information not communicated is not relevant.

17          MR. WAYLAND:  Your Honor, this is an extraordinary

18  serious issue for all the defendants and we need to make a

19  substantial record on that with a hearing and the opportunity

20  to -- full briefing.  Because we think once your Honor hears

21  our argument, sees the law on this issue and thinks about the

22  issues, you may have a different view of, so we need to have a

23  second --

24          THE COURT:  Make a motion.  Do it by motion.

25          MR. WAYLAND:  All right.

73MZ911C

1          MR. MIGLIORI:  Your Honor, we'd ask that it be made

2     promptly as well, because --

3          THE COURT:  Mr. Wayland can make it promptly.

4          MR. WAYLAND:  We will make it promptly, your Honor.

5     It's a substantial motion.  It will take some time to put it

6     together, but we will make a motion.

7          THE COURT:  30 days?

8          MR. WAYLAND:  30 days, your Honor.

9          MR. MIGLIORI:  Your Honor, just so it's clear on the

10    record, the representation -- there are two types of federal

11    discovery.  One has to do with the investigations of what

12    happened on 9/11 and leading up to 9/11, as opposed to the

13    discovery of what the government knew pre9/11 and what it did

14    or didn't tell, and we share the Government's concern about the

15    letter.

16         THE COURT:  I didn't catch the distinction.

17         MR. MIGLIORI:  The nine -- the FBI after, on the day

18    of 9/11, went right to Logan and started interviewing people

19    with knowledge about the events immediately.

20         THE COURT:  And I understand that can lead to relevant

21    information.

22         MR. MIGLIORI:  And that's an investigative discovery

23    consistent with what plaintiffs have asked for in a very

24    tailored specific way.  That's --

25         THE COURT:  Is the FBI willing to surrender that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

73MZ911C

1    information?

2           MR. MIGLIORI:  Some of it has come.

3           MS. NORMAND:  Your Honor, that is the type of

4    information that is likely to be provided.  I'm not in a

5    position to articulate our position as to specific documents,

6    but things like interviews of employees at the airport and

7    things confiscated by FBI or FAA as of that time, those are

8    probably the types of things that will be appropriately

9    provided.

10          THE COURT:  Well, If produced, I can understand that

11   those are relevant in discovery sense.

12          MR. MIGLIORI:  So that's one area that we've been sort

13   of in agreement.  And we agree with the government, though,

14   that discovery of the government, the government about what

15   they knew or didn't tell prior to 9/11, didn't tell the

16   defendants, plaintiffs think that's highly irrelevant and --

17          THE COURT:  I understand.  But Mr. Wayland --

18          MR. MIGLIORI:  No, I understand.

19          THE COURT:  -- is pushing for that and he has a right

20   to make his record.

21          MR. MIGLIORI:  And we'll respond appropriately.  I

22   just want to make sure the Court was aware there are two

23   different types of federal discovery that we're talking about.

24          THE COURT:  Mr. Wayland, would you create a briefing

25   schedule for this?

73MZ911C

1    are taken off the table today, but will be replaced by the

2    30(b)(6). And I don't think even if we win our motion, your

3    Honor, it's more than another 20 or so witnesses, if we really

4    parse through it and try and get the people who can really

5    provide the answer, so I don't think --

6              THE COURT: The fewer number of witnesses in

7    prospect --

8              MR. WAYLAND: I don't think --

9              THE COURT: -- the better your chances of getting a

10   practical result.

11             MR. WAYLAND: Right.

12             THE COURT: In saying. Go ahead and get done within a

13   space of narrow frame.

14             MR. WAYLAND: Exactly. It's not a -- this is not

15   morass. It's pretty focused exercise.

16             THE COURT: I'm reacting, though, to Mr. Barry's

17   letter, which really made me concerned about the number of

18   people that he has in mind.

19             MR. WAYLAND: It's not, it's not a large number, your

20   Honor.

21             MR. BARRY: That was a joint letter. I know I've been

22   vilified for signing that letter, but, you know, that was on

23   behalf of all the aviation defendants.

24             THE COURT: You've told me that privately.

25             MR. MIGLIORI: I heard that too, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

73MZ911C

1          MR. MOLLER:  I would request in Mr. Wayland's motion

2     that they identify the individuals who constitute the universe

3     of people they think they want to depose, because that will

4     also sharpen the focus.

5          MR. BARRY:  In addition to the 30(b)(6).

6          THE COURT:  I'm not going to impose that because, once

7     it gets into a motion, there's more inflexibility than without

8     it.  But I think you might share in a side letter where you're

9     dealing with best representation and good faith rather than a

10     hard rule.

11          MR. WAYLAND:  I will, your Honor.

12          MR. WAYLAND:  I would just like to second that,

13     because we have been asking for lists of witnesses since

14     September, and we've gotten Clark and Tenet and Freeh and few

15     others in the last now month, but apparently there are longer

16     lists of witnesses and government's position may not be the

17     same as to each witness.  We're really trying to take a

18     targeted witness by witness approach here, so there may -- I

19     would like to narrow the dispute.

20          THE COURT:  Yeah, and I think as I said before, the

21     fewer the witnesses, the more practical an answer can be

22     gotten.

23          MR. BARRY:  Well, true.  And the plaintiffs have a

24     rather long list of government witnesses that they put forth.

25          THE COURT:  Yeah, but I gather from them that --

Exhibit 2

Harry E. Kreindler (1919-1984)
Lee S. Kreindler (1949-2003)
Marc S. Moller
Steven R. Pounian
James P. Kreindler
David C. Cook
David Beekman
Noah H. Kushlefsky
Robert J. Spragg
Brian J. Alexander
Justin T. Green
Andrew J. Maloney III
Daniel O. Rose

Francis G. Fleming
Paul S. Edelman
Milton G. Sincoff
John J. Veth**
    Counsel

# KREINDLER & KREINDLER LLP

100 Park Avenue
New York, NY 10017-5590
(212) 687-8181
Fax: (212) 972-9432
www.kreindler.com

Susan D. Bainnson
William O. Angelley
Michael R. Sherwin
Hilary B. Taylor
Elizabeth Crotty
Megan Benett

**California Office**
Gretchen M. Nelson*
Stuart R. Fraenkel*
Mark I. Labaton•

Gabriel Barenfeld*

**Massachusetts Office**
Anthony Tarricone*

Susan A. Friery, M.D.°
James D. Gotz*
Joseph P. Musacchio*

*Admitted in CA only
*Admitted in MA only
°Admitted in MA & DC only
^Resident in CA office

May 10, 2007

**VIA EMAIL AND FACSIMILE:  (212) 370-4482**
Desmond T. Barry, Jr., Esq.
Condon & Forsyth LLP
Times Square Tower
7 Times Square
New York, NY 10036

Re:    **In re September 11 Litigation (21 MC 97)**
       **In re September 11 Property Damage and**
       **Business Loss Litigation (21 MC 101)**

Dear Des:

At the March 22 conference before Judge Hellerstein Joe Wayland agreed to provide plaintiffs with a side letter containing the Aviation Defendants' best good faith representation of the government witnesses that the Aviation Defendants want to depose as part of their "targeted witness by witness approach." Transcript, p. 53.

We would like this information promptly so we can consider it in connection with our response to the pending Motion for Focused Discovery from the Government.

Thanks.

Very truly yours,

Marc S. Moller
Plaintiffs' Liaison Counsel

MSM:fg
cc:    WD/PI Plaintiffs' Counsel (Via Facsimile)

Exhibit 3

# CONDON & FORSYTH LLP

NEW YORK
LOS ANGELES

Direct Dial: (212) 894-6770
Direct Fax:  (212) 894-6771
dbarry@condonlaw.com

May 15, 2007

**VIA EMAIL**

Marc S. Moller, Esq.
Kreindler & Kreindler LLP
100 Park Avenue
New York, New York 10017

Re:     In re September 11 Litigation, 21 MC 97
        In re September 11 Property Damage and Business Loss Litigation, 21 MC 101
        C & F Ref:  DTB/CRC/VAT/28507

Dear Marc:

I write in response to your May 10, 2007 letter requesting the Aviation Defendants' "best good faith representation of the government witnesses that the Aviation Defendants want to depose."

As you may recall, the Aviation Defendants previously served notices for Rule 30(b)(6) depositions on the Federal Aviation Administration ("FAA"), the Transportation Security Administration ("TSA"), and the Boston Field Office of the Federal Bureau of Investigation ("FBI"). The Aviation Defendants also have requested depositions of several individual government witnesses, including:

1.     Jane Garvey, former FAA Administrator.

2.     Scott Billings, currently a Special Agent with the FBI assigned to the Stillwater, Oklahoma resident agency of the Oklahoma City Division of the FBI. Special Agent Billings formerly was assigned to the Joint Terrorist Task Force in Oklahoma City in August and September of 2001.

3.     Erik T. Rigler, formerly a Special Agent with the FBI.

4.     Michael Rolince, formerly the FBI Section Chief, International Terrorism Operations Section from 1998 to 2002.

5.     Coleen M. Rowley, formerly a Special Agent and Minneapolis Chief Division Counsel with the FBI.

CONDON & FORSYTH LLP

Marc S. Moller, Esq.
May 15, 2007
Page 2

6.  Harry Samit, currently a Special Agent with the FBI assigned to the Minneapolis
    Field Office. In the summer and autumn of 2001, Special Agent Samit was assigned
    to the Minneapolis Field Office and the Joint Terrorism Task Force.

7.  The witness identified as "John" in *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB)
    (E.D.Va.). In 2001, John was the Deputy Chief of the Usama Bin Ladin Unit at the
    Central Intelligence Agency ("CIA") and was detailed to the FBI Headquarters in the
    International Terrorism Operations Section ("ITOS").

8.  The witness identified as "Mary" in *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB)
    (E.D.Va.). Mary was an FBI agent detailed to the Usama Bin Ladin Unit in the
    Counterterrorism Section ("CTC") of the CIA from 1988 through 2001.

9.  Ramzi Binalshibh, currently in the custody of the United States at a facility located at
    the U.S. Naval Base, Guantanamo Bay, Cuba.

10. Khalid Sheikh Mohammed, also currently in the custody of the United States at a facility
    located at the U.S. Naval Base, Guantanamo Bay, Cuba.

Although the FBI and CIA have denied most of the deposition requests, the Aviation Defendants
may challenge the rejections before Judge Hellerstein. Depending upon the outcome of any such
proceedings, the Aviation Defendants may then seek to depose additional FBI and CIA witnesses.
In addition, for the reasons set forth in the May 7, 2007 letter from Roger Podesta to Assistant
United States Attorney, Jeannette Vargas (a copy of which is enclosed), the Aviation Defendants
are not in a position at this time to provide you with the names of additional FAA and TSA witnesses
that we intend to depose in connection with this litigation. Similarly, we also are unable to provide
the names of additional witnesses that we intend to depose from other government agencies or who
are in government custody.

Best personal regards.

Sincerely yours,

Desmond T. Barry, Jr.
Aviation Defendants' Liaison Counsel

CONDON & FORSYTH LLP

Marc S. Moller, Esq.
May 15, 2007
Page 3

cc :    <u>Via Email</u>
    Robert A. Clifford, Esq.
    Timothy S. Tomasik, Esq.
    Clifford Law Offices, P.C.
    Property Plaintiffs' Liaison Counsel

    Richard A. Williamson, Esq. .
    M. Bradford Stein, Esq.
    Flemming Zulack Williamson Zauderer LLP
    Ground Defendants' Liaison Counsel

    Beth Jacob, Esq.
    Schiff Hardin LLP
    WTC 7 Ground Defendants' Liaison Counsel

    Beth E. Goldman, Esq.
    Sarah S. Normand, Esq.
    U.S. Attorney's Office

    Aviation Defendants' Counsel

Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                     :

IN RE SEPTEMBER 11 LITIGATION      :          21 MC 97 (AKH)

                                       :
----------------------------------------------------------X

### WTCP CROSS-CLAIM PLAINTIFFS' RESPONSE TO AVIATION DEFENDANTS' SECOND SET OF INTERROGATORIES TO 21 MC 97 PLAINTIFFS AND CROSS-CLAIM PLAINTIFFS

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiffs World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, 7 World Trade Company, L.P., ("WTCP Cross-Claim Plaintiffs") hereby object and respond to Aviation Defendants' ("Defendants") Second Set of Interrogatories to 21 MC 97 Plaintiffs and Cross-Claim Plaintiffs as follows:

### GENERAL RESPONSES AND OBJECTIONS

WTCP Cross-Claim Plaintiffs make the following general objections to the Interrogatories. These objections are stated here to avoid restating them for each Interrogatory. The assertion of the same, similar, or additional objections in response to a specific Interrogatory does not waive any of WTCP Cross-Claim Plaintiffs' general objections. WTCP Cross-Claim Plaintiffs reserve the right to amend or supplement these objections as may be appropriate.

WTCP Cross-Claim Plaintiffs' responses as set forth herein are based upon information presently known to them. These responses are provided prior to the completion of discovery, including depositions and responses to documentary demands. WTCP Cross-Claim Plaintiffs therefore reserve the right (a) to rely on any facts, documents, or other evidence which may develop or subsequently come to their attention, (b) to assert additional objections or

WTCP Cross-Claim Plaintiffs incorporate each of the foregoing general objections in their responses to each of Aviation Defendants' Interrogatories as if fully set forth therein.

## SPECIFIC RESPONSES TO INTERROGATORIES

INTERROGATORY NO. 1:  Do plaintiffs claim that any or all of the defendants had a duty to independently gather and assess terrorist threat info?  If so, set forth the basis for this claim.  Respond separately as to each defendant.

**RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein.  WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for a legal conclusion as to the duty owed by defendants, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure.  WTCP Cross-Claim Plaintiffs further object specifically to the phrases "gather and assess" and "terrorist threat info" as vague and ambiguous.  Without waiving their objections, and subject to them, WTCP Cross-Claim Plaintiffs respectfully refer defendants to Section 14 C.F.R. 108.18 and 108.19 of the Federal Aviation Regulations, Sections 12 (a) and (b) of the Air Carrier Standard Security Program ("ACSSP"), Section 6 of the Checkpoint Operations Guide, the opinion of this Court dated September 9, 2003 and to the common law.**

**INTERROGATORY NO. 2:** Do plaintiffs claim that any or all of the defendants had a duty to design countermeasures to address terrorist threats? If so, set forth the criteria that plaintiffs claim that the defendants should follow to decide which threats need to be addressed and, what defendants should do to respond to same. Respond separately as to each defendant.

**RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein. WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for a legal conclusion as to the duty owed by defendants, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure. Without waiving their objections, and subject to them, WTCP Cross-Claim Plaintiffs contend that Defendant air carriers, security companies, Massachusetts Port Authority and Boeing and their agents owed a duty to protect against the class of foreseeable hazards to prevent harm not only to passengers and crew, but also to ground victims.**

**INTERROGATORY NO. 3:** To whom do plaintiffs claim that any or all of the defendants owed a duty to provide security? Do plaintiffs claim that any or all of the defendants owed such a duty to persons and things to whom defendants had no contractual relationship and if so, do plaintiffs claim that this duty was the same? Set forth the basis for any such claims. Respond separately as to each defendant.

**RESPONSE:** WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein. WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for a legal conclusion as to the duty owed by defendants, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure. Without waiving their objections, and subject to them, WTCP Cross-Claim Plaintiffs are within the classes of persons to whom defendants owed a duty of care. By way of further response to this Interrogatory, defendants are referred to the Opinion of this Court dated September 9, 2003.

**INTERROGATORY NO. 4:**  Do plaintiffs claim that any or all of the defendants had a duty to provide 100% screening of prohibited and/or restricted items and, if not, what percentage of these items do plaintiffs claim the defendants should have "reasonably" detected? Set forth the basis for any such claims. Respond separately as to each defendant.

**RESPONSE:** WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein. WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for a legal conclusion as to the duty owed by defendants, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure. Without waiving their objections, and subject to them, WTCP Cross-

Claim Plaintiffs respond that defendants owed a duty to exercise the degree of care required under the circumstances including the duty to comply with all applicable provisions of law, including Section 2A of the ACSSP.

INTERROGATORY NO. 5: Do plaintiffs claim that any or all of the defendants breached a duty to anyone or anything by only using screening equipment and flight deck doors that were certified and approved by the FAA? If so, set forth the basis for any such claims. Respond separately as to each defendant.

RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein. WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for a legal conclusion, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure. Without waiving these objections and subject to them, WTCP Cross-Claim Plaintiffs respond that the FAA set minimum standards, and the Defendants owed a duty to implement those protective measures they knew or should have known were required under the circumstances.

INTERROGATORY NO. 6: What are the "reasonable measures to ensure the subject aircraft were safe and secure from danger," as alleged in paragraph 117 of the Complaint, which plaintiffs claim the defendants should have taken before September 11, 2001 but did not take? Respond separately as to each defendant.

8

RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein. WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for a legal conclusion, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure. Without waiving these objections and subject to them, WTCP Cross-Claim Plaintiffs respectfully refer defendants to the allegations made in their Master Complaints, and state further that the measures defendants failed to implement to ensure the subject aircraft were safe and secure from danger included but are not limited to:

Failing to adequately develop, operate, maintain, supervise and control an airline and airport security system that would ensure the safety of and protect passengers and the public, including WTCP Cross-Claim Plaintiffs, against criminal violence, air piracy and terrorism;

Failing to adequately train, staff and equip the subject airports' airline and airport security systems;

Failing to improve and/or heighten airline and airport security despite knowledge and prior warnings of numerous security deficiencies, breaches, lapses, and criminal and terrorist threats to airline security;

Failing to maintain watch lists of suspected terrorist, hijackers and other persons who could be considered a threat;

Failing to prevent unauthorized persons from gaining and exercising physical control of the aircraft;

Failing to follow appropriate procedures for responding to attacks upon flight crew by passengers;

Failing to properly screen and/or profile the hijackers, allowing them aboard the subject aircraft and allowing them to bring dangerous weapons onto the subject aircraft;

Failing to prevent entry into the sterile area of items that were not supposed to get past the security checkpoint;

Failing to adhere to proper security procedures, including FAA and internal airline/security guidelines, and other security directives;

Failing to properly scrutinize the hijackers' tickets, identification documents and ticket purchase information and failing to follow appropriate procedures for asking required security questions;

Failing to properly monitor security checkpoints, x-ray machines, metal detectors and hand wands;

Failing to install state of the art security equipment and systems to prevent hijacking and the boarding of persons constituting a threat to airline safety, and routinely failing to detect dangerous weapons in undercover investigations;

Failing to maintain security equipment and systems in proper working order;

Failing to adequately protect the subject aircraft cockpits from unauthorized entry;

Failing to prevent the hijackers from entering the cockpits;

Failing to implement adequate safety and security measures to prevent hijacking or other criminal acts;

Failing to equip the aircraft with secure cockpit doors and adequate locking mechanisms;

Failing to prevent armed terrorists from gaining access to the aircraft, bringing weapons and dangerous items onto the aircraft and crashing those aircraft into the World Trade Center;

Failing to prevent terrorists from gaining access to airplanes with items that were prohibited in the sterile area and known to present a danger, including mace and/or pepper spray, prohibited knives, box cutters, and real and/or fake bombs; and

Being otherwise negligent, engaging in conduct that was negligent per se, reckless, wrongful, unlawful, careless, willful and/or in conscious disregard of the rights and property of the crew and passengers, and persons and property on the ground, including WTCP Cross-Claim Plaintiffs.

WTCP Cross-Claim Plaintiffs reserve the right to amplify their response to this

Interrogatory as discovery progresses.

INTERROGATORY NO. 7:  What are the elements of the "adequate airline and airport security systems" at airports that plaintiffs claim the defendants should have developed, implemented and maintained before September 11, 2001 but failed to develop, implement and maintain, as alleged in paragraph 2 of the Complaint?  Respond separately as to each defendant.

**RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein.  WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for a legal conclusion, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure.  Without waiving these objections and subject to them, WTCP Cross-Claim Plaintiffs respectfully refer defendants to the allegations made in the various complaints filed 21 MC 97 and 21 MC 101, and state that measures defendants failed to implement to ensure the subject aircraft were safe and secure from danger included:**

> **Failing to adequately develop, operate, maintain, supervise and control an airline and airport security system that would ensure the safety of and protect passengers and the public, including WTCP Cross-Claim Plaintiffs, against criminal violence, air piracy and terrorism;**
>
> **Failing to adequately train, staff and equip the subject airports' airline and airport security systems;**
>
> **Failing to improve and/or heighten airline and airport security despite knowledge and prior warnings of numerous security deficiencies, breaches, lapses, and criminal and terrorist threats to airline security;**
>
> **Failing to maintain watch lists of suspected terrorist, hijackers and other persons who could be considered a threat;**

Failing to prevent unauthorized persons from gaining and exercising physical control of the aircraft;

Failing to follow appropriate procedures for responding to attacks upon flight crew by passengers;

Failing to properly screen and/or profile the hijackers, allowing them aboard the subject aircraft and allowing them to bring dangerous weapons onto the subject aircraft;

Failing to prevent entry into the sterile area of items that were not supposed to get past the security checkpoint;

Failing to adhere to proper security procedures, including FAA and internal airline/security guidelines, and other security directives;

Failing to properly scrutinize the hijackers' tickets, identification documents and ticket purchase information and failing to follow appropriate procedures for asking required security questions;

Failing to properly monitor security checkpoints, x-ray machines, metal detectors and hand wands;

Failing to install state of the art security equipment and systems to prevent hijacking and the boarding of persons constituting a threat to airline safety, and routinely failing to detect dangerous weapons in undercover investigations;

Failing to maintain security equipment and systems in proper working order;

Failing to adequately protect the subject aircraft cockpits from unauthorized entry;

Failing to prevent the hijackers from entering the cockpits;

Failing to implement adequate safety and security measures to prevent hijacking or other criminal acts;

Failing to equip the aircraft with secure cockpit doors and adequate locking mechanisms;

Failing to prevent armed terrorists from gaining access to the aircraft, bringing weapons and dangerous items onto the aircraft and crashing those aircraft into the World Trade Center;

Failing to prevent terrorists from gaining access to airplanes with items that were prohibited in the sterile area and known to present a danger, including mace and/or pepper spray, prohibited knives, box cutters, and real and/or fake bombs; and

Being otherwise negligent, engaging in conduct that was negligent per se, reckless, wrongful, unlawful, careless, willful and/or in conscious disregard of the rights and property of the crew and passengers, and persons and property on the ground, including WTCP Cross-Claim Plaintiffs.

WTCP Cross-Claim Plaintiffs reserve the right to amplify their response to this Interrogatory as discovery progresses.

INTERROGATORY NO. 8: Describe the "adequate safety and security measures" and "proper screen[ing] and/or profil[ing]" which would have prevented the hijackers from boarding "the subject aircraft with dangerous weapons" and that plaintiffs claim the defendants should have implemented before September 11, 2001, but failed to implement as alleged in paragraphs 119(d) and (k) of the Complaint? Respond separately as to each defendant.

RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein. WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for a legal conclusion, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure. Without waiving their objections and subject to them, WTCP Cross-Claim Plaintiffs respectfully refer defendants, *inter alia,* to the Air Carrier Standard Security Program, Checkpoint Operations Guide, and 49 U.S.C. 44902(b).

**INTERROGATORY NO. 12:**  What actions do plaintiffs contend defendants should have taken, or were required to take, but failed to take prior to September 11, 2001 to respond to the information identified in response to Interrogatory Numbers 10 and 11? Respond separately as to each defendant.

**RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein, as well as all objections set forth in response to Interrogatory Numbers 10 and 11.  WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for legal conclusions, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure.  Without waiving their objections and subject to them, WTCP Cross-Claim Plaintiffs respond that defendants failed to detect or adequately facilitate detecting any of nineteen hijackers boarding flights that defendants were responsible for securing, failed to prevent any of the nineteen hijackers from bringing weapons and prohibited items onto the aircraft, and failed to prevent such hijackers from commandeering the aircraft and crashing them into the World Trade Center, the Pentagon, and the field in Shanksville, Pennsylvania.**

**Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for legal conclusions, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure.**

INTERROGATORY NO. 29: What actions do plaintiffs contend defendants should have taken but failed to take and/or what actions do plaintiffs contend defendants took but negligently performed, with respect to the check-in or ticketing procedures applied to the terrorists on September 11, 2001? Respond separately as to each defendant.

**RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein. WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for legal conclusions, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure.**

INTERROGATORY NO. 30: Do plaintiffs claim that defendants acted in a negligent or improper manner in processing Mohammad Atta's or Abdulaziz al Omari's baggage at Portland International Jetport on September 11, 2001. If so, state all facts that support plaintiffs' claims. Respond separately as to each defendant.

**RESPONSE:** WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein. WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for legal conclusions, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure. Without waiving their objections and subject to them, WTCP Cross-Claim Plaintiffs respond as follows: Yes. Given the facts surrounding the check-in of Atta and al Omari, including suspicions of U.S. Airways' ticket agent at check-in, Atta's and al Omari's baggage should have been inspected and these bags and passengers should have been denied boarding pursuant to 49 U.S.C. 44902(b), whereby the air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety.

**INTERROGATORY NO. 31:** What actions do plaintiffs contend defendants should have taken but failed to take with respect to the application of the CAPPS program to the terrorists on September 11, 2001? Respond separately as to each defendant.

**RESPONSE:** WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein. WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for legal conclusions, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for

INTERROGATORY NO. 36:  What actions do plaintiffs claim defendants should have taken before September 11, 2001 but failed to take to protect the hijacked aircrafts' cockpit from unauthorized entry, as alleged in paragraph 119 of the Complaint?  Respond separately as to each defendant.

**RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein.  WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for legal conclusions, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure.  Without waiving their objections and subject to them, WTCP Cross-Claim Plaintiffs respond that in addition to the measures stated heretofore, defendants should have exercised the degree of care required by law, including regulatory provisions requiring that hijackers not be given unauthorized access to the cockpit, and that cockpit doors be sufficiently strong and secure to prevent forced or unauthorized entry.**

INTERROGATORY NO. 37:  What actions do plaintiffs claim defendants should have taken before September 11, 2001 but failed to take to prevent the terrorists from entering the hijacked aircrafts' flight deck, as alleged in paragraph 119 of the Complaint?  Respond separately as to each defendant.

**RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein.  WTCP Cross-Claim Plaintiffs further object upon the grounds the**

INTERROGATORY NO. 39:   Do plaintiffs claim that any of the actions or omissions taken by defendants on September 11, 2001 violated the Common Strategy as set forth in the appendices to the Air Carrier Standard Security Programs of American Airlines and United Airlines?  If so, identify the specific actions or omissions that violated the Common Strategy.  State all facts and the source of each fact that plaintiffs rely on in making such allegations.  Respond separately as to each defendant.

**RESPONSE: WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein.  WTCP Cross-Claim Plaintiffs further object upon the grounds the Interrogatory is vague, ambiguous and defective in its form, it is an improper contention interrogatory, it improperly calls for legal conclusions, it calls for information that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony, and it violates Rules 33.3 (b) and (c) of the Local Rules and Rule 33(a) of the Federal Rules of Civil Procedure.  WTCP Cross-Claim Plaintiffs also object to the Interrogatory insofar as it may be deemed to suggest that any compliance with the Common Strategy is a defense to WTCP Cross-Claim Plaintiffs' claims.  Without waiving their objections and subject to them, WTCP Cross-Claim Plaintiffs respond that Defendants breached their duty of care by, among other things, employing procedures that were no longer appropriate given the existing threat to civil aviation.  WTCP Cross-Claim Plaintiffs do not presently have full access to the ACSSP, have received virtually no discovery on the "Common Strategy" and therefore reserve their right to amplify their response to this Interrogatory.**

additional discovery, it improperly calls for information that will be the subject of expert testimony and violates Rules 33.3 (b) of the Local Rules of the Southern District of New York. WTCP Cross-Claim Plaintiffs further note the paucity of information produced by Defendants to date on the subject matter of this Interrogatory.

INTERROGATORY NO. 48: What training do plaintiffs contend should have been provided to the cabin crew and/or the flight crew on the hijacked aircraft to prevent the September 11, 2001 hijacking? Respond separately as to each flight.

RESPONSE: WTCP Cross-Claim Plaintiffs need not respond to this Interrogatory which violates Rule 33(a) of the Federal Rules of Civil Procedure. WTCP Cross-Claim Plaintiffs incorporate all general objections as if fully set forth herein. WTCP Cross-Claim Plaintiffs further object upon the grounds this Interrogatory is unduly burdensome, calls for a degree of specificity that cannot be supplied at this time without the benefit of additional discovery, it improperly calls for information that will be the subject of expert testimony and violates Rules 33.3 (b) of the Local Rules of the Southern District of New York. WTCP Cross-Claim Plaintiffs further note the paucity of information produced by Defendants to date on the subject matter of this Interrogatory. Without waiving their objections and subject to them, WTCP Cross-Claim Plaintiffs respond as follows: the cabin crews and/or flight crews should have received training consistent with the known threat to civil aviation on September 11, 2001, including training that would have allowed them to respond or react to the hijackings that occurred on September 11th and the threat to civil aviation that existed at that time.

Exhibit 5

M. Bradford Stein (MS-9510)
FLEMMING, ZULACK & WILLIAMSON, LLP
One Liberty Plaza, 35th Floor
New York, New York 10006-1404
(212) 412-9500

Attorneys for Defendant-Cross-Claim Plaintiff:
    World Trade Center Properties LLC;
Additional Cross-Claim Plaintiffs:
    1 World Trade Center LLC
    5 World Trade Center LLC
    7 World Trade Company, L.P.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                            :
In re SEPTEMBER 11, 2001 LITIGATION    :    21 MC 97 (AKH)
                            :
-------------------------------------------------------X   **Jury Trial Demanded**

## AMENDED CROSS-CLAIMS BY THE WTCP ENTITIES AGAINST CERTAIN DEFENDANTS IN PLAINTIFFS' AMENDED FLIGHT 11 MASTER LIABILITY COMPLAINT

### Preliminary Statement

1.      Defendant and cross-claim plaintiff World Trade Center Properties LLC ("WTC

Properties LLC") and additional cross-claim plaintiffs 1 World Trade Center LLC, 5 World

Trade Center LLC and 7 World Trade Company, L.P. (all four entities are collectively referred to

as "the cross-claim plaintiffs" or "The WTCP Entities"), by their attorneys Flemming, Zulack &

Williamson, LLP, hereby cross-claim against certain of the defendants (collectively referred to as

"the cross-claim defendants"), see ¶¶ 11-40, *infra,* that are named in "Plaintiffs' Amended Flight

11 Master Liability Complaint," dated March 31, 2004 (the "complaint").

## CROSS-CLAIM ONE FOR NEGLIGENCE

### THE WTCP ENTITIES AGAINST THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS AND MASSPORT

41.     Each and every allegation contained in each of the foregoing paragraphs is realleged as if fully set forth herein.

42.     Upon information and belief, on and prior to September 11, 2001, THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY DEFENDANTS and MASSPORT, through their agents, servants, officers, employees, designees and/or contractors, jointly and severally, undertook and did develop, implement, own, operate, manage, supervise, staff, equip, maintain, control and/or oversee the airline and airport security systems at the Portland Jetport and Logan Airport (including, but not limited to, passenger screening, security checkpoint operations, pre-boarding passenger and luggage inspections, controlling access to secure areas and other security activities, ticketing purchase and check-in procedures and passenger identification and document checks for aircrafts and flights), to ensure the safety of air passengers and the non-passenger public on the ground from, *inter alia*, harm as the result of hijackings and intentional crashes. As such, they owed the cross-claim plaintiffs a duty to establish, operate, and maintain such security systems in a non-negligent and non-reckless manner.

43.     On and prior to September 11, 2001, the United States Department of Transportation, through the Federal Aviation Administration, licensed THE AIRLINE CROSS-CLAIM DEFENDANTS and THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS as commercial air common carriers that were authorized to transport passengers for hire. Pursuant to this license each had a legal obligation to comply with all federal statutes,

10

rules, regulations and environmental directives. Each had a duty, both jointly and severally, to maintain the highest degree of care when providing airport and airline security to protect both their passengers and the general public (including the cross-claim plaintiffs herein) from harm as a result of the hijacking of and intentional crash of an aircraft.

44.    Upon information and belief, AMERICAN was, on and prior to September 11, 2001, a common carrier engaged in the business of transporting passengers by air and was operating regularly scheduled flights from Portland Jetport and Logan Airport. AMERICAN operated a Boeing 767 aircraft, registration no. N334AA, designated as Flight 11 ("Flight 11"), which departed from Logan Airport with an intended destination of Los Angeles International Airport, California. Flight 11 was hijacked and thereafter intentionally crashed by the hijackers into One World Trade Center on September 11, 2001. The crash destroyed that building along with the nearby buildings, Five World Trade Center and Seven World Trade Center.

45.    Upon information and belief, on September 11, 2001, COLGAN and US AIRWAYS were common carriers engaged in the business of transporting passengers by air and were operating regularly scheduled flights from Portland Jetport and Logan Airport.

46.    Upon information and belief, on September 11, 2001, COLGAN, operating as US Airways Flight 5930, a regularly scheduled passenger flight for hire, carried certain of the American Flight 11 hijackers from Portland Jetport to Logan Airport. COLGAN's aircraft displayed a US AIRWAYS logo, trade dress, paint scheme and livery, under the full actual and apparent authority, knowledge and consent of US AIRWAYS.

47.    Upon information and belief, COLGAN and US AIRWAYS are jointly, severally and contractually responsible by and through their agents, employees and contractors, for maintaining the airline and airport security systems at Portland Jetport and Logan Airport.

48.    Upon information and belief, on and before September 11, 2001, THE

SECURITY COMPANY CROSS-CLAIM DEFENDANTS were corporations or entities, who

under the authority and the direction of THE AIRLINE CROSS-CLAIM DEFENDANTS, THE

NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, and MASSPORT, engaged in the

business of, and separately and collectively assumed responsibility for, implementing,

developing, owning, operating, managing, maintaining and supervising the airline and airport

security systems at Portland Jetport and Logan Airport.

49.    Upon information and belief, on and prior to September 11, 2001, THE

SECURITY COMPANY CROSS-CLAIM DEFENDANTS and MASSPORT, by their

respective officers, agents, employees, servants and/or representatives selected, hired, trained,

instructed and supervised the security checkpoint screeners, metal detector and x-ray machine

monitors and others who operated, maintained and controlled the security checkpoints at

Portland Jetport and/or Logan Airport.

50.    On September 11, 2001, hijackers penetrated the airline and airport security

systems, including the screening systems at the Portland Jetport and Logan Airport that were

designed to prevent weapons from being taken onto aircraft.  The hijackers, nevertheless, were

able to board Flight 5930 and Flight 11, respectively, carrying dangerous and deadly weapons.

These hijackers entered the unprotected cockpit of Flight 11 and took control of the aircraft.

While under the control of the hijackers, the aircraft was operated in an unusual and extreme

manner.  No system was in place that would have prevented the hijackers from operating the

aircraft or which would automatically notify the Cross-Claim Defendants or the government that

the authorized pilots were no longer in control of the aircraft.  The hijackers were unimpeded in

their criminal act of crashing Flight 11 into One World Trade Center, which caused, *inter alia,*

12

the collapse and destruction of that building and the nearby buildings, Five World Trade Center and Seven World Trade Center.

51.     THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS, and MASSPORT each owed a duty to The WTCP Entities, as persons with a property interest in World Trade Center buildings, to take reasonably effective countermeasures to prevent persons from bringing weapons aboard an aircraft and from entering into the cockpit and taking over the flight controls of a commercial aircraft. They also owed a duty to The WTCP Entities to have a system in place that would automatically notify them and the government whenever unauthorized persons were flying the aircraft.

52.     THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS, and MASSPORT negligently and/or recklessly breached their joint and several duties owed to The WTCP Entities, which breaches proximately caused the injury and death of persons in and near One World Trade Center on September 11, 2001, and the destruction of One World Trade Center, Five World Trade Center and Seven World Trade Center. They were negligent and reckless, *inter alia*, in failing to screen passengers to protect against weapons and/or potential weapons from being brought onto an aircraft, in failing to protect against unlawful entry by hijackers into the cockpit of Flight 11; in failing to protect against the hijackers flying the plane after they had gained entry; and in failing to install an automatic notification system to signal when the authorized pilots were no longer operating the aircraft.

53.     As a consequence, The WTCP Entities have been deprived, and continue to be deprived, of the use and benefit of their property interests, including but not limited to, the ability

to use the buildings and to receive the rental income therefrom, from September 11, 2001 until

the office space is rebuilt and rented.  Therefore, THE AIRLINE CROSS-CLAIM

DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE

SECURITY COMPANY CROSS-CLAIM DEFENDANTS, and MASSPORT are jointly and

severally liable for all damages sustained by The WTCP Entities.  The WTCP Entities are

entitled to recover their damages from them to the full extent allowed under applicable federal

and state law.

### CROSS-CLAIM TWO FOR NEGLIGENT SELECTION

### THE WTCP ENITITES AGAINST THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS AND MASSPORT

54.     Each and every allegation contained in each of the foregoing paragraphs is

realleged as if fully set forth herein.

55.     THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER

CROSS-CLAIM AIRLINE DEFENDANTS, and MASSPORT had, on and before September 11,

2001, a nondelegable duty to the traveling public and to The WTCP Entities to exercise

reasonable care in the selection of a competent and reasonably careful security system

contractor(s).

56.     THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER

AIRLINE CROSS-CLAIM DEFENDANTS, and MASSPORT breached this duty when they

employed THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS to work as security

system contractors at Portland Airport and Logan Airport.

57.     Upon information and belief, THE SECURITY COMPANY CROSS-CLAIM

DEFENDANTS had a well-documented record of incompetent and careless operation and

maintenance of their contractual security service operations over many years, according to the FAA "Red Team" audits and other independent checks on the effectiveness of their security systems.

58.    The failure of THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, and MASSPORT to exercise reasonable care to select competent and careful security system contractors was a proximate cause of the hijacking and crash of Flight 11 on September 11, 2001, of the personal injuries and wrongful deaths sustained by persons in and near One World Trade Center on September 11th, and of the destruction of One World Trade Center, Five World Trade Center and Seven World Trade Center.

59.    As a consequence, The WTCP Entities have been deprived, and continue to be deprived, of the use and benefit of their property interests, including but not limited to, the ability to use the buildings and to receive the rental income therefrom, from September 11, 2001 until the office space is rebuilt and rented. Therefore, THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, and MASSPORT are jointly and severally liable for all damages sustained by The WTCP Entities. The WTCP Entities are entitled to recover their damages from them to the full extent allowed under applicable federal and state law.

### CROSS-CLAIM THREE BASED ON *RES IPSA LOQUITUR*

### THE WTCP ENTITIES AGAINST THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS AND MASSPORT

60.    Each and every allegation contained in each of the foregoing paragraphs is realleged as if fully set forth herein.

15

entitled to recover these damages from them to the full extent allowed under applicable federal and state law.

## CROSS-CLAIM FIVE FOR NEGLIGENT DESIGN AND/OR MANUFACTURE

### THE WTCP ENTITIES AGAINST THE
### BOEING COMPANY, AMERICAN AND AMR

70.     Each and every allegation contained in each of the foregoing paragraphs is realleged as if fully set forth herein.

71.     Upon information and belief, on and before September 11, 2001 BOEING was engaged in the business of designing and manufacturing aircraft to be used to transport passengers and crew by common carriers throughout the world.  The aircraft, including the cockpit environment, cockpit doors and cockpit locking mechanisms used for AMERICAN Flight 11 on September 11, 2001 were designed by AMERICAN, operating under the control of AMR, in conjunction with BOEING, and were manufactured by BOEING in accordance with the design specifications.  Additionally, AMERICAN, under the control of AMR, in conjunction with BOEING designed the systems used to operate the aircraft.  BOEING manufactured these systems according to the design specifications.

72.     AMERICAN and AMR owed the public, including The WTCP Entities, a duty to design the aircraft used in Flight 11, and BOEING owed the public, including The WTCP Entities, a duty to design and manufacture the aircraft used in Flight 11, in a way that hijackers could not gain access to the cockpit and/or could not take control of and fly the aircraft. Moreover, AMERICAN, AMR, and BOEING owed the public, including The WTCP Entities, a duty to design and manufacture, respectively, a system that would, if hijackers succeeded in unlawfully operating and flying the aircraft, automatically notify AMERICAN and the government that unauthorized persons were in operational control of the aircraft.

19

73.     AMERICAN, AMR and BOEING negligently and recklessly breached their respective duties by defectively designing and manufacturing the cockpit and flight deck environment, including the door and accompanying locks, in a way that hijackers could gain entry and operate the aircraft.  Alternative and safer designs were available for a nominal increase in cost that would have prevented the hijackers from gaining access to the cockpit on Flight 11 and taking charge of the aircraft's controls.  AMERICAN, AMR and BOEING also negligently and recklessly breached their respective duties by defectively designing and manufacturing the aircraft's systems without putting in place a system that would automatically notify AMERICAN and the government when unauthorized persons were flying the aircraft.  Alternative designs were available for a nominal increase in cost that would have automatically notified AMERICAN and the government that unauthorized persons were illegally flying the aircraft.

74.     AMERICAN, AMR, and BOEING's negligent and reckless design and/or manufacture of the 767 aircraft used for Flight 11 were proximate causes of the destruction of The WTCP Entities' property interests at the World Trade Center on September 11, 2001.

75.     As a consequence, The WTCP Entities have been deprived, and continue to be deprived, of the use and benefit of their property interests, including but not limited to, the ability to use the buildings and to receive the rental income therefrom, from September 11, 2001 until the office space is rebuilt and rented.  Therefore, AMERICAN, AMR, and THE BOEING COMPANY are jointly and severally liable for all damages sustained by The WTCP Entities. The WTCP Entities are entitled to recover these damages from them to the full extent allowed under applicable federal and state law.

Exhibit 6

M. Bradford Stein (MS-9510)
FLEMMING, ZULACK & WILLIAMSON, LLP
One Liberty Plaza, 35th Floor
New York, New York  10006-1404
(212) 412-9500

Attorneys for Defendant-Cross-Claim Plaintiff:
     World Trade Center Properties LLC;
Additional Cross-Claim Plaintiffs:
     2 World Trade Center LLC
     4 World Trade Center LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                           :

In re SEPTEMBER 11, 2001 LITIGATION    :    21 MC 97 (AKH)
                                           :
------------------------------------------------------------X    **Jury Trial Demanded**

## CROSS-CLAIMS BY THE WTCP ENTITIES AGAINST CERTAIN DEFENDANTS IN PLAINTIFFS' AMENDED FLIGHT 175 MASTER LIABILITY COMPLAINT

### Preliminary Statement

1.     Defendant and cross-claim plaintiff World Trade Center Properties LLC ("WTC

Properties LLC") and additional cross-claim plaintiffs 2 World Trade Center LLC and 4 World

Trade Center LLC (all three entities are collectively referred to as "the cross-claim plaintiffs"

or "The WTCP Entities"), by their attorneys Flemming, Zulack & Williamson, LLP, hereby

cross-claim against certain of the defendants (collectively referred to as "the cross-claim

defendants"), see ¶¶ 10-40, *infra,* that are named in "Plaintiffs' Amended Flight 175 Master

Liability Complaint," dated March 31, 2004 (the "complaint").

## CROSS-CLAIM ONE FOR NEGLIGENCE

**THE WTCP ENTITIES AGAINST THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS AND MASSPORT**

41.    Each and every allegation contained in each of the foregoing paragraphs is realleged as if fully set forth herein.

42.    Upon information and belief, on and prior to September 11, 2001, THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY DEFENDANTS and MASSPORT, through their agents, servants, officers, employees, designees and/or contractors, jointly and severally, undertook and did develop, implement, own, operate, manage, supervise, staff, equip, maintain, control and/or oversee the airline and airport security systems at the Portland Jetport and Logan Airport (including, but not limited to, passenger screening, security checkpoint operations, pre-boarding passenger and luggage inspections, controlling access to secure areas and other security activities, ticketing purchase and check-in procedures and passenger identification and document checks for aircrafts and flights), to ensure the safety of air passengers and the non-passenger public on the ground from, *inter alia*, harm as the result of hijackings and intentional crashes. As such, they owed the cross-claim plaintiffs a duty to establish, operate, and maintain such security systems in a non-negligent and non-reckless manner.

43.    On and prior to September 11, 2001, the United States Department of Transportation, through the Federal Aviation Administration, licensed THE AIRLINE CROSS-CLAIM DEFENDANTS and THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS as commercial air common carriers that were authorized to transport passengers for hire. Pursuant to this license each had a legal obligation to comply with all federal statutes,

rules, regulations and environmental directives. Each had a duty, both jointly and severally, to maintain the highest degree of care when providing airport and airline security to protect both their passengers and the general public (including the cross-claim plaintiffs herein) from harm as a result of the hijacking of and intentional crash of an aircraft.

44.    Upon information and belief, UNITED was, on and prior to September 11, 2001, a common carrier engaged in the business of transporting passengers by air and was operating regularly scheduled flights from Portland Jetport and Logan Airport. UNITED operated the flight designated as Flight 175 ("Flight 175"), which departed from Logan Airport. Flight 175 was hijacked and thereafter intentionally crashed by the hijackers into Two World Trade Center on September 11, 2001. The crash destroyed that building along with the nearby building Four World Trade Center.

45.    Upon information and belief, on September 11, 2001, COLGAN and US AIRWAYS were common carriers engaged in the business of transporting passengers by air and were operating regularly scheduled flights from Portland Jetport and Logan Airport.

46.    Upon information and belief, on September 11, 2001, COLGAN, operating as US Airways Flight 5930, a regularly scheduled passenger flight for hire, carried certain of the United Flight 175 hijackers from Portland Jetport to Logan Airport. COLGAN's aircraft displayed a US AIRWAYS logo, trade dress, paint scheme and livery, under the full actual and apparent authority, knowledge and consent of US AIRWAYS.

47.    Upon information and belief, COLGAN and US AIRWAYS are jointly, severally and contractually responsible by and through their agents, employees and contractors, for maintaining the airline and airport security systems at Portland Jetport and Logan Airport.

48.     Upon information and belief, on and before September 11, 2001, THE

SECURITY COMPANY CROSS-CLAIM DEFENDANTS were corporations or entities, who

under the authority and the direction of THE AIRLINE CROSS-CLAIM DEFENDANTS, THE

NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, and MASSPORT, engaged in the

business of, and separately and collectively assumed responsibility for, implementing,

developing, owning, operating, managing, maintaining and supervising the airline and airport

security systems at Portland Jetport and Logan Airport.

49.     Upon information and belief, on and prior to September 11, 2001, THE

SECURITY COMPANY CROSS-CLAIM DEFENDANTS and MASSPORT, by their

respective officers, agents, employees, servants and/or representatives selected, hired, trained,

instructed and supervised the security checkpoint screeners, metal detector and x-ray machine

monitors and others who operated, maintained and controlled the security checkpoints at

Portland Jetport and/or Logan Airport.

50.     On September 11, 2001, hijackers penetrated the airline and airport security

systems, including the screening systems at the Portland Jetport and Logan Airport that were

designed to prevent weapons from being taken onto aircraft. The hijackers, nevertheless, were

able to board Flight 5930 and Flight 175, respectively, carrying dangerous and deadly weapons.

These hijackers entered the unprotected cockpit of Flight 175 and took control of the aircraft.

While under the control of the hijackers, the aircraft was operated in an unusual and extreme

manner. No system was in place that would have prevented the hijackers from operating the

aircraft or which would automatically notify the cross-claim defendants or the government that

the authorized pilots were no longer in control of the aircraft. The hijackers were unimpeded in

12

their criminal act of crashing Flight 175 into Two World Trade Center, which caused, *inter alia*, the collapse and destruction of that building and the nearby building Four World Trade Center.

51.     THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS, and MASSPORT each owed a duty to The WTCP Entities, as persons with a property interest in World Trade Center buildings, to take reasonably effective countermeasures to prevent persons from bringing weapons aboard an aircraft and from entering into the cockpit and taking over the flight controls of a commercial aircraft.  They also owed a duty to The WTCP Entities to have a system in place that would automatically notify them and the government whenever unauthorized persons were flying the aircraft.

52.     THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS, and MASSPORT negligently and/or recklessly breached their joint and several duties owed to The WTCP Entities, which breaches proximately caused the injury and death of persons in and near Two World Trade Center on September 11, 2001, and the destruction of Two World Trade Center and Four World Trade Center.  They were negligent and reckless, *inter alia*, in failing to screen passengers to protect against weapons and/or potential weapons from being brought onto an aircraft, in failing to protect against unlawful entry by hijackers into the cockpit of Flight 175; in failing to protect against the hijackers flying the plane after they had gained entry; and in failing to install an automatic notification system to signal when the authorized pilots were no longer operating the aircraft.

53.     As a consequence, The WTCP Entities have been deprived, and continue to be deprived, of the use and benefit of their property interests, including but not limited to, the ability

13

to use the buildings and to receive the rental income therefrom, from September 11, 2001 until the office space is rebuilt and rented. Therefore, THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS, and MASSPORT are jointly and severally liable for all damages sustained by The WTCP Entities. The WTCP Entities are entitled to recover their damages from them to the full extent allowed under applicable federal and state law.

## CROSS-CLAIM TWO FOR NEGLIGENT SELECTION

### THE WTCP ENITITES AGAINST THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS AND MASSPORT

54.     Each and every allegation contained in each of the foregoing paragraphs is realleged as if fully set forth herein.

55.     THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER CROSS-CLAIM AIRLINE DEFENDANTS, and MASSPORT had, on and before September 11, 2001, a nondelegable duty to the traveling public and to The WTCP Entities to exercise reasonable care in the selection of a competent and reasonably careful security system contractor(s).

56.     THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, and MASSPORT breached this duty when they employed THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS to work as security system contractors at Portland Airport and Logan Airport.

57.     Upon information and belief, THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS had a well-documented record of incompetent and careless operation and

maintenance of their contractual security service operations over many years, according to the FAA "Red Team" audits and other independent checks on the effectiveness of their security systems.

58.    The failure of THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, and MASSPORT to exercise reasonable care to select competent and careful security system contractors was a proximate cause of the hijacking and crash of Flight 175 on September 11, 2001, of the personal injuries and wrongful deaths sustained by persons in and near Two World Trade Center on September 11th, and of the destruction of Two World Trade Center and Four World Trade Center.

59.    As a consequence, The WTCP Entities have been deprived, and continue to be deprived, of the use and benefit of their property interests, including but not limited to, the ability to use the buildings and to receive the rental income therefrom, from September 11, 2001 until the office space is rebuilt and rented.  Therefore, THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, and MASSPORT are jointly and severally liable for all damages sustained by The WTCP Entities. The WTCP Entities are entitled to recover their damages from them to the full extent allowed under applicable federal and state law.

### CROSS-CLAIM THREE BASED ON *RES IPSA LOQUITUR*

### THE WTCP ENTITIES AGAINST THE AIRLINE CROSS-CLAIM DEFENDANTS, THE NON-CARRIER AIRLINE CROSS-CLAIM DEFENDANTS, THE SECURITY COMPANY CROSS-CLAIM DEFENDANTS AND MASSPORT

60.    Each and every allegation contained in each of the foregoing paragraphs is realleged as if fully set forth herein.

15

**CROSS-CLAIM FIVE FOR NEGLIGENT DESIGN AND/OR MANUFACTURE**

**THE WTCP ENTITIES AGAINST THE**
**BOEING COMPANY, UNITED AND UAL**

70.    Each and every allegation contained in each of the foregoing paragraphs is realleged as if fully set forth herein.

71.    Upon information and belief, on and before September 11, 2001 BOEING was engaged in the business of designing and manufacturing aircraft to be used to transport passengers and crew by common carriers throughout the world.  The aircraft, including the cockpit environment, cockpit doors and cockpit locking mechanisms used for UNITED Flight 175 on September 11, 2001 were designed by UNITED, operating under the control of UAL, in conjunction with BOEING, and were manufactured by BOEING in accordance with the design specifications.  Additionally, UNITED, under the control of UAL, in conjunction with BOEING designed the systems used to operate the aircraft.  BOEING manufactured these systems according to the design specifications.

72.    UNITED and UAL owed the public, including The WTCP Entities, a duty to design the aircraft used in Flight 175, and BOEING owed the public, including The WTCP Entities, a duty to design and manufacture the aircraft used in Flight 175, in a way that hijackers could not gain access to the cockpit and/or could not take control of and fly the aircraft. Moreover, UNITED, UAL, and BOEING owed the public, including The WTCP Entities, a duty to design and manufacture, respectively, a system that would, if hijackers succeeded in unlawfully operating and flying the aircraft, automatically notify UNITED and the government that unauthorized persons were in operational control of the aircraft.

73.    UNITED, UAL and BOEING negligently and recklessly breached their respective duties by defectively designing and manufacturing the cockpit and flight deck environment,

19

including the door and accompanying locks, in a way that hijackers could gain entry and operate the aircraft. Alternative and safer designs were available for a nominal increase in cost that would have prevented the hijackers from gaining access to the cockpit on Flight 175 and taking charge of the aircraft's controls. UNITED, UAL and BOEING also negligently and recklessly breached their respective duties by defectively designing and manufacturing the aircraft's systems without putting in place a system that would automatically notify UNITED and the government when unauthorized persons were flying the aircraft. Alternative designs were available for a nominal increase in cost that would have automatically notified UNITED and the government that unauthorized persons were illegally flying the aircraft.

74.    UNITED, UAL, and BOEING's negligent and reckless design and/or manufacture of the Boeing aircraft used for Flight 175 were proximate causes of the destruction of The WTCP Entities' property interests at the World Trade Center on September 11, 2001.

75.    As a consequence, The WTCP Entities have been deprived, and continue to be deprived, of the use and benefit of their property interests, including but not limited to, the ability to use the buildings and to receive the rental income therefrom, from September 11, 2001 until the office space is rebuilt and rented. Therefore, UNITED, UAL, and THE BOEING COMPANY are jointly and severally liable for all damages sustained by The WTCP Entities. The WTCP Entities are entitled to recover these damages from them to the full extent allowed under applicable federal and state law.

## CROSS-CLAIM SIX FOR CONTRIBUTION

## WTC PROPERTIES LLC AGAINST THE CROSS-CLAIM DEFENDANTS

76.    Each and every allegation contained in each of the foregoing paragraphs is realleged as if fully set forth herein.

Exhibit 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                          :          21 MC 101 (AKH)

IN RE SEPTEMBER 11, 2001 LITIGATION    :

                                            :         JURY TRIAL DEMANDED

-----------------------------------------------------------x

**FIFTH AMENDED MASTER PROPERTY COMPLAINT AGAINST**
**AIRLINE AND SECURITY COMPANY DEFENDANTS**

      Plaintiffs,[1] by their respective attorneys complaining of defendants[2] herein, upon knowledge as to themselves and their own acts, upon information and belief as to all other matters, and upon the opinion of this Court in *In re September 11, 2001 Litigation*, 280 F.Supp.2d 279 (S.D.N.Y. 2003), respectfully state and allege as set forth below. Plaintiffs believe that the information and belief allegations have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

---

[1]  The caption for each individual Complaint is attached as Appendix A. The counts incorporated from each individual Complaint into this Master Property Complaint Against Ground Defendants are set forth in Appendix A-1. To the extent any cause of action in any individual Complaint is not incorporated into this Fifth Amended Master Property Complaint or into the Master Property Complaint Against Ground Defendants, such causes of action shall be as set forth in the individual Complaint.

[2] The term "defendants" as used herein refers to those defendants being sued by each plaintiff, respectively, as set forth in Appendices A and B. Several plaintiffs that are a party to this master complaint do not allege fault or liability on the part of the Massachusetts Port Authority ("Massport"). Only certain complaints, as set forth in Appendix C, allege Massport's fault or liability. Therefore, any allegation containing a reference to Massport, or expressly or implicitly assigning fault or liability to Massport should not be attributed to any plaintiff other than those who assert claims against Massport as set forth in Appendix C.

## COUNT I

**CLAIM FOR DAMAGES AGAINST THE AIRLINE DEFENDANTS AND
THE SECURITY COMPANY DEFENDANTS BASED ON NEGLIGENCE**

115.   Plaintiffs repeat and restate each and every allegation contained in the foregoing
paragraphs as if fully set forth herein.

116.   Plaintiffs suing on this Count I, and the specific defendants complained against by
each of them, are set forth in Appendix C attached hereto.

117.   On and prior to September 11, 2001, and at all times pertinent hereto, the Airline
Defendants and the Security Company Defendants, by and through their officers, agents, employees,
servants or representatives, had an independent, joint and several, and nondelegable duty to plaintiffs
to safeguard the subject aircraft; to prevent hijackers from breaching the airline and airport security
systems and carrying dangerous weapons aboard the subject aircraft; to take reasonable measures to
ensure the subject aircraft were safe and secure from danger; and to prevent the operation of the
subject aircraft from causing injury or death to passengers and the public, or property damage to
plaintiffs, such as occurred on September 11, 2001.

118.   On and prior to September 11, 2001, and at all times pertinent hereto, the Airline
Defendants contracted for security services with the Security Company Defendants and others for all
flights departing from the subject airports.  The Airline Defendants breached the aforementioned
non-delegable duties of care owed to plaintiffs through these contracts with the Security Company
Defendants.

119.   On and prior to September 11, 2001, and at all times pertinent hereto, the Airline
Defendants and the Security Company Defendants, by and through their respective officers, agents,
employees, servants and/or representatives, also breached the aforementioned non-delegable duties

of care owed to plaintiffs by engaging in conduct that was reckless, negligent, wrongful, unlawful, careless, and/or in conscious disregard of the rights and safety of the passengers and the public, including plaintiffs and other property owners, by violating applicable rules and regulations, including Federal Aviation Regulations and industry standards, and further by creating unreasonable dangers, in that the Airlines Defendants and the Security Company Defendants:

(a)   Failed to adequately develop, operate, maintain, supervise and control an airline and airport security system that would ensure the safety of or protect passengers and the public, including plaintiffs and other property owners, against criminal violence, air piracy and terrorism;

(b)   Failed to adequately train, staff and equip the subject airports' airline and airport security systems;

(c)   Failed to improve and/or heighten airline and airport security despite knowledge and prior warnings of numerous security breaches, lapses, and terrorist threats to airline security;

(d)   Failed to properly screen and/or profile the hijackers and, consequently, allowed them aboard the subject aircraft with dangerous weapons;

(e)   Failed to adhere to proper security procedures, including FAA and internal airline/security guidelines, and other security directives;

(f)   Failed to properly scrutinize the hijackers' tickets and identification documents;

(g)   Failed to properly monitor security checkpoints, x-ray machines and metal detectors;

(h)   Failed to install state of the art security equipment and systems to prevent hijacking, and routinely failed to detect dangerous weapons in undercover investigations;

(i)   Failed to adequately protect the subject aircraft cockpits from unauthorized entry;

(j)   Failed to prevent the hijackers from entering the unprotected cockpits;

(k)   Failed to implement adequate safety and security measures to prevent hijacking;

(l)   Failed to equip the subject aircraft with secure cockpit doors and adequate locking mechanisms; and

(m)    Were otherwise negligent, and engaged in conduct that was negligent per se, reckless, wrongful, unlawful, careless, willful and/or in conscious disregard of the rights and property of the plaintiffs.

120.    It was foreseeable to the Airline Defendants and the Security Company Defendants that the aforementioned breaches of duties of care owed to plaintiffs could cause the property damage, business losses, and other related losses incurred by plaintiffs due to the damage to the Properties on September 11, 2001.

121.    As a direct and proximate result of the Airline Defendants' and the Security Company Defendants' breach of the aforementioned duties of care, the Properties suffered significant damages caused by the collapse of the subject buildings necessitating significant repair, replacement, restoration and/or rehabilitation.

122.    As a direct and proximate result of the conduct of all defendants, including Airline Defendants and the Security Company Defendants, plaintiffs sustained property damage, business losses, and other related losses. Therefore, all defendants are jointly and severally liable for damages sustained by plaintiffs, and plaintiffs are entitled to recover such damages to the extent allowed under applicable law.

## COUNT II

### CLAIM FOR DAMAGES AGAINST MASSPORT BASED ON NEGLIGENCE

123.    Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

124.    Plaintiffs suing on this Count II are set forth in Appendix C attached hereto.

125.    On and prior to September 11, 2001, and at all times pertinent hereto, Massport, by and through its officers, agents, employees, servants or representatives, had an independent and nondelegable duty to plaintiffs to safeguard the subject aircraft; to prevent hijackers from breaching

the airline and airport security systems and carrying dangerous weapons aboard the subject aircraft;

to take reasonable measures to ensure the subject aircraft were safe and secure from danger; and to

prevent the operation of the subject aircraft from causing injury or death to passengers and the

public, or property damage to plaintiffs, such as occurred on September 11, 2001.

126.    On and prior to September 11, 2001, and at all times pertinent hereto, Massport

contracted for security services with the Security Company Defendants and others for all flights

departing from the subject airports. Massport breached the aforementioned non-delegable duties of

care owed to plaintiffs through these contracts with the Security Company Defendants.

127.    On and prior to September 11, 2001, and at all times pertinent hereto, Massport, by

and through its officers, agents, employees, servants and/or representatives, also breached the

aforementioned non-delegable duties of care owed to plaintiffs by engaging in conduct that was

reckless, negligent, wrongful, unlawful, careless, and/or in conscious disregard of the rights and

safety of the passengers and the public, including plaintiffs and other property owners, by violating

applicable rules and regulations, including Federal Aviation Regulations and industry standards, and

further by creating unreasonable dangers, in that Massport:

(a)    Failed to adequately develop, operate, maintain, supervise and control an airline and
airport security system that would ensure the safety of or protect passengers and the
public, including plaintiffs and other property owners, against criminal violence, air
piracy and terrorism;

(b)    Failed to adequately train, staff and equip the subject airports' airline and airport
security systems;

(c)    Failed to improve and/or heighten airline and airport security despite knowledge and
prior warnings of numerous security breaches, lapses, and terrorist threats to airline
security;

(d)    Failed to properly screen and/or profile the hijackers and, consequently, allowed them
aboard the subject aircraft with dangerous weapons;

(e)    Failed to adhere to proper security procedures, including FAA and internal airline/security guidelines, and other security directives;

(f)    Failed to properly scrutinize the hijackers' tickets and identification documents;

(g)    Failed to properly monitor security checkpoints, x-ray machines and metal detectors;

(h)    Failed to install state of the art security equipment and systems to prevent hijacking, and routinely failed to detect dangerous weapons in undercover investigations;

(i)    Failed to adequately protect the subject aircraft cockpits from unauthorized entry;

(j)    Failed to prevent the hijackers from entering the unprotected cockpits;

(k)    Failed to implement adequate safety and security measures to prevent hijacking;

(l)    Failed to equip the subject aircraft with secure cockpit doors and adequate locking mechanisms; and

(m)    Were otherwise negligent, and engaged in conduct that was negligent per se, reckless, wrongful, unlawful, careless, willful and/or in conscious disregard of the rights and property of the plaintiffs.

128.    It was foreseeable to Massport that the aforementioned breaches of duties of care owed to plaintiffs could cause the property damage, business losses, and other related losses incurred by plaintiffs due to the damage to the Properties on September 11, 2001.

129.    As a direct and proximate result of Massport's breach of the aforementioned duties of care, the Properties suffered significant damages caused by the collapse of the subject buildings necessitating significant repair, replacement, restoration and/or rehabilitation.

130.    As a direct and proximate result of the conduct of all defendants, including Massport, plaintiffs sustained property damage, business losses, and other related losses.  Therefore, all defendants are jointly and severally liable for damages sustained by plaintiffs, and plaintiffs are entitled to recover such damages to the extent allowed under applicable law.

## COUNT III

## CLAIMS FOR DAMAGES AGAINST THE AIRLINE DEFENDANTS BASED ON NEGLIGENT HIRING, SELECTION, RETENTION AND SUPERVISION

131.    Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

132.    Plaintiffs suing on this Count III, and the specific defendants complained against by each of them, are set forth in Appendix C attached hereto.

133.    The Airline Defendants have a non-delegable duty to plaintiffs to provide competent and careful security of their terminal operations area and aircraft.

134.    On and prior to September 11, 2001, and at all times pertinent hereto, the Airline Defendants contracted for security services with the Security Company Defendants for all flights departing from the subject airports.

135.    The Security Company Defendants' work as security system contractors at the subject airports presents a risk of harm to persons and property on the ground unless reasonably performed.

136.    The Security Company Defendants had a record of incompetent and careless operation and maintenance of their contracted security service obligations over many years according to FAA audits and other independent checks on the effectiveness of their security systems.

137.    The Airline Defendants failed to exercise reasonable care in the hiring, selection, retention and supervision of competent and careful security system contractors.

138.    The Airline Defendants' failure to exercise reasonable care in the hiring, selection, retention and supervision of competent and careful security system contractors was a proximate cause of the property damage, business losses, and other related losses sustained by plaintiffs.

139.    As a direct and proximate result of the conduct of all defendants, including the Airline

Defendants, plaintiffs sustained property damage, business losses, and other related losses.

Therefore, all defendants are jointly and severally liable for damages sustained by each plaintiff and

each plaintiff is entitled to recover such damages to the extent allowed under applicable law.

### COUNT IV

**CLAIMS FOR DAMAGES AGAINST MASSPORT BASED ON
NEGLIGENT HIRING, SELECTION, RETENTION AND SUPERVISION**

140.    Plaintiffs repeat and restate each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

141.    Plaintiffs suing on this Count IV are set forth in Appendix C attached hereto.

142.    Massport has a non-delegable duty to plaintiffs to provide competent and careful

security of their terminal operations area and aircraft.

143.    On and prior to September 11, 2001, and at all times pertinent hereto, Massport

contracted for security services with the Security Company Defendants for all flights departing from

the subject airports.

144.    The Security Company Defendants' work as security system contractors at the subject

airports presents a risk of harm to persons and property on the ground unless reasonably performed.

145.    The Security Company Defendants had a record of incompetent and careless

operation and maintenance of their contracted security service obligations over many years according

to FAA audits and other independent checks on the effectiveness of their security systems.

146.    Massport failed to exercise reasonable care in the hiring, selection, retention and

supervision of competent and careful security system contractors.

147.    Massport's failure to exercise reasonable care in the hiring, selection, retention and supervision of competent and careful security system contractors was a proximate cause of the property damage, business losses, and other related losses sustained by plaintiffs.

148.    As a direct and proximate result of the conduct of all defendants, including Massport, plaintiffs sustained property damage, business losses, and other related losses. Therefore, all defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable law.

## COUNT V

### CLAIM FOR DAMAGES BASED ON RES IPSA LOQUITUR AGAINST THE AIRLINE DEFENDANTS AND THE SECURITY COMPANY DEFENDANTS

149.    Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

150.    Plaintiffs suing on this Count V, and the specific defendants complained against by each of them, are set forth in Appendix C attached hereto.

151.    The Airline Defendants and the Security Company Defendants, and each of them, had exclusive management and control of the subject aircraft and subject airports' security systems, which the terrorists penetrated on September 11, 2001, and whose actions resulted in property damage, business losses, and other related losses to plaintiffs.

152.    The penetrations of the subject airports' security systems, and the resulting hijackings of the subject aircraft, as set forth above, are such that in the ordinary course of events would not have occurred if the Airline Defendants and the Security Company Defendants had exercised ordinary care in the maintenance and operation of the security systems.

design was a proximate cause of the property damage, business losses, and other related losses sustained by plaintiffs.

181.    As a direct and proximate result of the conduct of all defendants, including Boeing, defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable law.

<u>COUNT X</u>

**CLAIMS FOR DAMAGES AGAINST
DEFENDANT BOEING BASED ON NEGLIGENT DESIGN**

182.    Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

183.    Plaintiffs suing on this Count X are set forth in Appendix C attached hereto.

184.    Defendant Boeing owed plaintiffs a duty of care in safely designing the subject aircraft and their component parts and systems, including secure cockpit doors and accompanying locks.

185.    Defendant Boeing breached this duty of care by, among other things, failing to design the subject aircraft cockpits, including doors and locking mechanisms, in a manner which would prevent hijackers and/or other passengers from accessing the cockpits. The subject aircraft cockpits, including doors and locking mechanisms, were insufficient to deter or prevent a hijacking.

186.    Defendant Boeing knew or should have known that the design of the subject aircraft and their component parts and systems, including but not limited to its cockpits, cockpit doors and locking mechanisms, was defective. Defendant Boeing failed to remedy this defect. In addition, Boeing knew or should have known that alternative and safer designs were available for a nominal

increase in cost, which would have prevented the terrorists from entering the cockpits on the subject aircraft.

187.    The defective design permitted the terrorists to easily gain access to the cockpits of the subject aircraft on September 11, 2001. The defective design was a proximate cause of the property damage, business losses, and other related losses sustained by plaintiffs.

188.    Plaintiffs sustained property damage, business losses, and other related losses as a direct and proximate result of Boeing's negligent design of the subject aircraft and their component parts and systems, including but not limited to cockpits, cockpit doors and locking mechanisms.

189.    As a direct and proximate result of the conduct of all defendants, including Boeing, defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable law.

## COUNT XI

### CLAIMS FOR DAMAGES AGAINST
### DEFENDANT BOEING BASED ON BREACH OF WARRANTY

190.    Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

191.    Plaintiffs suing on this Count XI are set forth in Appendix C attached hereto.

192.    Prior to September 11, 2001, defendant Boeing expressly and/or impliedly warranted and represented that the subject aircraft, and their component parts and systems, including, but not limited to, the subject aircraft structures, airframes, and cockpit doors, were airworthy, of merchantable quality, and/or fit and safe for the purposes for which they were designed, manufactured, assembled, inspected, tested, distributed, sold, serviced, maintained and/or repaired, intended, and used. Defendant Boeing further warranted that the subject aircraft, and their

Exhibit 8



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                       :
IN RE SEPTEMBER 11, 2001 LITIGATION        :        21 MC 97 (AKH)
                                                       :
-------------------------------------------------------x

## PLAINTIFFS' AMENDED FLIGHT 175 MASTER LIABILITY COMPLAINT

## (TWO WORLD TRADE CENTER CRASH)

Plaintiffs,[1] by their respective attorneys complaining of defendants herein, upon information and belief, respectfully state as and for their common liability allegations as follows:

## BACKGROUND

These actions seek damages on behalf of plaintiffs, the heirs and next of kin of decedents, and the Estates of decedents for the personal injuries to and wrongful deaths of the individuals who were killed in the hijacking and crash of United Air Lines Flight 175 (hereinafter "Flight 175") into Two World Trade Center (hereinafter "Two World Trade") as well as on behalf of those who were in Two World Trade or in the vicinity thereof and were killed as a result of the fires in and collapse of Two World Trade on September 11, 2001 and its aftermath.

In sum, these actions allege that for several years prior to September 11, 2001, the defendants named herein had actual knowledge of the fact that terrorist groups and individuals associated with them had publicly proclaimed a pathological hatred of the United States, its citizens and those who resided or traveled within or to its borders and vowed to kill Americans and to destroy American institutions and that airlines and

---

[1]     For ease of reference, a chart summarizing the litigants is attached as Appendix A.

## COUNT ONE

### CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND AND MASSPORT BASED ON NEGLIGENCE, NEGLIGENCE PER SE, RECKLESS CONDUCT, AND CONSCIOUS DISREGARD FOR RIGHTS AND SAFETY

116.  Plaintiffs incorporate by reference all prior allegations in this Complaint.

117.  On and prior to September 11, 2001,  THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND and MASSPORT, by their officers, agents, employees, servants or representatives had an independent, joint and several, nondelegable duty to safeguard Flight 175 and all other aircraft that operated at Portland Jetport and Logan Airport to prevent hijackers from carrying dangerous and deadly weapons capable of causing injury or death aboard the aircraft or otherwise threaten the safety of passengers and crew as well as people in buildings or on the ground who might suffer death or injury as a result of a crash.

118.  The defendants were jointly and severally required to secure Flight 175 from unreasonable dangers such as terrorist action aboard the aircraft, including hijacking, resulting in injuries or death to passengers and crew; and/or to operate the subject aircraft in a manner which would not result in injury or death to its passengers and crew as well as individuals in buildings or on the ground who might suffer death or injury at the hands of the terrorists or otherwise by a crash of the airplane.

- 28 -

119.    On and prior to September 11, 2001, THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND and MASSPORT, entered into contracts for security services for all flights departing from Portland Jetport and Logan Airport. These defendants had a duty to exercise the highest degree of care to prevent individuals carrying weapons from passing through security checkpoints at Portland Jetport and Logan Airport and prior to boarding aircraft there, and in recognition of that duty, voluntarily entered into contracts with THE SECURITY COMPANY DEFENDANTS to provide various airline and airport security services.

120.    By virtue of their negligence, THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND and MASSPORT breached their contracts to provide effective security at Portland Jetport and Logan Airport and to prevent security breaches which could cause injury or death to passengers, crew and individuals in buildings or on the ground who might suffer death or injury as a result of a deliberate crash.

121.    On September 11, 2001, hijackers penetrated said airline and airport security system at Portland Jetport and subsequently Logan Airport, brought dangerous weapons onto the Colgan aircraft and subsequently the UNITED aircraft and used said dangerous weapons to seize control of the UNITED aircraft and then crash it into Two World Trade Center injuring and killing decedents.

122.    On and prior to September 11, 2001, THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND, and MASSPORT, by their respective officers, agents,

- 29 -

XC-    007299

employees, servants and/or representatives, breached their duty to decedents and

engaged in conduct that was reckless, negligent, negligent per se, wrongful, unlawful,

careless, and willful and wanton in conscious disregard of the rights and safety of the

decedents by violating applicable rules and regulations, including Federal Aviation

Regulations; and further by creating unreasonable dangers to decedents in that THE

AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, THE

SECURITY COMPANY DEFENDANTS, PORTLAND, and MASSPORT:

- failed to implement, operate, maintain, supervise and control an adequate airline and airport security system that ensured the safety of and protected passengers and crew and persons on the ground or in buildings who might suffer injury or death upon improper or unauthorized operation of an aircraft against acts of criminal violence and air piracy;

- failed to adequately train, staff and equip Portland Jetport and Logan Airport's airline and airport security system;

- failed to improve airline and airport security despite knowledge and prior warnings of numerous security breaches and lapses and terrorist threats to airline security;

- failed to properly screen the hijackers and allowed them aboard the subject aircraft with dangerous and deadly weapons capable of causing injury or death;

- violated proper security procedures, including FAA and internal airline/security guidelines and other security directives;

- failed to properly scrutinize the hijackers' tickets and identification documents;

- failed to properly monitor security checkpoints, x-ray machines and metal detectors;

- failed to install state of the art security equipment and systems to prevent hijacking and routinely failed to detect dangerous and deadly weapons capable of causing injury or death in undercover investigations;

- 30 -

XC-    007300

- failed to adequately protect the subject aircraft's cockpit from unauthorized entry;

- failed to prevent the hijackers from entering the unprotected cockpit;

- failed to implement adequate safety and security measures to prevent hijacking;

- failed to equip the subject aircraft with a secure cockpit door and adequate locking mechanisms; and

- defendants were otherwise negligent, engaged in conduct that was negligent per se, reckless, wrongful, unlawful, careless, and/or willful in conscious disregard for rights and safety.

123. As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

124. Plaintiffs and the Estates of decedents and the heirs and next of kin of the decedents have sustained and are entitled to recover compensatory damages allowed under law, including damages for the value of decedents' life, loss of net earnings of the decedents, loss of probable support, future contributions and pecuniary benefits, loss of services, loss of inheritance of prospective accumulations, mental anguish, emotional pain and suffering, grief and sorrow, loss of society, companionship, comfort, protection, care, attention, advice, maintenance, counsel, guidance, and decedents' pre-death conscious pain, suffering and fear of death, loss of personal property, and funeral and burial expenses, and other damages.

- 31 -

XC -    007301

## COUNT TWO

### CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND, AND MASSPORT BASED ON NEGLIGENT SELECTION

125.   Plaintiffs incorporate by reference all prior allegations in this Complaint.

126.   On and prior to September 11, 2001, THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT had an independent and non-delegable duty to provide and maintain competent and careful security of their terminal operations area and aircraft.  In recognition of that duty, THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT subcontracted for security services to protect all flights departing from Portland Jetport and Logan Airport.

127.   THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT failed to exercise reasonable care in the selection of a competent and careful security system contractor by employing THE SECURITY COMPANY DEFENDANTS.

128.   THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT each had a duty or voluntarily undertook a duty through their contracts with THE SECURITY COMPANY DEFENDANTS to exercise the highest degree of care for the safety and security of all passengers and crew passing through security at Portland Jetport and Logan Airport.

129.   THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT each knew or should have known that

- 32 -

XC-    007302

the security screening systems and services at Portland Jetport and Logan Airport provided by THE SECURITY COMPANY DEFENDANTS were grossly inadequate and posed a severe danger to its aircraft, passengers, crew and the public. THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT knew or should have known that the security systems at Portland Jetport and Logan Airport had been demonstrated to be like a sieve frequently unable to detect dangerous and deadly weapons capable of causing injury or death in numerous evaluations.

130.    THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT knew or should have known that THE SECURITY COMPANY DEFENDANTS failed to adequately train their employees, hired illegal aliens, failed to conduct required criminal background checks, and routinely failed in undercover security evaluations to detect even the most obvious of dangerous and deadly weapons capable of causing injury or death.

131.    THE SECURITY COMPANY DEFENDANTS' work as security system contractors at Portland Jetport and Logan Airport presents a risk of physical harm and death unless skillfully and carefully performed commensurate with the threat of terrorist action.

132.    THE SECURITY COMPANY DEFENDANTS had a record of incompetent and careless operation and maintenance of their contracted security service obligations over many years according to FAA "Red Team" audits and other independent checks on the effectiveness of their security systems.

- 33 -

XC-    007303

133.   THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT's failure to remedy these known security lapses was a reckless, negligent and willful and wanton breach of their respective duties of care to all passengers and crew passing through Portland Jetport and Logan Airport and boarding aircraft there.

134.   THE AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND and MASSPORT's failure to exercise reasonable care in the selection, continued retention and supervision of competent and careful security systems and contractors were proximate contributing factors to the causes of decedents injuries, death and damages.

135.   As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by plaintiffs and plaintiffs are entitled to recover such damages to the extent allowed under applicable state law.

## COUNT THREE

### CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST DEFENDANT BOEING BASED ON STRICT TORT LIABILITY

136.   Plaintiffs incorporate by reference all prior allegations in this Complaint.

137.   The aforementioned aircraft was being used in an intended and foreseeable manner on the morning of September 11, 2001.

138.   Defendant BOEING defectively designed the cockpit or flight deck environment, including its door and accompanying locks of the subject aircraft. The design in use on September 11, 2001 in the subject aircraft was unreasonably

- 34 -

X C -    0 0 7 3 0 4

dangerous in that it could easily be penetrated by a determined passenger. The cockpit door was not secure and the accompanying locks were insufficient to deter or prevent unauthorized or unlawful entry to thwart a hijacking attack. Alternative and safer designs were available for a nominal increase in cost which would have prevented these terrorists from gaining access to the cockpit on Flight 175.

139.    This defective design permitted the terrorists to gain access to the cockpit of Flight 175 and hijack the aircraft. BOEING'S defective design was a proximate cause of the personal injuries to and death of decedents.

140.    As a direct and proximate result of the conduct of defendant BOEING, BOEING is jointly and severally liable for damages sustained by plaintiffs and plaintiffs are entitled to recover such damages to the extent allowed under applicable state law.

**COUNT FOUR**

**CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST DEFENDANT BOEING BASED ON NEGLIGENT DESIGN**

141.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

142.    Defendant BOEING owed all passengers and crew who fly on their aircraft and those persons on the ground or in buildings who might suffer injury or death as a result of improper or unauthorized operation of a BOEING aircraft, including decedents, a duty of care in safely designing the aircraft including a secure cockpit door and accompanying locks.

143.    Defendant BOEING recklessly and negligently breached this duty of care by failing to design the cockpit doors and accompanying locks to the subject aircraft in a manner which would prevent hijackers and/or other passengers from accessing the

- 35 -

XC-    007305

cockpit. The cockpit door on Flight 175 was not secure and the accompanying locks were insufficient to deter or prevent a hijacking.

144.    Defendant BOEING knew or should have known that the design of its cockpit door was defective. Defendant BOEING failed to remedy this defect. Defendant BOEING knew or should have known that alternative and safer designs were available for a nominal increase in cost which would have prevented these terrorists from entering the cockpit on Flight 175.

145.    This defective design permitted the terrorists to easily gain access to the Flight 175 cockpit on September 11, 2001 and was a proximate cause of the injuries to and deaths of decedents.

146.    As a direct and proximate result of the conduct of defendant BOEING, BOEING is jointly and severally liable for damages sustained by plaintiffs and plaintiffs are entitled to recover such damages to the extent allowed under applicable state law.

## COUNT FIVE

### CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST DEFENDANT BOEING BASED ON BREACH OF WARRANTY

147.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

148.    Prior to September 11, 2001, defendant BOEING expressly and/or impliedly warranted and represented that the subject aircraft and its component parts and systems, including, but not limited to, the subject aircraft's structure and airframe, including the subject aircraft's cockpit door, were airworthy, of merchantable quality, and/or fit and safe for the purposes for which they were designed, manufactured, assembled, inspected, tested, distributed, sold, serviced, maintained, and/or repaired,

- 36 -

Exhibit 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                               :
IN RE SEPTEMBER 11, 2001 LITIGATION    :        21 MC 97 (AKH)
                                               :
                                               :
-----------------------------------------------------------------x

## PLAINTIFFS' FLIGHT 77 MASTER LIABILITY COMPLAINT

### (THE PENTAGON CRASH)

Plaintiffs[1], by their respective attorneys complaining of the defendants herein, upon information and belief, respectfully state as and for their common liability allegations as follows:

### BACKGROUND

These actions seek damages on behalf of plaintiffs, the heirs and next of kin of decedents, and the Estates of decedents for the wrongful deaths of the individuals who were killed in the hijacking and crash of American Airlines Flight 77 (hereinafter "Flight 77") into the Pentagon in Arlington, Virginia on September 11, 2001. Flight 77 originated at Dulles International Airport, Virginia (hereinafter "Dulles Airport") and was bound for Los Angeles International Airport.

In sum, these actions allege that for several years prior to September 11, 2001, American Airlines, Argenbright and the other security company defendant named herein, and the Metropolitan Washington Airports Authority had actual knowledge of the fact that terrorist groups and individuals associated with them had publically proclaimed a pathological hatred of the United States, its citizens and those who resided or traveled

---

[1]    The caption for each individual plaintiff and, for ease of reference, a chart summarizing the litigants is attached as Appendix A.

### CLAIMS FOR WRONGFUL DEATH AGAINST ALL DEFENDANTS
### BASED ON NEGLIGENCE, NEGLIGENCE PER SE, RECKLESS
### CONDUCT AND CONSCIOUS DISREGARD FOR RIGHTS AND SAFETY

28.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

29.    On and prior to September 11, 2001,  American, the Security Company Defendants and MWAA, by their officers, agents, employees, servants or representatives, had an independent, joint and several, nondelegable duty to exercise and provide the passengers of Flight 77 with the highest level of security and care to safeguard Flight 77 and all other aircraft that operated at Dulles Airport to prevent hijackers from carrying dangerous and deadly weapons capable of causing injury or death aboard aircraft or otherwise threaten the safety of passengers and crew.

9)    The defendants were jointly and severally required to secure Flight 77 from unreasonable dangers such as terrorist action aboard the aircraft, including hijacking and to operate the subject aircraft in a manner which would not result in injury or death to its passengers.

10)    On and prior to September 11, 2001, American and MWAA entered into contracts with the Security Company Defendants for security services for all flights departing from Dulles Airport.  These defendants had a duty to exercise the highest degree of care for the safety and security of all passengers passing through security checkpoints at Dulles Airport and prior to boarding aircraft there, and in recognition of that duty, voluntarily entered into contracts with the Security Company Defendants to provide various airline and airport security services.

11)    By virtue of their negligence, the Security Company Defendants breached their contracts to provide effective security at Dulles Airport and to prevent security breaches which could cause injury or death to passengers.

30.    On and prior to September 11, 2001, American, the Security Company Defendants, and MWAA, by their respective officers, agents, employees, servants and/or representatives, breached their duty to decedents and engaged in conduct which was reckless, negligent, negligent per se, wrongful, unlawful, careless, and willful and wanton in conscious disregard of the rights and safety of the passengers by violating applicable rules and regulations, including Federal Aviation Regulations; and further by creating unreasonable dangers to Flight 77 passengers in that American, the Security Company Defendants, and MWAA:

- failed to implement, operate, maintain, supervise and control an adequate airline and airport security system that ensured the safety of and protected passengers against acts of criminal violence and air piracy;

- failed to adequately train, staff and equip Newark Airport's airline and airport security system;

- failed to improve airline and airport security despite knowledge and prior warnings of numerous security breaches and lapses and terrorist threats to airline security;

- failed to properly screen the hijackers and allowed them aboard the subject aircraft with dangerous and deadly weapons capable of causing injury or death;

- violated proper security procedures, including FAA and internal airline/security guidelines and other security directives;

- failed to properly scrutinize the hijackers' tickets and identification documents;

–12–

· failed to properly monitor security checkpoints, x-ray machines and metal detectors;

· failed to install state of the art security equipment and systems to prevent hijacking and routinely failed to detect dangerous and deadly weapons capable of causing injury or death in undercover investigations;

· failed to adequately protect the subject aircraft's cockpit from unauthorized entry;

· failed to prevent the hijackers from entering the unprotected cockpit;

· failed to implement adequate safety and security measures to prevent hijacking;

· failed to equip the subject aircraft with a secure cockpit door and adequate locking mechanisms; and

· defendants were otherwise negligent, engaged in conduct that was negligent per se, reckless, wrongful, unlawful, careless, and/or willful in conscious disregard for rights and safety.

42.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.


## COUNT TWO

### CLAIMS FOR WRONGFUL DEATH AND SURVIVAL
### DAMAGES AGAINST AMERICAN AND MWAA
### BASED ON NEGLIGENT SELECTION

43.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

44.    American and MWAA failed to exercise reasonable care in the selection of a competent and careful security system contractor by employing the Security Company Defendants.

45.    The Security Company Defendants' work as security system contractors at Dulles Airport presents a risk of physical harm and death unless skillfully and carefully performed commensurate with the threat of terrorist action.

46.    American and MWAA have a non-delegable duty to the traveling public, including decedents, to provide competent and careful security of their terminal operations area and aircraft.

47.    The Security Company Defendants had a record of incompetent and careless operation and maintenance of their contracted security service obligations over many years according to FAA "Red Team" audits and other independent checks on the effectiveness of their security systems.

48.    American and MWAA's failure to exercise reasonable care in the selection of competent and careful security system contractors were proximate contributing factors to the causes of each decedent's injuries and damages.

49.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT THREE

### CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES
### RES IPSA LOQUITUR AGAINST ALL DEFENDANTS

–14–

Exhibit 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                                   :

IN RE SEPTEMBER 11, 2001 LITIGATION    :       21 MC 97 (AKH)
                                                   :
-------------------------------------------------------------------x

## PLAINTIFFS' FLIGHT 93 MASTER LIABILITY COMPLAINT

### (THE SHANKSVILLE CRASH)

Plaintiffs,[1] by their respective attorneys complaining of the Defendants herein,

upon information and belief, respectfully state as and for their common liability

allegations as follows:

### BACKGROUND

These actions seek damages on behalf of plaintiffs, the heirs and next of kin of

decedents, and the Estates of decedents for the wrongful deaths of the individuals who

were killed in the hijacking and crash of United Air Lines Flight 93 (hereinafter "Flight

93") in Shanksville, Pennsylvania on September 11, 2001.  Flight 93 originated at

Terminal A, Newark International Airport (hereinafter "Newark Airport") and was bound

for San Francisco International Airport.

In sum, these actions allege that for several years prior to September 11, 2001,

United Air Lines and the other airline defendants named herein, Argenbright and the

other security company defendant named herein, and the Port Authority of New York

and New Jersey had actual knowledge of the fact that terrorist groups and individuals

---

[1]      The caption for each individual plaintiff and, for ease of reference, a chart
summarizing the litigants is attached as Appendix A.

1

Arlington, Virginia.

49.    Upon information and belief, having learned that other aircraft crashed into various national landmarks, at approximately 9:58 a.m. certain passengers on board Flight 93 attempted to re-take control of the subject aircraft to prevent the hijackers from using Flight 93 as an instrument of mass destruction.

50.    Upon information and belief, at approximately 10:05 a.m., due to the heroic efforts of the passengers to prevent the hijackers from using the subject aircraft as an instrument of mass destruction, the subject aircraft crashed in Somerset County, near Shanksville, Pennsylvania, killing all passengers and crew.

51.    As a result of the actions of the hijackers, the passengers of Flight 93 were subjected to unusual G-forces, causing physical personal injuries, as well as pre-death pain and suffering, extreme emotional distress, extreme terror, and unremitting fear of impending death based on the knowledge that the hijackers had killed or attempted to kill passengers or crew aboard Flight 93 and that other aircraft had been hijacked and crashed into the World Trade Center and Pentagon, and damage to their personal property.

52.    As a direct and proximate consequence of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

**COUNT ONE**

**CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST UNITED, THE SECURITY COMPANY DEFENDANTS AND THE**

13

## PORT AUTHORITY BASED ON NEGLIGENCE; NEGLIGENCE PER SE; RECKLESS CONDUCT AND CONSCIOUS DISREGARD FOR RIGHTS AND SAFETY

53.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

54.    On and prior to September 11, 2001, United, the Security Company Defendants and the Port Authority, by their officers, agents, employees, servants or representatives, had an independent, joint and several, nondelegable duty to exercise and provide the passengers of Flight 93 with the highest level security and care to safeguard Flight 93 and all other aircraft that operated at Newark Airport to prevent hijackers from carrying dangerous and deadly weapons capable of causing injury or death aboard aircraft or otherwise threaten the safety of passengers and crew.

55.    The defendants were jointly and severally required to secure Flight 93 from unreasonable dangers, such as terrorist action aboard the aircraft, including hijacking and to operate the subject aircraft in a manner which would not result in injury or death to its passengers.

56.    On and prior to September 11, 2001, United and the Port Authority entered into contracts with the Security Company Defendants for security services for all flights departing from Newark Airport.  These defendants had a duty to exercise the highest degree of care for the safety and security of all passengers passing through security checkpoints at Newark Airport and prior to boarding aircraft there, and in recognition of that duty, voluntarily entered into contracts with the Security Company Defendants to provide various airline and airport security services.

57.    By virtue of their negligence, the Security Company Defendants breached their contracts to provide effective security at Newark Airport and to prevent security

14

breaches which could cause injury or death to passengers.

58.    On and prior to September 11, 2001, United, the Security Company Defendants, and the Port Authority, by their respective officers, agents, employees, servants and/or representatives, breached their duty to decedents and engaged in conduct which was reckless, negligent, negligent per se, wrongful, unlawful, careless, and willful and wanton in conscious disregard of the rights and safety of the passengers by violating applicable rules and regulations, including Federal Aviation Regulations; and further by creating unreasonable dangers to Flight 93 passengers in that United, the Security Company Defendants, and the Port Authority:

- failed to implement, operate, maintain, supervise and control an adequate airline and airport security system that ensured the safety of and protected passengers against acts of criminal violence and air piracy;

- failed to adequately train, staff and equip Newark Airport's airline and airport security system;
- failed to improve airline and airport security despite knowledge and prior warnings of numerous security breaches and lapses and terrorist threats to airline security;

- failed to properly screen the hijackers and allowed them aboard the subject aircraft with dangerous and deadly weapons capable of causing injury or death;

- violated proper security procedures, including FAA and internal airline/security guidelines and other security directives;

- failed to properly scrutinize the hijackers' tickets and identification documents;

- failed to properly monitor security checkpoints, x-ray machines and metal detectors;

- failed to install state of the art security equipment and systems to prevent hijacking and routinely failed to detect dangerous and deadly weapons capable of causing injury or death in undercover

15

investigations;

- failed to adequately protect the subject aircraft's cockpit from unauthorized entry;

- failed to prevent the hijackers from entering the unprotected cockpit;

- failed to implement adequate safety and security measures to prevent hijacking;

- failed to equip the subject aircraft with a secure cockpit door and adequate locking mechanisms; and

- defendants were otherwise negligent, engaged in conduct that was negligent per se, reckless, wrongful, unlawful, careless, and/or willful in conscious disregard for rights and safety.

59.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT TWO

### CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST THE OTHER AIRLINES DEFENDANTS BASED ON NEGLIGENCE

60.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

61.    On and prior to September 11, 2001, the Other Airline Defendants had an independent and non-delegable duty to maintain the security of their aircraft and Newark Airport.  In recognition of that duty, the Other Airline Defendants subcontracted for security services to protect all flights departing from Newark Airport.

1)    The Other Airline Defendants each had a duty or voluntarily undertook a duty through its contract with the Security Company Defendants to exercise the highest

16

degree of care for the safety and security of all passengers passing through security at Newark Airport.

2)     The Other Airline Defendants each knew or should have known that the security screening systems and services at Newark Airport provided by the Security Company Defendants were grossly inadequate and posed a severe danger to its passengers and the public.  The Other Airline Defendants knew or should have known that the security systems at Newark Airport had been demonstrated to be like a sieve frequently unable to detect dangerous and deadly weapons capable of causing injury or death in numerous evaluations.

3)     Each of the Other Airline Defendants knew or should have known that the Security Company Defendants failed to adequately train its employees, hired illegal aliens, failed to conduct required criminal background checks, and routinely failed in undercover security evaluations to detect even the most obvious of dangerous and deadly weapons capable of causing injury or death.

4)     The Other Airline Defendants failure to remedy these known security lapses was a reckless, negligent and willful and wanton breach of their respective duties of care to all passengers passing through Newark Airport and boarding aircraft there.

5)     As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

**COUNT THREE**

17

## CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST UNITED AND THE PORT AUTHORITY BASED ON NEGLIGENT SELECTION

6)      Plaintiffs incorporate by reference all prior allegations in this Complaint.

7)      United and the Port Authority failed to exercise reasonable care in the selection of a competent and careful security system contractor by employing the Security Company Defendants.

8)      The Security Company Defendants' work as security system contractors at Newark Airport presents a risk of physical harm and death unless skillfully and carefully performed commensurate with the threat of terrorist action.

9)      United and the Port Authority have a non-delegable duty to the traveling public, including decedents, to provide competent and careful security of their terminal operations area and aircraft.

10)      The Security Company Defendants had a record of incompetent and careless operation and maintenance of their contracted security service obligations over many years according to FAA "Red Team" audits and other independent checks on the effectiveness of their security systems.

62.      United and the Port Authority's failure to exercise reasonable care in the selection of competent and careful security system contractors were proximate contributing factors to the causes of each decedent's injuries and damages.

11)      As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable

18

15)    Plaintiffs incorporate by reference all prior allegations in this Complaint.

16)    The aforementioned aircraft was being used in an intended and foreseeable manner on the morning of September 11, 2001.

17)    Defendant Boeing defectively designed the cockpit or flight deck environment, including its door and accompanying locks of the subject aircraft.  The design in use on September 11, 2001 in the subject aircraft was unreasonably dangerous in that it could easily be penetrated by a determined passenger.  The cockpit door was not secure and the accompanying locks were insufficient to deter or prevent unauthorized or unlawful entry to thwart a hijacking attack.  Alternative and safer designs were available for a nominal increase in cost which would have prevented these terrorists from gaining access to the cockpit on Flight 93.

18)    This defective design permitted the terrorists to gain access to the cockpit of Flight 93 and hijack the aircraft.  Boeing's defective design was a proximate cause of the deaths of decedents on Flight 93.

19)    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

**COUNT SIX**

**CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES**
**AGAINST DEFENDANT BOEING BASED ON NEGLIGENT DESIGN**

20)    Plaintiffs incorporate by reference all prior allegations in this Complaint.

21)    Defendant Boeing owed all passengers who fly on their aircraft and those

20

who flew on Flight 93 a duty of care in safely designing the aircraft including a secure cockpit door and accompanying locks.

22)    Defendant Boeing recklessly and negligently breached this duty of care by failing to design the cockpit doors and accompanying locks to the subject aircraft in a manner which would prevent hijackers and/or other passengers from accessing the cockpit.  The cockpit door on Flight 93 was not secure and the accompanying locks were insufficient to deter or prevent a hijacking.

23)    Defendant Boeing knew or should have known that the design of its cockpit door was defective.  Defendant Boeing failed to remedy this defect.  Defendant Boeing knew or should have known that alternative and safer designs were available for a nominal increase in cost which would have prevented these terrorists from entering the cockpit on Flight 93.

24)    This defective design permitted the terrorists to easily gain access to the Flight 93 cockpit on September 11 2001 and was a proximate cause of the deaths of decedents.

25)    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT SEVEN

### CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES
### AGAINST DEFENDANT BOEING BASED ON BREACH OF WARRANTY

26)    Plaintiffs incorporate by reference all prior allegations in this Complaint.

21

Exhibit 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                    :
IN RE SEPTEMBER 11, 2001 LITIGATION      :     21 MC 97 (AKH)
                                    :
-------------------------------------------------------------x

## PLAINTIFFS' AMENDED FLIGHT 11 MASTER LIABILITY COMPLAINT

### (ONE WORLD TRADE CENTER CRASH)

Plaintiffs,[1] by their respective attorneys complaining of defendants herein, upon information and belief, respectfully state as and for their common liability allegations as follows:

### BACKGROUND

These actions seek damages on behalf of plaintiffs, the heirs and next of kin of decedents, and the Estates of decedents for the personal injuries to and wrongful deaths of the individuals who were killed in the hijacking and crash of American Airlines Flight 11 (hereinafter "Flight 11") into One World Trade Center (hereinafter "One World Trade") as well as on behalf of those who were present in or in the vicinity of One World Trade and were killed as a result of the fires in and collapse of One World Trade on September 11, 2001 or its immediate aftermath.

In sum, these actions allege that for several years prior to September 11, 2001, the defendants named herein had actual knowledge of the fact that terrorist groups and individuals associated with them had publicly proclaimed a pathological hatred of the United States, its citizens and those who resided or traveled within or to its borders and vowed to kill Americans and to destroy American institutions and that airlines and

---

       [1]     For ease of reference, a chart summarizing the litigants is attached as Appendix A.

XC-   007223

## COUNT ONE

## CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES, AGAINST THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND AND MASSPORT BASED ON NEGLIGENCE, NEGLIGENCE PER SE; RECKLESS CONDUCT, AND CONSCIOUS DISREGARD FOR RIGHTS AND SAFETY

114.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

115.    On and prior to September 11, 2001, THE AIRLINE DEFENDANTS, THE

NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY

DEFENDANTS, PORTLAND and MASSPORT, by their officers, agents, employees,

servants or representatives had an independent, joint and several, nondelegable duty to

safeguard Flight 11 and all other aircraft that operated at Portland Jetport and Logan

Airport to prevent hijackers from carrying dangerous and deadly weapons capable of

causing injury or death aboard the aircraft or otherwise threaten the safety of

passengers and crew as well as people in buildings or on the ground who might suffer

death or injury as a result of a crash.

116.    The defendants were jointly and severally required to secure Flight 11

from unreasonable dangers such as terrorist action aboard the aircraft, including

hijacking, resulting in injuries or death to passengers and crew; and/or to operate the

subject aircraft in a manner which would not result in injury or death to its passengers

and crew as well as individuals in buildings or on the ground who might suffer death or

injury at the hands of the terrorists or otherwise by a crash of the airplane.

117.    On and prior to September 11, 2001, THE AIRLINE DEFENDANTS, THE

NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY

- 28 -

XC-    007250

DEFENDANTS, PORTLAND and MASSPORT entered into contracts for security services for all flights departing from Portland Jetport and Logan Airport. These defendants had a duty to exercise the highest degree of care to prevent individuals carrying weapons from passing through security checkpoints at Portland Jetport and Logan Airport and prior to boarding aircraft there, and in recognition of that duty, voluntarily entered into contracts with THE SECURITY COMPANY DEFENDANTS to provide various airline and airport security services.

118.    By virtue of their negligence, THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND and MASSPORT breached their contracts to provide effective security at Portland Jetport and Logan Airport and to prevent security breaches which could cause injury or death to passengers, crew and individuals in buildings or on the ground who might suffer death or injury as a result of a deliberate crash.

119.    On September 11, 2001, hijackers penetrated said airline and airport security system at Portland Jetport and subsequently Logan Airport, brought dangerous weapons onto the Colgan aircraft and subsequently the subject aircraft and used said dangerous weapons to seize control of the subject aircraft and then crash it into One World Trade Center injuring and killing decedents.

120.    On and prior to September 11, 2001, THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND and MASSPORT, by their respective officers, agents, employees, servants and/or representatives, breached their duty to decedents and engaged in conduct that was reckless, negligent, negligent per se, wrongful, unlawful,

- 29 -

careless, and willful and wanton in conscious disregard of the rights and safety of the decedents by violating applicable rules and regulations, including Federal Aviation Regulations; and further by creating unreasonable dangers to decedents in that THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND and MASSPORT:

- failed to implement, operate, maintain, supervise and control an adequate airline and airport security system that ensured the safety of and protected passengers and crew and persons on the ground or in buildings who might suffer injury or death upon improper or unauthorized operation of an aircraft against acts of criminal violence and air piracy;

- failed to adequately train, staff and equip Portland Jetport and Logan Airport's airline and airport security system;

- failed to improve airline and airport security despite knowledge and prior warnings of numerous security breaches and lapses and terrorist threats to airline security;

- failed to properly screen the hijackers and allowed them aboard the subject aircraft with dangerous and deadly weapons capable of causing injury or death;

- violated proper security procedures, including FAA and internal airline/security guidelines and other security directives;

- failed to properly scrutinize the hijackers' tickets and identification documents;

- failed to properly monitor security checkpoints, x-ray machines and metal detectors;

- failed to install state of the art security equipment and systems to prevent hijacking and routinely failed to detect dangerous and deadly weapons capable of causing injury or death in undercover investigations;

- failed to adequately protect the subject aircraft's cockpit from unauthorized entry;

- 30 -

XC-    007252

- failed to prevent the hijackers from entering the unprotected cockpit;

- failed to implement adequate safety and security measures to prevent hijacking;

- failed to equip the subject aircraft with a secure cockpit door and adequate locking mechanisms; and

- defendants were otherwise negligent, engaged in conduct that was negligent per se, reckless, wrongful, unlawful, careless, and/or willful in conscious disregard for rights and safety.

121.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

122.    Plaintiffs and the Estates of decedents and the heirs and next of kin of the decedents have sustained and are entitled to recover compensatory damages allowed under law, including damages for the value of decedents' life, loss of net earnings of the decedents, loss of probable support, future contributions and pecuniary benefits, loss of services, loss of inheritance of prospective accumulations, mental anguish, emotional pain and suffering, grief and sorrow, loss of society, companionship, comfort, protection, care, attention, advice, maintenance, counsel, guidance, and decedents' pre-death conscious pain, suffering and fear of death, loss of personal property, and funeral and burial expenses, and other damages.

- 31 -

## COUNT TWO

### CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND, AND MASSPORT BASED ON NEGLIGENT SELECTION

123.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

124.    On and prior to September 11, 2001, THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT had an independent and non-delegable duty to provide and maintain competent and careful security of their terminal operations area and aircraft. In recognition of that duty, THE AIRLINE DEFENDANTS THE NON-CARRYING AIRLINE DEFENDANTS PORTLAND AND MASSPORT subcontracted for security services to protect all flights departing from Portland Jetport and Logan Airport.

125.    THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT failed to exercise reasonable care in the selection of a competent and careful security system contractor by employing THE SECURITY COMPANY DEFENDANTS.

126.    THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT each had a duty or voluntarily undertook a duty through their contracts with THE SECURITY COMPANY DEFENDANTS to exercise the highest degree of care for the safety and security of all passengers and crew passing through security at Portland Jetport and Logan Airport.

127.    THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT each knew or should have known that

- 32 -

XC-    007254

the security screening systems and services at Portland Jetport and Logan Airport provided by THE SECURITY COMPANY DEFENDANTS were grossly inadequate and posed a severe danger to its aircraft, passengers, crew and the public. THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT knew or should have known that the security systems at Portland Jetport and Logan Airport had been demonstrated to be like a sieve frequently unable to detect dangerous and deadly weapons capable of causing injury or death in numerous evaluations.

128.    THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT knew or should have known that THE SECURITY COMPANY DEFENDANTS failed to adequately train their employees, hired illegal aliens, failed to conduct required criminal background checks, and routinely failed in undercover security evaluations to detect even the most obvious of dangerous and deadly weapons capable of causing injury or death.

129.    THE SECURITY COMPANY DEFENDANTS' work as security system contractors at Portland Jetport and Logan Airport presents a risk of physical harm and death unless skillfully and carefully performed commensurate with the threat of terrorist action.

130.    THE SECURITY COMPANY DEFENDANTS had a record of incompetent and careless operation and maintenance of their contracted security service obligations over many years according to FAA "Red Team" audits and other independent checks on the effectiveness of their security systems.

- 33 -

131.    THE AIRLINE DEFENDANTS, THE NON-CARRYING AIRLINE DEFENDANTS, PORTLAND and MASSPORT's failure to remedy these known security lapses was a reckless, negligent and willful and wanton breach of their respective duties of care to all passengers and crew passing through Portland Jetport and Logan Airport and boarding aircraft there.

132.    THE AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, PORTLAND and MASSPORT's failure to exercise reasonable care in the selection, continued retention and supervision of competent and careful security systems and contractors were proximate contributing factors to the causes of decedents injuries, death and damages.

133.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by plaintiffs and plaintiffs are entitled to recover such damages to the extent allowed under applicable state law.

### COUNT THREE

**CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH
AND SURVIVAL DAMAGES AGAINST DEFENDANT
<u>BOEING BASED ON STRICT TORT LIABILITY</u>**

134.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

135.    The aforementioned aircraft was being used in an intended and foreseeable manner on the morning of September 11, 2001.

136.    Defendant BOEING defectively designed the cockpit or flight deck environment, including its door and accompanying locks of the subject aircraft.  The

- 34 -

design in use on September 11, 2001 in the subject aircraft was unreasonably dangerous in that it could easily be penetrated by a determined passenger. The cockpit door was not secure and the accompanying locks were insufficient to deter or prevent unauthorized or unlawful entry to thwart a hijacking attack. Alternative and safer designs were available for a nominal increase in cost which would have prevented these terrorists from gaining access to the cockpit on Flight 11.

137.    This defective design permitted the terrorists to gain access to the cockpit of Flight 11 and hijack the aircraft. BOEING'S defective design was a proximate cause of the personal injuries to and death of decedents.

138.    As a direct and proximate result of the conduct of defendant BOEING, BOEING is jointly and severally liable for damages sustained by plaintiffs and plaintiffs are entitled to recover such damages to the extent allowed under applicable state law.

## COUNT FOUR

### CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST DEFENDANT BOEING BASED ON NEGLIGENT DESIGN

139.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

140.    Defendant BOEING owed all passengers and crew who fly on their aircraft and those persons on the ground or in buildings who might suffer injury or death as a result of improper or unauthorized operation of a BOEING aircraft, including decedents, a duty of care in safely designing the aircraft including a secure cockpit door and accompanying locks.

- 35 -

XC-    007257

141.   Defendant BOEING recklessly and negligently breached this duty of care by failing to design the cockpit doors and accompanying locks to the subject aircraft in a manner which would prevent hijackers and/or other passengers from accessing the cockpit. The cockpit door on Flight 11 was not secure and the accompanying locks were insufficient to deter or prevent a hijacking.

142.   Defendant BOEING knew or should have known that the design of its cockpit door was defective. Defendant BOEING failed to remedy this defect. Defendant BOEING knew or should have known that alternative and safer designs were available for a nominal increase in cost which would have prevented these terrorists from entering the cockpit on Flight 11.

143.   This defective design permitted the terrorists to easily gain access to the Flight 11 cockpit on September 11, 2001 and was a proximate cause of the injuries to and deaths of decedents.

144.   As a direct and proximate result of the conduct of defendant BOEING, BOEING is jointly and severally liable for damages sustained by plaintiffs and plaintiffs are entitled to recover such damages to the extent allowed under applicable state law.

### COUNT FIVE

### CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST DEFENDANT BOEING BASED ON BREACH OF WARRANTY

145.   Plaintiffs incorporate by reference all prior allegations in this Complaint.

146.   Prior to September 11, 2001, defendant BOEING expressly and/or impliedly warranted and represented that the subject aircraft and its component parts

- 36 -

XC-    007258

.

Exhibit 12

72QYWTCP

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------x

3   IN RE: SEPTEMBER 11 LITIGATION

4                                        21 MC 97 (AKH)

5   IN RE:  SEPTEMBER 11 PROPERTY
    DAMAGE AND BUSINESS LOSS
6   LITIGATION

7   -------------------------------x

8

9

10

11                                   February 26, 2007
                                     10:20 a.m.
12

13

14

15  Before:

16         HON. ALVIN K. HELLERSTEIN

17                                   District Judge

18

19

20

21

22

23

24

25

72QYWTCP

1                          APPEARANCES

2    FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
     Attorneys for WTCP
3           One Liberty Plaza
            New York, New york
4    CATHI A. HESSION, ESQ.,
     RICHARD A. WILLIAMSON, ESQ.,
5    JASON T. COHEN, ESQ.,
            Of counsel
6

7    QUIRK AND BAKALOR, P.C.
     Attorneys  for United Airlines
8           845 Third Avenue
            New York, New York
9    JEFFREY J. ELLIE, ESQ.,
            Of counsel
10

11   CONDON & FORSYTH LLP
     Attorneys  for American Airlines
12          7 Times Square
            New York, New York
13   DESMOND T. BARRY, JR., ESQ.,
            Of counsel

14

15                                        - - -

16          THE COURT:  It seems to me that the question whether

17   or not the World Trade Center Properties parties were negligent

18   or not in the context of the security precautions they did or

19   did not take prior to and on 9/11 have nothing to do with

20   whether or not the aviation parties were negligent or not on or

21   about 9/11.  The loci of activity were different and there was

22   no interrelationship in terms of security arrangements between

23   one and the other of which I have been informed or of which I

24   know of.

25          I could have done this by simple endorsement.  I asked

72QYWTCP

1   security, should have been doing more than what we were doing,

2   isn't it relevant for impeachment purposes for us to be able to

3   say that the people that are suing us and saying we never

4   should have considered costs --

5              THE COURT:  I don't know that anyone can argue that

6   cost is not a factor.  Of course cost is a factor.  Not only

7   cost, but amount of people in line, the whole context of the

8   times.

9              I won't go into this because none of the plaintiffs

10  are here, but I think the context is in all in a decision on

11  reasonableness.  But what other parties did or did not do is

12  not relevant.

13             MR. ELLIS:  Your Honor, forget about the wrongful

14  death plaintiffs, we are just talking about the property damage

15  plaintiffs that are here --

16             THE COURT:  I would think that if Mr. Williamson says

17  cost has no bearing on whether you do not, I probably would

18  object.

19             MR. ELLIS:  Your Honor, if that issue comes before the

20  jury, is there any more powerful evidence to drive home the

21  point that cost is an issue --

22             THE COURT:  I made my ruling on that point.

23             MR. ELLIS:  Fine, your Honor.

24             THE COURT:  And Mr. Williamson knows now the ground of

25  the objection.

72QYWTCP

1          MR. BARRY:  One last point, your Honor.

2          THE COURT:  Yes, sir.

3          MR. BARRY:  Direct assessment of the threat.  Fourteen

4     years ago today the World Trade Center was bombed.  From 1993

5     until 2001 what did World Trade Center do to assess the threat

6     of --

7          THE COURT:  That is going to be an issue with regard

8     to people suing the World Trade Center, it's not an issue

9     between them and you or what people have to prove or not prove.

10         MR. BARRY:  What if I got an admission from them that

11    that was the government's responsibility, not our

12    responsibility?

13         THE COURT:  That is their contention.

14         MR. BARRY:  What?

15         THE COURT:  That's their contention.

16         MR. BARRY:  That's our contention, it's a government

17    responsibility.

18         THE COURT:  I have to deal with it in terms of each

19    parties' contentions.  But what some party did or did not do or

20    may or may not be negligent in relation to that is not relevant

21    to my judgment to the situation of another party.

22         MR. BARRY:  I understand that's your ruling, Judge,

23    but threat assessment, foreseeability, if they agree with us

24    that threat assessment of a terrorist Islamic attack is the

25    government's function, that goes to our defense and I think to

Exhibit 13

# THE 9/11 COMMISSION REPORT

## Final Report of the
## National Commission on Terrorist
## Attacks Upon the United States

OFFICIAL GOVERNMENT EDITION

For sale by the Superintendent of Documents, U S Government Printing Office
Internet: bookstore gpo gov  Phone: toll free (866) 512-1800;  DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop SSOP, Washington, DC 20402-0001

ISBN 0-16-072304-3

XC- 002059

# PREFACE

WE PRESENT THE NARRATIVE of this report and the recommendations that flow from it to the President of the United States, the United States Congress, and the American people for their consideration. Ten Commissioners—five Republicans and five Democrats chosen by elected leaders from our nation's capital at a time of great partisan division—have come together to present this report without dissent.

We have come together with a unity of purpose because our nation demands it. September 11, 2001, was a day of unprecedented shock and suffering in the history of the United States. The nation was unprepared. How did this happen, and how can we avoid such tragedy again?

To answer these questions, the Congress and the President created the National Commission on Terrorist Attacks Upon the United States (Public Law 107-306, November 27, 2002).

Our mandate was sweeping. The law directed us to investigate "facts and circumstances relating to the terrorist attacks of September 11, 2001," including those relating to intelligence agencies, law enforcement agencies, diplomacy, immigration issues and border control, the flow of assets to terrorist organizations, commercial aviation, the role of congressional oversight and resource allocation, and other areas determined relevant by the Commission.

In pursuing our mandate, we have reviewed more than 2.5 million pages of documents and interviewed more than 1,200 individuals in ten countries. This included nearly every senior official from the current and previous administrations who had responsibility for topics covered in our mandate.

We have sought to be independent, impartial, thorough, and nonpartisan. From the outset, we have been committed to share as much of our investigation as we can with the American people. To that end, we held 19 days of hearings and took public testimony from 160 witnesses.

XC-  002067

Exhibit 14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE WORLD TRADE CENTER          Master Docket No.: 21 MC 100 (AKH)
DISASTER SITE LITIGATION

CASE MANAGEMENT ORDER No. 3

This Order outlines the timing of and manner in which discovery limited to the subject

matters of certain potentially dispositive motions, identified herein, that it is anticipated will be _____

made by one or more Defendants in these actions is to be conducted in the above-captioned

World Trade Center Disaster Site Litigation (the "Litigation"). This case management order

("CMO No. 3") is the product of recommendations by Plaintiffs' Liaison and Steering

Committee Counsel, Defendants' Liaison and Steering Committee Counsel, and counsel for

other parties, but departs from those recommendations and reflects my own requirements in

certain requests.

## I.     Definitions

As used herein, the World Trade Center Site shall be defined as the 16-acre site including

the sites of the buildings known as 1 World Trade Center, 2 World Trade Center, 3 World Trade

Center (a/k/a the Marriot World Trade Center Hotel), 4 World Trade Center, 5 World Trade

Center and 7 World Trade Center, as well as the surrounding plaza and underground shopping,

parking and public transit facilities. The World Trade Center Site shall also be defined to

include the World Financial Center and Winter Garden, the Verizon Building at West and Vesey

Streets, the Deutsche Bank Building at Liberty and Greenwich Streets, 90 West Street, St

Nicholas Church, and 125 Cedar Street, as well as the Fresh Kills Landfill site, the debris-

removal barges, piers and transfer stations. This definition is provided for the sole purpose of

construing the provisions of CMO No. 3 and may not be utilized or cited by the parties for any other purpose.

## II.    Defendants' Motions

Defendants' Liaison and Steering Committee Counsel previously have identified for the Court and for Plaintiffs' counsel certain motions that they anticipate will be made by one or more Defendants and which may be dispositive of some or all of the individual actions in the Litigation.    The Court has expressed an interest in having focused and specific discovery ("limited" discovery) undertaken regarding the subject matters of these motions in order to develop an appropriate record for these motions.  This CMO No. 3 sets forth the plan for this limited discovery and the Defendants' dispositive motions to follow.

Defendants contemplate the following motions for summary judgment or judgment on the pleadings dismissing some or all of Plaintiffs' claims with prejudice based on various provisions of statute or common law proving immunity to defendants against plaintiffs' claims. Among such provisions are:

A.   The New York State Defense Emergency Act, N.Y. Unconsol. Law §§ 9101-9200;

B.      The New York State and Local Natural and Man-Made Disaster Preparedness Law, N.Y. Exec. Law §§ 20-29-g;

C.      Principles of common law immunity, to be identified, in reasonable detail within ten (10) days of the entry of this Case Management Order;

D.      Principles of federal immunity to be identified in reasonable detail within ten (10) days of the entry of this Case Management Order; and

2

E.      Those Defendants whose alleged liability would derive from their status as owner or lessee of the property at issue (or some part thereof), but who were not in control or possession of the relevant property at the time of Plaintiffs' claimed injuries may also file motions for summary judgment or for judgment on the pleadings, dismissing all or part of the claims against them.  Such defendants, within ten (10) days of the entry of this Case Management Order shall identify with specificity:

1)  The property involved; and

2)  The status of defendants with regard to such property; and

F.  Those Defendants whose alleged liability would derive from their status as owner or lessee of the property at issue (or some part thereof), but who were not in control or possession of the relevant property at the time of Plaintiffs' claimed injuries shall produce the specific documents reflecting the defendant's status and that of all others relating to the property.

### III.    Order of Discovery

*A.    Defendants' Preliminary Disclosure of Reasonably Ascertainable Information
Relevant To Their Motions And Detailed Chronological Declarations*

**1.    Briefs And Opinions Relating To Previously Filed Dispositive Motions In
Other World Trade Center Litigations**

Within five (5) days of the entry of this CMO No. 3, Defendants' Liaison and Steering

Committee Counsel shall provide Plaintiffs' Liaison and Steering Committee Counsel and the

Court with all judicial opinions, previously filed briefs and supporting documentation in other

World Trade Center Litigations not pending before this Court that are in Defendants' possession

and relate to the subject matters of the motions identified herein.

**2.    Preliminary Disclosure Of Organizations Involved In Rescue, Recovery,
Debris Removal And/Or Construction At The World Trade Center Site And
Documents Of Which Defendants Are Currently Aware And Intend To Rely
Upon In Support Of The Motions Described Herein**

Within ten (10) days of the entry of this CMO No. 3, Defendants' Liaison and Steering

Committee Counsel shall provide to Plaintiffs' Liaison and Steering Committee Counsel, a list

identifying all city agencies and non-city entities that worked at or were in any way involved in

the rescue, recovery, cleanup, debris removal and/or construction at the World Trade Center Site.

Within thirty (30) days of the entry of this CMO No. 3, Defendants' Liaison and Steering

Committee Counsel shall also provide to Plaintiffs' Liaison and Steering Committee Counsel

copies of documents, if any, of which Defendants are then aware, of which Defendants intend to

rely in support of their motions.

4

3.    **Defendants' Detailed Chronological Declarations**

Within thirty (30) days of the entry of this Case Management Order, each Defendant (except, as to the Contractor Defendants, only the four prime Contractors—Bovis, Turner, Tully, and Amec) shall provide to Plaintiffs' Liaison and Steering Committee Counsel a detailed chronological declaration that shall set forth the key arguments that the Defendant anticipates may be made to support the anticipated motions identified herein.  In addition to key arguments then anticipated, each Defendant's detailed chronological declaration shall also set forth the following information.

(a)    The scope of work that the Defendant performed at the World Trade Center Site;

(b)    Where the Defendant performed work at the World Trade Center Site;

(c)    The dates when the Defendant began work, performed work, and concluded work at the World Trade Center Site;

(d)    Whether the Defendant entered into any contract for the work done at the World Trade Center Site, as well as copies of such contracts, if any exist;

(e)    The Defendants shall also disclose the internal "chain of command" structure for each entity during the relevant time period;

(f)    Defendants' declarations shall include: all declarations and orders issued by City, State and Federal agencies and departments governing: A) Occupational safety and health of workers at the site; and B) the provision of respiratory equipment to workers at the site and C) the access of workers, including firefighters, to the site;

5

(g)    The area of the World Trade Center Site the Defendant was assigned to, if

applicable; and maps of the World Trade Center Site depicting its division into

quadrants, to the extent the Defendant possesses such maps and if any such maps

in fact exist.

(h)  Information concerning Defendants and/or subcontractors involved in

producing or providing respirators, air quality, or safety at the World Trade

Center site.

Defendants shall have the duty to supplement all discovery obligations within five days

after learning of information which, had it been known, should have been disclosed pursuant to

this CMO.

**B.    *Identification of and Discovery Requests to City Agencies and/or Departments***

    **1.    Plaintiffs' Identification of City Agencies and/or Departments From Which
They Intend to Seek Discovery and Related Discovery Requests**

Within twenty (20) days of the entry of this CMO No. 3, Plaintiffs' Liaison and Steering

Committee Counsel shall provide to Defendants' Liaison and Steering Committee Counsel a list

identifying the agencies and/or departments of the City of New York from which Plaintiffs seek

documents and information regarding the subject matters of the motions identified herein.

Within fifty (50) days of the entry of this CMO NO. 3, Plaintiffs' Liaison and Steering

Committee Counsel shall provide to Defendants' Liaison and Steering Committee Counsel a

detailed chronological declaration that shall set forth the key arguments that Plaintiffs then

anticipate may be asserted in opposition to Defendants' anticipated motions identified herein.

The Court will hold a Case Management Conference on Monday, April 18, 2005, at 4:00 P.M. to regulate further discovery, the filing of motions and oppositions and replies, and to entertain further case management recommendations.


SO ORDERED


Alvin K. Hellerstein, U.S.D.J.

Dated: New York, New York
      February 7, 2005

CONSENTED TO:

Plaintiffs' Liaison Counsel           Plaintiffs' Liaison Counsel


By: Andrew Carboy, Esq.           By: Paul J. Napoli

Dated: New York, New York
      February ___, 2005

CONSENTED TO:

Defendants' Liaison Counsel          Defendants' Liaison Counsel


By: James E. Tyrrell, Esq.          By: Richard A. Williamson

Dated: New York, New York
      February ___, 2005

7

Exhibit 15

1

```
 1    54ICWTCC

 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------x

 4        In Re.:

 5   WORLD TRADE CENTER DISASTER SITE

 6   LITIGATION,

 7
                                      New York, N.Y.
 8
                                      21 mc 100
 9
     ------------------------------x
10
                                      April 18, 2005
11                                    4:15 p.m.

12   Before:

13                    HON. ALVIN K. HELLERSTEIN,

14                                      District Judge

15                         APPEARANCES

16   WORBY, GRONER, EDELMAN, NAPOLI & BERN,
          Attorneys for Plaintiffs,
17   PAUL NAPOLI,
     WILLIAM GRONER,
18   WILLIAM J. DUBANEVICH,
          of Counsel.
19
     SULLIVAN, PAPAIN, BLOCK, MCGRATH & CANNAVO, P.C.
20        Attorneys for Plaintiffs,
     ANDREW J. CARBOY,
21   FRANK FLORIANI,
          of Counsel.
22
     LATHAM & WATKINS,
23        Attorneys for Defendants Westfield Parties,
     PETER ROSEN,
24   SHANE FRIEDMAN,
          of Counsel.
25
```

2

```
 1    LATHAM & WATKINS,
           Attorneys for City of New York and contractor Defendants,
 2    JAMES E. TYRRELL, JR.,
      JOSEPH E. HOPKINS,
 3         of Counsel.

 4    FLEMMING, ZULOCK & WILLIAMSON, LLP,
           Attorneys for World Trade Center parties, Port
 5         Authority of New York and New Jersey,
      RICHARD A. WILLIAMSON,
 6    THOMAS A. EGAN,
           of Counsel.
 7
      McDERMOTT WISE & EMERY, LLP,
 8         Attorneys for WTC Captive Insurance Company,
      MARGARET H. WARNER,
 9         of Counsel.

10    LONDON, FISCHER, LLP,
           Attorneys for Defendante Turner entities,
11    JOHN E. SPERLING,
           of Counsel.
12
      NEW YORK CITY LAW DEPARTMENT,
13         Attorneys for Defendant City of New York,
      KEN BECKER,
14    GARY SHAFFER,
      Assistant Corporation Counsel, of Counsel.
15
      OHRENSTEIN & BROWN, LLP,
16         Attorneys for Defendant Trinity Centre, LLC,
      GAIL RITZERT,
17         of counsel.

18                          ----------

19    dEX
                (Case called)

              THE COURT:  I trust that you all have the

      agenda that has been distributed.
                    We can make comments and if we have to, add to the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        MR. TYRRELL:  Your Honor, respectfully, I don't

2   believe we can complete our work with respect to the federal

3   government by that schedule.  It's just not going to be able to

4   happen in that time period.  There are too many agencies that

5   are involved, we are focusing on the specific documents that we

6   want, but that has yet to start.  I have no problem with

7   completing the things that counsel says he wants and be open if

8   he wants something else, but I would not be honest to the court

9   if I didn't say I don't think we are going to finish.

10        THE COURT:  What federal agencies are involved?

11        MR. TYRRELL:  There is about eight or ten of them,

12   FEMA, EPA, OSHA, Army Corps of Engineers.  Your Honor, there is

13   just a whole group of them that have documents indicating that

14   they exercised control over the site, we believe, with respect

15   to specific functions.

16        THE COURT:  If you have eight agencies claiming to

17   exercise control, you probably don't have any control.  You are

18   going to make a case out of FEMA, EPA and OSHA.  There may be

19   others involved.

20        MR. TYRRELL:  Your Honor, let's me give you an

21   example.  The Army Corps of Engineers dealt with the whole

22   question of the bathtub built around the foundation.  We are

23   certainly going to argue that all of the activities in removing

24   all of that debris to get down to the bathtub for state

25   purposes and for federal purposes were part of what should be

1    immunized.

2            THE COURT:  So you have four, FEMA, EPA, OSHA, and the

3    Army Corps of Engineers.

4            MR. TYRRELL:  Your Honor, there are others.

5            THE COURT:  I am sure there are others, but I don't

6    know that you have to do this to a point of infinity or the

7    opposite.  Work with the four agencies, and there can't be that

8    many individuals either.  I will be receptive to an enlarged

9    time if after thought and discussion you can identify a finite

10   number of witnesses of these four agencies to make your report.

11           MR. TYRRELL:  Your Honor, we will report

12   appropriately.

13           THE COURT:  All right.  I am going to assume that you

14   can conclude this by June 30.  I understand that my projections

15   may be too optimistic, and by the beginning of June, you can

16   probably let me know that they are too optimistic and you can

17   give me a projection of some additional time, but I think you

18   will need to show that you have been diligent in taking

19   depositions up to that point.  So I think we need to schedule a

20   meeting for early July, July 13 at 4 o'clock.

21           Before that date, I would look to the results of the

22   meeting where the defendants and plaintiffs come together and

23   defined their needs in a narrow way.  Otherwise, I think I

24   would be happier if we can get a briefing schedule for motions.

25           Have I covered all the points in IV?

1          MR CARBOY:  Yes, you have.

2          THE COURT:  Mr. Williamson?

3          MR. WILLIAMSON:  I think that covers everything, your

4    Honor.

5          THE COURT:  Then we have the next conference date,

6    July 13 at 4 o clock.

7          All right.  We have a pleasant Memorial Day weekend to

8    look forward to and a pleasant July 4 weekend to look forward

9    to.  I will see you you again July 13.

10                              -0-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 16

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,          .       Criminal No. 1:01cr455
                                   .
        vs.                        .       Alexandria, Virginia
                                   .       March 21, 2006
                                   .       9:00 a.m.
ZACARIAS MOUSSAOUI,                .
a/k/a Shaqil, a/k/a                .
Abu Khalid al Sahrawi,             .
                                   .
             Defendant.            .
                                   .

.   .   .   .   .   .   .   .   .   .

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:            ROBERT A. SPENCER, AUSA
                              DAVID J. NOVAK, AUSA
                              DAVID RASKIN, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314


FOR THE DEFENDANT:            EDWARD B. MAC MAHON, JR., ESQ.
                              P.O. Box 903
                              107 East Washington Street
                              Middleburg, VA 20118
                                and
                              ALAN H. YAMAMOTO, ESQ.
                              643 South Washington Street
                              Alexandria, VA 22314-3032

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Electronically signed by Anneliese Thomson (501-170-180-8434)                    c0adfa55-d8c9-406f-bd3d-3322f549efe4

Page 2

```
 1    APPEARANCES:   (Cont'd.)

 2    FOR THE DEFENDANT:              GERALD THOMAS ZERKIN

                                     KENNETH P. TROCCOLI

 3                                   ANNE M. CHAPMAN

                                     Assistant Federal Public Defenders

 4                                   Office of the Federal Public

                                     Defender

 5                                   1650 King Street

                                     Alexandria, VA 22314

 6

 7    COURT SECURITY OFFICER:        CHRISTINE GUNNING

 8

      ALSO PRESENT:                  PAM BISHOP

 9

10    OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR

                                     U.S. District Court, Fifth Floor

11                                   401 Courthouse Square

                                     Alexandria, VA 22314

12                                   (703)299-8595

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Anneliese J. Thomson
(703)299-8595

Electronically signed by Anneliese Thomson (501-170-180-8434)                              c0adfa55-d8c9-406f-bd3d-3322f549efe4

Page 13

1          Now, that's not a problem for you-all, but I've got a

2    lawyer here who was charged with a great deal of responsibility,

3    as I still understand it, in working with the aviation portion of

4    this case.   I mean, she was involved in getting documents to

5    witnesses, presenting witnesses with documents to see whether they

6    should be declassified.

7          I have no idea what went on in that process, and because

8    I have an image now of a person who perhaps out of overzealousness

9    or whatever the motivation or loyalty to the aviation industry in

10   trying to protect her clients from civil liability, for whatever

11   motivation, was way across the line in what is appropriate

12   behavior for an attorney, let alone a government attorney.

13         So there is, I think, in this record -- and whether

14   we'll ever be able to sort it out in a reasonable amount of time,

15   I don't know -- the potential problem about whether other aspects

16   of the aviation evidence in this case have been interfered with.

17         I mean, the defense had a right to fair access, to fair

18   discovery.   Now, the record of this case is so long, as you-all

19   argued, and so voluminous that your position has essentially been

20   much of this evidence was generated long before Ms. Martin got

21   involved at least for preparing for trial, that much of it's been

22   presented in other fora, and therefore, the defense should have

23   confidence that they've had access to all the relevant material,

24   but Martin's conduct cut in two directions.

25         One, it tainted your affirmative evidence, but two, it

Page 43

1    Our prosecution team has in some fashion.

2              Now, obviously, they know where the records are, and

3    they'd bring them there.

4              THE COURT:  Let me just stop you.  Had the civil

5    aviation litigation commenced at the time you did that discovery

6    review, do you know?

7              MR. NOVAK:  I really don't know.  I don't know when it

8    commenced, Judge.

9              THE COURT:  All right.

10             MR. NOVAK:  My guess is yes, and Mr. Spencer is

11   whispering he thinks it's true, too.  I mean, I -- but I don't

12   want to say something that -- I'm obviously very sensitive on this

13   issue, so I want to make sure I'm crystal clear about what I know

14   the facts are.

15             THE COURT:  Because one of the additional problems --

16   and this is just based on what I've read in the paper -- would

17   appear to be is Ms. Martin may have been wearing two hats in this

18   matter; that is, if she's defending -- or assisting in the defense

19   of some FAA people in a civil case and then assisting you with

20   discovery in a criminal case --

21             MR. NOVAK:  Right.

22             THE COURT:  -- where, you know, you're looking at the

23   potential liability of --

24             MR. NOVAK:  Sure.

25             THE COURT:  It's a very different path --

Exhibit 17



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Virginia*

---

*2100 Jamieson Avenue*
*Alexandria, Virginia 22314*

March 13, 2006



<u>**Ex Parte — Under Seal**</u>

Hon. Leonie M. Brinkema
United States District Judge
401 Courthouse Square
Alexandria, VA 22314

<u>By Hand Delivery</u>

       Re:   <u>U.S. v. Zacarias Moussaoui</u>; Crim. No. 01-455-A

Dear Judge Brinkema:

      We write *ex parte* to inform the Court of a possible violation of the sequestration order as it relates to FAA witnesses. Late in the afternoon on Friday, March 10, 2006, we learned that Carla Martin, an attorney for the Transportation Safety Administration, provided a copy of the transcript from the first day of trial to one of the witnesses from the FAA, Lynne Osmus. Ms. Osmus did not read the transcript. We then investigated Ms. Martin's contact with other current/past employees of FAA, whom Ms. Martin represented in this case (she has since been replaced). We learned over the weekend that Ms. Martin sent e-mails with the transcript from the first day to the following potential witnesses:

| Name of Witness | Side Calling Witness | Read E-Mail? | Read Transcript? |
|---|---|---|---|
| Lynne Osmus | Gov't | Yes | No |
| Claudio Manno | Gov't | Yes | Yes |
| Lee Longmire | Gov't | Yes | No |
| Pat McDonnell | Defense | Yes | No |
| Robert White | Defense | Yes | No |
| Matthew Kormann | Defense | Yes | Yes |
| John Hawley | Defense | Unknown | Unknown |

We have been unable to contact Mr. Hawley to determine whether he reviewed the e-mails or the

1671

transcript.

　　　　We view Ms. Martin's conduct as reprehensible and we frankly cannot fathom why she engaged in such conduct.  As soon as we learned of her conduct, we contacted her supervisors and engaged in an investigation which yielded the above results.  We also notified defense counsel of the conduct by letter, a copy of which is attached.

　　　　We submit this letter *ex parte* because we ask the Court to review Ms. Martin's e-mails, which we enclose, to determine whether they must be produced to defense counsel.  As noted in the letter to defense counsel, one e-mail generated a response from Ms. Osmus and her response has been turned over as Jencks material.  The rest of the e-mails consist of Ms. Martin pontificating about the openings, wrongly understanding the proof that the Government intends to offer.  In our view, Ms. Martin's misguided opinions are not Brady material because she is not a fact witness.  In addition, Ms. Martin was an attorney working on this case, and her e-mails consist of her opinions about on-going litigation prepared as part of her preparation for the litigation and, therefore, may constitute attorney work product.  As noted above, we have provided notice to the defense that potential witnesses have learned of the contents of the opening statements and one portion of Agent Anticev's testimony, and this disclosure may be the subject of cross-examination.  For this reason, we respectfully submit that Ms. Martin's e-mails should not be produced to defense counsel.

　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　Paul J. McNulty
　　　　　　　　　　　　　　　　United States Attorney

　　　　　　By:

　　　　　　　　　　　　　　　　Robert A. Spencer
　　　　　　　　　　　　　　　　David J. Novak
　　　　　　　　　　　　　　　　David Raskin
　　　　　　　　　　　　　　　　Assistant United States Attorneys



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Virginia*

---

2100 Jamieson Avenue  (703)299-3700
Alexandria, Virginia 22314

March 13, 2006

Edward B. MacMahon, Jr., Esq.
Alan Yamamoto, Esq.
Gerald Zerkin, Esq.
Ken Troccoli, Esq.

<u>Hand-delivery</u>

       Re:    <u>United States v. Zacarias Moussaoui</u>; Crim. No. 01-455-A

Dear Counsel:

    We write to inform you of a possible violation of the sequestration order as it relates to FAA witnesses.  Late in the afternoon on Friday, March 10, 2006, we learned that Carla Martin, an attorney for the Transportation Safety Administration, provided a copy of the transcript from the first day of trial to one of the witnesses from the FAA, Lynne Osmus.  Ms. Osmus did not read the transcript.  We then investigated Ms. Martin's contact with other current/past employees of FAA, whom Ms. Martin represented in this case (she has since been replaced).  We learned over the weekend that Ms. Martin sent e-mails with the transcript from the first day to the following potential witnesses:

| Name of Witness | Side Calling Witness | Read E-Mail? | Read Transcript? |
|---|---|---|---|
| Lynne Osmus | Gov't | Yes | No |
| Claudio Manno | Gov't | Yes | Yes |
| Lee Longmire | Gov't | Yes | No |
| Pat McDonnell | Defense | Yes | No |
| Robert White | Defense | Yes | No |
| Matthew Kormann | Defense | Yes | Yes |
| John Hawley | Defense | Unknown | Unknown |

We have been unable to contact Mr. Hawley.  When we learn whether he reviewed the e-mail and the transcript, we will promptly let you know.

Additionally, Ms. Osmus responded to one of Ms. Martin's e-mails about the possible subject of her testimony. We enclose a copy of that e-mail as part of Ms. Osmus's <u>Jencks</u> material.

Ms. Martin's e-mails contained portions of the opening statements from both sides regarding the FAA evidence. She also included, however, a comment about the testimony of Agent Anticev, stating that he "got tripped up on the Murad issue of flying a plane into the CIA bldg., stating that before 9/11 'no one had ever thought about flying an airplane into a building.'" We are providing a copy of all of Ms. Martin's e-mails to the Court for an *ex parte* determination as to whether they must be produced in discovery.

Sincerely,

Paul J. McNulty
United States Attorney

By:

Robert A.  Spencer
David J. Novak
David Raskin
Assistant United States Attorneys

**Novak, David (USAVAE)**

| | |
|---|---|
| **From:** | Kerner, Francine [█████████████] |
| **Sent:** | Saturday, March 11, 2006 11:57 AM |
| **To:** | Novak, David (USAVAE) |
| **Subject:** | FW: Got your message |

```
-----Original Message-----
From: Martin, Carla <TSA OCC>
Sent: Sat 3/11/2006 9:53 AM
To:   Kerner, Francine
Cc:
Subject:    FW: Got your message


FYI
-----Original Message-----
From: █████████████████
Sent: Wednesday, March 08, 2006 8:15 AM
To: Carla
Subject: Got your message
```

```
And agree w need to be careful in describing how these measures would have impacted the
attack, and will be prepared.  I don't support including 100percent gate
screening...couldn't be done in the shortterm, which is why CAPPS was used to identify who
would get the gate screening.
```

Novak, David (USAVAE)

**From:**        Kerner, Francine [▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓]
**Sent:**        Saturday, March 11, 2006 1:57 PM
**To:**          Novak, David (USAVAE)
**Subject:**     Fw: Moussaoui Transcripts

**Attachments:**     3-6-06 1.PDF; 3-6-06.1a.pdf

 

3-6-06 1.PDF (780    3-6-06.1a.pdf (5
KB)                  MB)

Here is the email that went to Pat. I left you a voice mail. When
Carla went into the office today to check her records, she determined that she sent the
transcript to TSA witnesses too.  I will be following up with additional email.


-----Original Message-----
From: Martin, Carla <TSA OCC> ◄▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
To: Kerner, Francine <▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Sent: Sat Mar 11 12:32:01 2006
Subject: FW: Moussaoui Transcripts


<<3-6-06 1.PDF>>

-----Original M <<3-6-06.1a.pdf>> essage-----
From: Martin, Carla <TSA OCC>
Sent: Wednesday, March 08, 2006 12:40 PM
To: ▓▓▓▓▓▓▓▓▓▓▓▓
Subject: FW: Moussaoui Transcripts



Pat:  here are the opening statements-unfortunately, there are big gaps that the defense
can exploit:


 Among the highlights:


"The FAA is responsible for commercial airline security in the United States.  Where the
FBI would be the offense looking for the plot, had Moussaoui not lied, the FAA would be
the defense."

 That "CAPPS (the "computer assisted passenger preselection system" (sic) would have been
changed to look not for explosives but for small knives and box cutters, and that would
have prevented the terrorists from getting on the plane and getting on the plane with the
weapons they used to turn those aircraft into weapons to kill Americans."

"It would have been a very straightforward effort for the FAA to keep those hijackers and
to keep anyone with a knife or a box cutter off a plane."

 "Because the FAA before 9/11 was concerned about people smuggling explosives in
checked luggage onto planes.  They weren't concerned at that point about people taking
over a plane with a primitive weapon."

 The defense, essentially responded by saying "what the Govt. wants you to believe is
only a dream, and its most seductive quality is that we all wish it had come true, but it
is only a dream."

Today, the FBI agent on the stand got tripped up on the Murad issue of flying a plane into the CIA bldg., stating that before 9/11 "no one had ever thought about flying an airplane into a building."

and p. 59, from the defense:  "The evidence in this case will be that every measure taken after 9/11 to protect airline pax could have been taken before, and the Govt. and the airlines' inability to adapt to the new threat of suicde hijackings was the fundamental weakness most plainly exploited by the real hijackers on September 11th."

As you can see, Claudio, Lynne, Ed Soliday and Larry Wannsley have their work cut out for them, and you may as well.

Carla

--

2

**Novak, David (USAVAE)**

| | |
|---|---|
| **From:** | Kerner, Francine [⬛⬛⬛⬛⬛⬛⬛⬛] |
| **Sent:** | Saturday, March 11, 2006 2:17 PM |
| **To:** | Novak, David (USAVAE) |
| **Subject:** | Fw: Moussaoui Transcripts |
| | |
| **Attachments:** | 3-6-06 1.PDF; 3-6-06.1a.pdf |


3-6-06 1.PDF (780 KB)


3-6-06.1a.pdf (5 MB)

```
-----Original Message-----
From: Martin, Carla <TSA OCC> <⬛⬛⬛⬛⬛⬛⬛⬛⬛>
To: Kerner, Francine <⬛⬛⬛⬛⬛⬛⬛⬛⬛>
Sent: Sat Mar 11 13:31:45 2006
Subject: FW: Moussaoui Transcripts


  <<3-6-06 1.PDF>>

-----Original M <<3-6-06.1a.pdf>> essage-----
From: Martin, Carla <TSA OCC>
Sent: Tuesday, March 07, 2006 4:54 PM
To: White, Robert L <Intelligence TSI>; Hawley, John; Kormann, Matthew
Cc: Stauffer, Stefanie; Longmire, Lee
Subject: FW: Moussaoui Transcripts
```

FYI:  Among the highlights:

"The FAA is responsible for commercial airline security in the United States.  Where the FBI would be the offense looking for the plot, had Moussaoui not lied, the FAA would be the defense."

 That "CAPPS (the "computer assisted passenger preselection system" (sic) would have been changed to look not for explosives but for small knives and box cutters, and that would have prevented the terrorists from getting on the plane and getting on the plane with the weapons they used to turn those aircraft into weapons to kill Americans."

"It would have been a very straightforward effort for the FAA to keep those hijackers and to keep anyone with a knife or a box cutter off a plane."

     "Because the FAA before 9/11 was concerned about people smuggling explosives in checked luggage onto planes.  They weren't concerned at that point about people taking over a plane with a primitive weapon."

     The defense, essentially responded by saying "what the Govt. wants you to believe is only a dream, and its most seductive quality is that we all wish it had come true, but it is only a dream."

     Today, the FBI agent on the stand got tripped up on the Murad issue of flying a plane into the CIA bldg., stating that before 9/11 "no one had ever thought about flying an airplane into a building."

Carla

--

# Novak, David (USAVAE)

| | |
|---|---|
| **From:** | Martin, Carla <TSA OCC> [███████████████] |
| **Sent:** | Saturday, March 11, 2006 5:28 PM |
| **To:** | Kerner, Francine |
| **Subject:** | FW: Got your message |

-----Original Message-----
**From:** Martin, Carla <TSA OCC>
**Sent:** Wednesday, March 08, 2006 11:52 AM
**To:** ███████████████
**Subject:** RE: Got your message

Lynne-let me put it this way: my friends Jeff Ellis and Chris Christenson, NY lawyers rep. UAL and AAL respectively in the 9/11 civil litigation, (and rep. Ed S. and Larry W. here) all of us aviation lawyers, were stunned by the opening. The opening has created a credibility gap that the defense can drive a truck through. There is no way anyone could say that the carriers could have prevented all short bladed knives from going through-Dave MUST elicit that from you and the airline witnesses on direct, and not allow the defense to cut your credibility on cross, (just as they did yesterday with the FBI witness) by saying, "do you really believe, as the prosecution has stated, that all knives could have been found, when there are x-thousands of domestic flights daily in the US, that even now post 9/11 the screener detection rates are very law, and that's all it would have taken to prevent 9/11? That's all he would really need to say.

> -----Original Message-----
> **From:** ███████████
> **Sent:** Wed 3/8/2006 8:14 AM
> **To:** Carla
> **Cc:**
> **Subject:** Got your message

And agree w need to be careful in describing how these measures would have impacted the attack, and will be prepared. I don't support including 100percent gate screening...couldn't be done in the shortterm, which is why CAPPS was used to identify who would get the gate screening.

3/12/2006

## Novak, David (USAVAE)

| | |
|---|---|
| **From:** | Martin, Carla <TSA OCC> ████████████ |
| **Sent:** | Saturday, March 11, 2006 5:29 PM |
| **To:** | Kerner, Francine |
| **Subject:** | FW: Security Counter-Measures |

-----Original Message-----
**From:** Martin, Carla <TSA OCC>
**Sent:** Tuesday, March 07, 2006 6:32 PM
**To:** ████████████
**Cc:** ████████████
**Subject:** Security Counter-Measures

Lynne:

I don't want you to respond to this by email, but I want you to think about this:  I am of the opinion, based on what was said in the opening, (and I am VERY CONCERNED about this opening) and how the defense can exploit it-i.e., the fact that by merely finding all the "primitive weapons"  (assuming that could be done) that that's all it would take to prevent the 9/11 attacks from happening?   I don't think so.

If you look at the Exhib. list , as I said yesterday, we would have had a measure to initiate 100 per cent gate screening with hand-helds before boarding the aircraft, but FAR MORE IMPORTANTLY-all of these hijackers, particularly Atta, and Jarrah, were well trained in hand to hand combat.  Assuming some of them got on board the plane, we know that many things could have been utilized on the aircraft to intimidate and to kill people with.  Therefore:  we MUST emphasize the deterrent value of the measures-i.e., putting up big signs at the screening checkpoints re knives, the scanning of the names through the pax reservation systems,  100 per cent gate screening of pax, but more importantly,  assuming they actually got on the plane,  we would have had to have some provision that forbid the cockpit from opening the door for any reason, that F/A's could not use their keys to open the doors.  Something, to take into account that the banning of small knives alone would NOT have prevented the attacks from going forward-but that the deterrent value of knowing that security measures had been stepped up, would have caused them to re-think their plans, and thus thwart them from going forward.

This is what I would have said in the opening:

"That the multilayered system of aviation security -which you will see examples of in this case-which the FAA had initiated before, and would have initiated again, a multilayered, redundant system of security counter-measures involving close cooperation between the FAA and the regulated air carriers who would implement such measures-

3/12/2006

These measures would have acted as a deterrent to the hijackers and
their deadly plans to take over these aircraft, and would have
thwarted the attacks."

Unfortunately, we can't redo this now.

Carla

FW: Moussaoui Transcripts

## Novak, David (USAVAE)

| | |
|---|---|
| **From:** | Martin, Carla <TSA OCC> [████████████████] |
| **Sent:** | Saturday, March 11, 2006 6:17 PM |
| **To:** | Kerner, Francine |
| **Subject:** | FW: Moussaoui Transcripts |

Francine: as we discussed, the quote below of the FBI witness was taken from a Fox News website article on Tues. Mar. 7th. Here's the link:

www.foxnews.com/story/0,2933,187021,00.html?sPage=specialsections.foxnews/lawcenter

-----Original Message-----
From: Martin, Carla <TSA OCC>
Sent: Wednesday, March 08, 2006 11:38 AM
To: ████████████████
Subject: RE: Moussaoui Transcripts

Claudio-Matt has said he can live with the substitution, except for one small part, which he says is incorrect-and I will go over this with you-I need to pick it up downstairs. More importantly, re the issue of did we ever explore the scenario of flying planes into buildings-and partic. Murad's talk of flying a plane into CIA HQ-I had Matt pull the unclass. Airman checks that we did to check on Murad's assoc. and the fact that we briefed the carriers on our investigation-I will look at what he pulled.

Also, Dave is going to have to go over the lack of information sharing with you ON DIRECT EXAMINATION-to blunt the blow of having the defense raise it for the first time on cross, thus weakening your credibility-and I'm speaking specifically of the following issues: 1. the Phoenix Memo-no, we did not get it, but if we had, this is what we would have done, just as we did when we got the Moussaoui info. -no, we did not know that DCI Tenet was being briefed on Moussaoui re "Islamic Fundamentalist Learns to Fly", but it doesn't matter, because we did get the information, we were following up on it, and he was in custody at the time, so we knew he himself posed no immediate threat to aviation-the question will be raised did you have any reason to believe that M. was part of a conspiracy? Did you think about this? Did you do anything about this? How did you follow up on this?

In other words, the defense will exploit the fact that the FAA was not clued in to what was going on-you need to assert that we did not necessarily need to wait until we got all available information, that we acted independently, indeed, we had a statutory mandate, to follow up on any issue that we thought was a threat to civil aviation, regardless of whether the IC had any information to share on the subject or not.

-----Original Message-----
From: ████████████████
Sent: Wednesday, March 08, 2006 10:44 AM
To: Carla Martin
Subject: Re: Moussaoui Transcripts

Ok. Incredible -- 3 lengthy assessments whittled down to 2 pages. The best way to get it here is probably to fax it since it's only 2 Pages. Our fax number is ████████████

----- Original Message -----
From: "Martin, Carla <TSA OCC>" [███████████████]
Sent: 03/08/2006 10:29 AM
To: ███████████████████
Subject: RE: Moussaoui Transcripts

Yes, I have it-it's 2 pages-and I had Matt review it.

    -----Original Message-----
    From: ████████████ [████████████████████]
    Sent: Wed 3/8/2006 10:01 AM
    To: ████████████████████████████████
    Cc:
    Subject: RE: Moussaoui Transcripts

OK. Thanks . Do you know what the status of the substitution is. today is
already Wednesday and they supposedly were to have it done by Monday
evening.



     "Martin, Carla
     <TSA OCC>"
                        To
     03/07/2006 04:37    ████████████████████
     PM
                     cc
        ████████████████████
                Subject
        RE: Moussaoui Transcripts

Also, Claudio-the FBI agent today got tripped up when questioned about
flying airplanes into buildings-he said that no one, before 9/11 "had
ever thought about flying airplanes into buildings."  The defense
countered with Murad re the plane and CIA.  I've asked Matt to pull any
unclass. Information on Murad-as I know we ran down this issue, deemed
it not to be credible, and ran names through the airman registry, those

3/12/2006

names of other indiv. assoc. with Murad.  Dave will need to go over that
with you.

-----Original Message-----
From: Martin, Carla <TSA OCC> [█████████████████]
Sent: Tuesday, March 07, 2006 4:31 PM
To: Claudio.Manno██████████████
Cc: █████████████
Subject: RE: Moussaoui Transcripts


Yes-and here are some of the highlights I'm not too happy about:


"The FAA is responsible for commercial airline security in the United
States.  Where the FBI would be the offense looking for the plot, had
Moussaoui not lied, the FAA would be the defense."

That "CAPPS (the "computer assisted passenger preselection system"
(sic) would have been changed to look not for explosives but for small
knives and box cutters, and that would have prevented the terrorists
from getting on the plane and getting on the plane with the weapons they
used to turn those aircraft into weapons to kill Americans."

"It would have been a very straightforward effort for the FAA to keep
those hijackers and to keep anyone with a knife or a box cutter off a
plane."

    "Because the FAA before 9/11 was concerned about people
smuggling explosives in checked luggage onto planes.  They weren't
concerned at that point about people taking over a plane with a
primitive weapon."

    The defense, essentially responded by saying "what the Govt.
wants you to believe is only a dream, and its most seductive quality is
that we all wish it had come true, but it is only a dream."


-----Original Message-----
From: ████████████████████████
Sent: Tuesday, March 07, 2006 4:28 PM
To: Carla Martin
Cc: ████████████
Subject: Re: Moussaoui Transcripts


Thanks Carla. We'll look at it. 119 pages -- did they really talk that
Long?


3/12/2006

----- Original Message -----
From: "Martin, Carla <TSA OCC>" █████████████
Sent: 03/07/2006 03:06 PM
To: ████████████████████
Cc: ████████████████████
Subject: FW: Moussaoui Transcripts

Lynne, Claudio-you need to read this transcript of the prosecutor's opening statements-it is all about the FAA, and how it would have caught the hijackers and prevented 9/11.

I believe there are more than a few errors here.

Carla

-----Original Message-----
From: Jeffrey Ellis [█████████████████████
Sent: Tuesday, March 07, 2006 12:26 PM
To: Martin, Carla
Subject: Fw: Moussaoui Transcripts

-------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Christensen, Christopher R. ████████████████
To: Jeffrey Ellis ████████████████
Sent: Tue Mar 07 10:27:17 2006
Subject: Fw: Moussaoui Transcripts

Y <<3-6-06 1.PDF>> ou may have had di <<3-6-06.1a.pdf>> fficulty opening the prior version of the transcripts
-------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

-----Original Message-----
From: Selinger, Maia L. ████████████████
To: Christensen, Christopher R. ████████████████
Sent: Tue Mar 07 10:24:52 2006
Subject: Moussaoui Transcripts

   < <<3-6-06 1.PDF>> <3-6-06 1.PDF>>  <<3-6-06.1a.pdf>> <<3-6-06.1a.pdf>>

Maia Selinger
Legal Assistant
Condon and Forsyth LLP

3/12/2006

7 Times Square
New York, NY 10036

3/12/2006

FW: Moussaoui Transcripts

## Novak, David (USAVAE)

| | |
|---|---|
| **From:** | Martin, Carla <TSA OCC> [████████████████] |
| **Sent:** | Saturday, March 11, 2006 6:27 PM |
| **To:** | Kerner, Francine |
| **Subject:** | FW: Moussaoui Transcripts |

-----Original Message-----
From: Martin, Carla <TSA OCC>
Sent: Tuesday, March 07, 2006 4:38 PM
To: ██████████████
Cc: ██████████████
Subject: RE: Moussaoui Transcripts

Also, Claudio-the FBI agent today got tripped up when questioned about flying airplanes into buildings-he said that no one, before 9/11 "had ever thought about flying airplanes into buildings."   The defense countered with Murad re the plane and CIA.  I've asked Matt to pull any unclass. Information on Murad-as I know we ran down this issue, deemed it not to be credible, and ran names through the airman registry, those names of other indiv. assoc. with Murad.  Dave will need to go over that with you.

-----Original Message-----
From: Martin, Carla <TSA OCC>███████████████
Sent: Tuesday, March 07, 2006 4:31 PM
To: ██████████████
Cc: ██████████████
Subject: RE: Moussaoui Transcripts

Yes-and here are some of the highlights I'm not too happy about:

"The FAA is responsible for commercial airline security in the United States.  Where the FBI would be the offense looking for the plot, had Moussaoui not lied, the FAA would be the defense."

That "CAPPS (the "computer assisted passenger preselection system" (sic) would have been changed to look not for explosives but for small knives and box cutters, and that would have prevented the terrorists from getting on the plane and getting on the plane with the weapons they used to turn those aircraft into weapons to kill Americans."

"It would have been a very straightforward effort for the FAA to keep those hijackers and to keep anyone with a knife or a box cutter off a plane."

"Because the FAA before 9/11 was concerned about people smuggling explosives in checked luggage onto planes. They weren't concerned at that point about people taking over a plane with a primitive weapon."

The defense, essentially responded by saying "what the Govt. wants you to believe is only a dream, and its most seductive quality is that we all wish it had come true, but it is only a dream."

3/12/2006

-----Original Message-----
From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Tuesday, March 07, 2006 4:28 PM
To: Carla Martin
Cc: ▮▮▮▮▮▮▮▮▮▮▮
Subject: Re: Moussaoui Transcripts


Thanks Carla. We'll look at it. 119 pages -- did they really talk that Long?


-----Original Message-----
From: "Martin, Carla <TSA OCC>" ▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: 03/07/2006 03:06 PM
To: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Cc: ▮▮▮▮▮▮▮▮▮▮▮▮
Subject: FW: Moussaoui Transcripts

Lynne, Claudio-you need to read this transcript of the prosecutor's opening statements-it is all about the FAA, and how it
would have caught the hijackers and prevented 9/11.

I believe there are more than a few errors here.

Carla

-----Original Message-----
From: Jeffrey Ellis ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Tuesday, March 07, 2006 12:26 PM
To: Martin, Carla
Subject: Fw: Moussaoui Transcripts



-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Christensen, Christopher R. ▮▮▮▮▮▮▮▮▮▮▮▮▮
To: Jeffrey Ellis <▮▮▮▮▮▮▮▮▮▮▮
Sent: Tue Mar 07 10:27:17 2006
Subject: Fw: Moussaoui Transcripts

Y <<3-6-06 1.PDF>> ou may have had di <<3-6-06.1a.pdf>> fficulty opening the prior version of the transcripts
-------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)


-----Original Message-----

3/12/2006

FW: Moussaoui Transcripts

From: Selinger, Maia L. ███████████████
To: Christensen, Christopher R. ████████████████
Sent: Tue Mar 07 10:24:52 2006
Subject: Moussaoui Transcripts

< <<3-6-06 1.PDF>> <3-6-06 1.PDF>  <<3-6-06.1a.pdf>> <<3-6-06.1a.pdf>>

Maia Selinger
Legal Assistant
Condon and Forsyth LLP
7 Times Square
New York, NY 10036
█████████████

3/12/2006

Exhibit 18

# DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel  212 909 6000
www.debevoise.com

Roger E. Podesta
Partner
Tel  212 909 6213
Fax  212 909 6836
repodesta@debevoise.com

May 7, 2007

**By E-mail**

Jeannette A. Vargas, Esq.
Assistant United States Attorney
U.S. Department of Justice
Southern District of New York
86 Chambers Street, Third Floor
New York, NY  10007

**In Re September 11 Tort Litigation
21 MC 97, 21 MC 101 (AKH)**

Dear Jeannette:

This is in response to your April 26, 2007 letter to me conveying the request of the FAA and TSA that the Aviation Defendants provide (1) the names of all FAA or TSA employees or former employees that any of the Aviation Defendants intend to depose in connection with this litigation; (2) the topics to be covered at such depositions, if authorized; (3) the expected duration of any such depositions, if authorized; and (4) the scope of any additional requests for document discovery from the agencies.

Unfortunately, for the reasons set forth below, the Aviation Defendants are not in a position at this time to provide the degree of specificity that you request. First, as you are aware, the Aviation Defendants' motions concerning the scope of government discovery and seeking determination of the applicable standard of care governing their conduct as of September 11, 2001 are in the process of being briefed and are scheduled for argument before Judge Hellerstein on June 14, 2007. These motions will provide important guidance concerning the scope and subject matter of the discovery the Aviation Defendants will require from TSA and FAA. Of course, the scope and extent of the discovery the Aviation Defendants will seek from TSA and FAA will undoubtedly be less, perhaps substantially less, if the Court determines that the federal aviation security regulations displace any competing state law standards and establish the outer limits of tort liability. If, however, the Court determines that the plaintiffs are to be permitted to attempt to fashion common law standards for what aviation security procedures should have been on 9/11, the scope and extent of the requested discovery will be much broader. It will then become necessary, for example, for the Aviation Defendants not only to

Jeannette A. Vargas, Esq.                    2                         May 7, 2007

establish what the aviation security procedures were, but also the rationale and policies underlying their adoption by the FAA and the FAA's consideration and rejection of alternative approaches to security screening that plaintiffs choose to contend were mandated by the common law. In effect, the Aviation Defendants will be required to conduct discovery to persuade the juries not only that they complied with FAA requirements but that those requirements had a sound policy basis and were reasonable measures that should be accepted by the juries as meeting the applicable common law standard of care. It is in large part for this reason that the Aviation Defendants consented to adjourn the FAA Rule 30(b)(6) deposition initially noticed for May 2, 2007 until after the June 14 hearing.

Second, the FAA and TSA requests for additional specificity largely put the cart before the horse. The Aviation Defendants have tried, consistent with the protection of their litigation interests, to avoid burdening TSA and FAA with multiple or conflicting requests. To that end, the Aviation Defendants as a group served a single set of document requests on FAA and TSA in July 2006 and have several times modified and prioritized that request in an effort to accommodate TSA and FAA. To date, however, we have received only a limited production of responsive documents, although we have been assured that substantial numbers of additional documents potentially containing SSI will be placed into the Reading Room. As of this writing, however, not a single attorney for any of the Aviation Defendants has been cleared for access to the Reading Room. Without an opportunity to review the documents that TSA and FAA are producing in response to our outstanding requests, the Aviation Defendants are simply unable to identify what additional documents they may require.

The situation is quite similar for depositions. Once again, the Aviation Defendants have avoided multiple or conflicting deposition requests and have provided TSA and FAA with a very detailed Rule 30(b)(6) deposition notice.[*] Indeed, we adopted the Rule 30(b)(6) approach to FAA deposition discovery at the suggestion of the Government in an effort potentially to limit the number of individual FAA and TSA witness depositions we might seek. But the Aviation Defendants have consistently reserved their right to take additional FAA or TSA depositions if the designated Rule 30(b)(6) witness or witnesses are unable to meet all of our legitimate discovery needs.

The Aviation Defendants have sought to cooperate with the Government in addressing the difficult discovery issues presented by this important and complex litigation and we in turn have appreciated the efforts of the Government, and particularly

---

[*]    MassPort's request for the depositions of Stephen Luongo and James Peters is consistent with the Aviation Defendants' approach. Messrs. Luongo and Peters are in no sense Rule 30(b)(6) witnesses, but rather fact witnesses on a specific topic of peculiar importance to MassPort.

Jeannette A. Vargas, Esq.                    3                    May 7, 2007

of your office, to take account of our interests.  But until the Court rules on the pending motions, until the documents already requested for production proceed through the process of Reading Room review and until the Rule 30(b)(6) deposition is held, the Aviation Defendants cannot provide, and cannot reasonably be expected to provide, the type of detailed particulars for additional discovery that TSA and FAA request in your letter.

                              Very truly yours,

                              Roger E. Podesta

Exhibit 19

Exhibit 19 has been filed in hard-copy format pursuant to ¶7.3 of the March 30, 2004 Confidentiality Order in this litigation.

Exhibit 20

541

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

Slide 1
(music)

\*\*\*

Slide 2
title - no narration

\*\*\*

Slide 3

Hello. My name is Pat McDonnell, Director of the Office of Civil Aviation Security Intelligence of the Federal Aviation Administration.

\*\*\*

Slide 4A

You are probably aware that civil aviation has long been a favored target of terrorist groups and state sponsors of terrorism. An air carrier's flag establishes it as a symbol of the nation—or the government of the nation—that the terrorists want to strike. In 1985, for example, Sikh terrorists were responsible for the bombing of an Air India flight from Canada, which crashed into the ocean off the coast of Ireland, killing 329 passengers and crew. This incident remains the most lethal terrorist attack on civil aviation in history. In 1987, North Korean agents disembarked from a South Korean airliner, leaving a bomb concealed in a radio in the cabin. It exploded on the next leg, causing the aircraft to crash, resulting in 115 deaths. The photo on the left depicts a radio similar to the one used to disguise the explosive device. More recently, in April 1999, the Colombian terrorist group ELN, or National Liberation Army, hijacked an Avianca aircraft on a domestic route and did not release the last hostages until November 2000, making this by far the longest hijacking on record.

Although there have been no successful terrorist attacks against U.S. civil aviation since the bombing of Pan Am flight 103 in December 1988, it is only a matter of luck that there were not multiple catastrophes with thousands of fatalities in 1995—as you will hear later. The purpose of this briefing is to give you a better understanding of the current threat to U.S. air carriers by focusing on the groups and state sponsors deemed likeliest to attack these symbols of the United States.

\*\*\*

Slide 4B

M-TSA-00000003

Unfortunately, there's been quite a bit of activity in the world of terrorism in the past year or so, including an international terrorist hijacking--the first since 1994--and an attempt

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

EXHIBIT
TWhey-168
11-1-06

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

by foreign terrorists to smuggle bomb materials into the United States from Canada. This presentation will examine these events and their relevance to the overall threat to U.S. civil aviation, both in the United States and overseas.

Currently, the most significant threats to the United States are the country of Iran, a designated state sponsor of terrorism, and terrorist groups based in the area enclosed by the circle on the map. Of the groups, we're concerned about the Lebanese Hizballah, which is a surrogate of Iran, and the groups which are part of the International Islamic Front for Jihad against Crusaders and Jews formed by Usama bin Laden. These groups have representatives in most parts of the world, including North America.

\*\*\*

Slide 5

Iran remains the most active state sponsor of terrorism. The government departments most closely associated with terrorism are under the control of Supreme Leader Ali Khameini (pictured here on the left). Because it opposes the Middle East peace process, Iran actively supports the operations of groups intent on derailing the negotiations. Iran also objects to the continuing presence of U.S. and other Western military forces in the Persian Gulf and Saudi Arabia. There are, however, some positive signals coming from Tehran lately. President Mohammed Khatami (pictured here on the right) and other "reformists" have expressed interest in renewed relations with the United States. Moving in that direction, on March 17, 2000, Secretary of State Albright announced revisions of the U.S. sanctions against Iran, allowing the import of Iranian food products and carpets. The fate of this diplomacy, however, lies in the hands of Supreme Leader Khameini and the hard-line Guardian Council. The reformists will have to move carefully to avoid a conservative backlash. Pro-reform journalists and moderate religious leaders have been arrested for speaking out against the establishment. Because of this, we should not expect any immediate, drastic changes in Iran's attitude toward the United States or its support of terrorism.

\*\*\*

Slide 6

Hizballah is one of the most notorious terrorist groups in the world. Their goal is to create an Islamic Republic in Lebanon and remove all Western influences from the area. They have a worldwide presence with concentrations in the Middle East, Africa, Europe and the Americas. While they have very close ties to Iran, they have conducted operations in the past without its approval. They have a long record of lethal attacks, but are probably best remembered for their suicide bombing of the Marine barracks in Beirut in 1983. They were also involved in a number of hijackings and hostage operations in the 1980s—most notably the hijacking of TWA 847 in 1985. Hizballah remains one of the best organized, best trained and most sophisticated terrorist groups in the world today.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

The Hizballah presence in the United States was highlighted on July 22, 2000 when 19 individuals were arrested in North Carolina and Michigan for money laundering, racketeering and immigrations violations. A federal affidavit stated that the accused were part of an active group of Hizballah members who had sent funds obtained from criminal enterprises to Lebanon for Hizballah's use. They had also acquired technical equipment such as night vision goggles and global positioning systems for Hizballah.

\*\*\*

Slide 7

Currently, however, the organization that presents the greatest clear and present danger to U.S. interests is the International Islamic Front for the Jihad Against the Crusaders and Jews formed by Usama bin Laden. Bin Laden is the renegade Saudi Arabian businessman who is using his considerable wealth to sponsor terrorist activities against the United States to diminish our presence and influence in Arab and Muslim countries.

Bin Laden has been placed on the FBI's most wanted list for his involvement with the bombings of the U.S. embassies in Kenya and Tanzania. A $5,000,000 reward has been offered for his capture.

\*\*\*

Slide 8

As it turned out, there was more to worry about at the turn of the century than the Y2K bug. Terrorist plots targeting U.S. interests were uncovered overseas and at home.

Since December 1999, authorities in Jordan have arrested 16 members of a group planning to attack tourist sites frequented by Americans and Israelis during celebrations coinciding with the millennium. Those arrested include Khalil al-Deek and Raid Hyazi, who are citizens of both the Unites States and Jordan. Evidence indicates that the suspects received terrorist training in Afghanistan and have links to the bin Laden network.

In addition, the Jordanians believe at leas, another 12 people, all still at large, were involved in the plot. This is a huge number for a terrorist operation. This point will be emphasized in greater detail later in this presentation. The interrogations of the suspects and subsequent investigations resulted in the discovery by Jordanian authorities of large amounts of weapons, explosives and bomb-making equipment.

\*\*\*

Slide 9

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

For years now, there has been a growing concern on both sides of the border regarding the presence of terrorists in Canada who have an interest in infiltrating into the U.S. There have been 13 cases documented from 1995 to 1999 involving terrorists crossing the border. One of the 13 cases involved a man who was sentenced to life for plotting to bomb the New York subway system.

\*\*\*

Slide 10

At the end of 1999 there was a somewhat similar plot uncovered. On December 14, Ahmed Ressam attempted to enter the U.S. at Port Angeles, Washington. Customs officers thought that he was acting in a suspicious manner. When they approached him, he fled, but was quickly apprehended. A search of his car revealed explosives and bomb-making equipment..

Canadian authorities announced that Ressam had undergone training at one of Usama bin Laden's Afghanistan camps in the early 1990's. In addition, they said that Ressam and a man named Abdel Dahoumane had recently shared a hotel room in Vancouver. Dahoumane was subsequently arrested in Algeria. So far, to our knowledge, he has not provided information regarding his role in the Millennium Plot or his connections to Usama bin Laden. Both Ressam and Dahoumane are believed to be connected to the Algerian Armed Islamic Group, or GIA, as it is known by its French acronym. They've been indicted on nine counts, including conspiracy to commit terrorism and several explosives-related violations.

\*\*\*

Slide 11

Ressam's specific plans or potential targets for terrorist activity are still unknown. Media speculation centered on attacks during the millennial celebrations in Seattle, New York and Washington, DC, but so far that has not been confirmed.

\*\*\*

Slide 12

A telephone number found in Ressam's possession led authorities to suspect Abdel Meskini, a Brooklyn, New York resident. The FBI placed a wiretap on his phone and intercepted a conversation between Meskini and Mukhtar Haouari of Montreal. Haouari instructed Meskini to get rid of his pager, cellular telephone and any evidence of his recent trip to Seattle. Just days later, authorities observed Meskini discarding several documents, including an airline ticket from Seattle, in a dumpster. He was subsequently arrested and told authorities that Haouari sent him to Seattle to drive and interpret for Ressam. He was waiting for Ressam to drive off the ferry at Port Angeles. When

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

Ressam didn't appear, he returned to New York, telephoned Haouari and learned of Ressam's arrest. Haouari was arrested in Montreal on charges of aiding and directing Ressam's activities. The U.S. government has requested his extradition. According to Canadian authorities, Haouari probably also has ties to the GIA.

\*\*\*

Slide 13

On December 19, 1999, Immigration officers stopped Lucia Garofalo and Bouabide Chamchi as they attempted to enter Vermont from Canada. INS records revealed that they had attempted to cross the border at two other locations during December. Based on telephone toll records, prosecutors filed court documents linking Garofalo and Ressam to the same cell of the GIA. In late February she was deported to Canada. Investigation also determined that her husband is a suspected member of the GIA who was deported to Algeria from Italy in January of this year (2001). So far, he has not been connected to the conspiracy.

The last arrest of an individual connected to Ressam was Abdel Tizegha, who was taken into custody near Seattle on December 24th and charged with immigrations violations. He has denied any ties to Ressam or Dahoumane, but the FBI stated that telephone records revealed contact between him and Ressam.

\*\*\*

Slide 14

Additional leads in the investigation indicate the broad transnational nature of this conspiracy. On December 21, 1999, Irish police detained Hammid Aich, who once shared an apartment in Canada with Dahoumane. At the time of his arrest, police discovered drawings for several devices, possibly bomb.

On January 27, Mohambedou Slahi, a Mauritanian, was taken into custody in Mauritania pending the outcome of a U.S. extradition request. Press reporting linked Slahi with both Ressam and a lieutenant of Usama bin Laden. The U.S. Attorney's office in Manhattan was considering charges against Slahi because he allegedly was in regular communication with Haouari in Canada. During interrogation by the FBI and Mauritanian authorities, Slahi consistently denied that he had any connection to bin Laden or to the individuals arrested in Canada and the United States. He was later released by Mauritanian authorities.

\*\*\*

Slide 15

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released with express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

It's quite possible that the bomb maker in this plot was trained in Afghanistan in a bin Laden camp. The timing mechanisms found among the bomb-making material in Seattle were Casio watches connected to nine-volt batteries, which is a method taught in those camps. The picture on the left is a modified Casio watch to be used as a timer in the 1995 plot by Ramzi Yousef to blow up a dozen U.S. airliners flying in Asia. The picture on the right is one of the timing mechanisms found in Seattle. However, the amount and type of explosives seized in Seattle indicates the bombs they were intending to build were larger than the type that would be used against an airliner.

***

Slide 16

The most troubling aspect of this conspiracy is that it involved members of the GIA. They are literally a gang of vicious cutthroats.. The GIA began its campaign of bloodshed in Algeria in mid-1992, as an effort to install a government based on Islamic law. They employ a variety of tactics, including vehicle bombings, abductions, kidnapping, torture and decapitation. They also intimidate civilians through massacres, often of entire villages. Their "signature" style of killing is cutting their victims' throats. So far, the unofficial death count in Algeria at the hands of the Armed Islamic Group is 80,000--and that's a low estimate! In terms of casualties, the GIA's fight with the Algerian government is considered one of the most serious ongoing conflict in the world.

***

Slide 17A

The involvement of GIA members in the millennium plot is out of character for the group, because they haven't been much of a concern for the United States in the past. They've only targeted U.S. interests twice, and those attacks were directed at U.S. facilities in Algeria. Historically, their main targets have been the present Algerian government and France. So why are they now interested in the United States?

The answer may lie in statements made by Canadian and U.S. officials who said that Ressam's group had approached the bin Laden network for assistance, making it more likely that they were freelancing, rather than being actually directed by the GIA.

If this is the beginning of a trend, persons responsible for aviation security should be concerned. The GIA conducted the deadliest terrorist hijacking of the last decade. Four armed terrorists took control of an Air France flight in Algeria in 1994. Their demand was the release of blind Shaykh Omar Rahman, who is in jail in the United States, and four Islamic extremists imprisoned in Algeria. The ordeal ended 56 hours later in Marseilles, France, when the plane was assaulted by a French special forces unit.

***

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1st. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security of the Federal Aviation Administration, Washington, D.C. 20591.

Slide 17B
(Air France hijacking Video)

Three passengers were killed by the terrorists. The most troubling aspect of this hijacking was that it may have been a suicide mission. As the plane was en route to Marseilles, a terrorist told the passengers: "We are here to die." The hijackers were also observed examining dynamite, which had been placed under seats in the cockpit and in the center of the plane. When the aircraft landed in Marseilles, the terrorists requested 27 tons of fuel to fly to Paris. This request was unusual because only 10 tons were required. It was then suspected that they intended to fly the aircraft to a friendly Islamic country or blow it up over Paris. The possibility that the second course of action would be carried out was made only too real when an anonymous informant warned the French Consulate in Algeria that the plane was a "flying bomb that will explode over Paris." This hijacking marked the beginning of the GIA's terror campaign against the French outside Algeria. During 1995 and 1996, the GIA was the primary suspect in several attacks in France, including bombings of the Paris subway system in which seven passengers were killed and dozens were injured.

***

Slide 18

The second international terrorist hijacking of an airliner in the '90s occurred in December 1999. The major difference between it and Air France, is that this one was successful.

Five terrorists, armed with pistols, grenades and knives hijacked Indian Airlines flight 814 while it was en route to India from Nepal. Initially, the hijackers demanded the plane be flown to Lahore, Pakistan, but Pakistani officials denied it landing, forcing it to land instead in Amritsar, India. While in Amritsar, the hijackers demanded fuel for the aircraft, threatening to harm passengers if the demand wasn't met. During this time, one passenger, an Indian national, was killed, supposedly for failing to follow directions. The aircraft eventually took off for Lahore, where authorities closed the airport to discourage it from landing. After a plea from the pilot that they would crash if it they couldn't land, the plane made an emergency landing, and departed after taking on food and fuel. The flight was then diverted to Oman and Dubai, before arriving in Qandahar, Afghanistan on December 26.

***

Slide 19

The hijackers demanded the release of Maulana Mazood Azhar from an Indian jail.

Azhar is a Pakistani Muslim cleric and leader of the Kashmiri separatist group, Harakat-ul-Mujahidin. They also demanded the release of 35 other jailed militants and $200

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1st. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1 et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

million. On December 29, during negotiations with Indian diplomats, the hijackers dropped their demands for ransom and the release of 35 prisoners; however, India did agree to exchange three jailed militants for the safe return of the aircraft and passengers.

The hijacking concluded on December 31st with the release of Azhar and two other prisoners. The passengers and crew were released and flown from Qandahar to New Delhi. Meanwhile, the Taliban, the controlling force in Afghanistan, had granted the hijackers ten hours to leave the country. The hijackers departed with a Taliban "hostage" to ensure their safe passage, and allegedly left Afghanistan.

The hijacking was professional, well-planned and, unfortunately, successful. According to one passenger, the hijackers had one man monitoring the cockpit at all times, while two others would watch the passengers, and the remaining two would rest. The hijackers wore ski masks and were always armed, they also carried radios to communicate with each other. The passengers were blindfolded and forced to keep their heads down, and the shutters on the aircraft windows were closed to make sure the passengers were unaware of their location.

\*\*\*

Slide 20

Speculation is that the hijackers were members of the Harakat-ul-Mujahedin, also known as the HUM, a militant group based in Pakistan. Their goal is to liberate Kashmir from what it sees as Indian occupation. HUM is part of the International Islamic Front for Jihad against Crusaders and Jews, and signed Usama bin Laden's proclamation calling for attacks on United States. Although their primary target is India, they've announced their intention to avenge the members of its group who were killed or wounded in the U.S. missile strikes on bin Laden's training camps in 1998. It's likely that the hijackers received their training in these camps.

On November 12, 1999, improvised rockets were fired at the U.S. Embassy, U.N. facilities, and the American Cultural Center in Islamabad. None of the rockets hit the Embassy, but there were injuries. The photo on the left is a picture of one of the launch vehicles that caught fire. The HUM is a primary suspect in this attack.

\*\*\*

Slide 21

What do the terrorist events of the past year tell us about the future? Let's first take a look at hijackings. Most international hijackings in the 1990's were perpetrated by individuals motivated by personal factors like escaping political or economic conditions in their homeland. They were largely unprofessional operations and rarely involved violence against passengers or crew. The hijacking of Ariana Airlines flight 805 in

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1 et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20691.

February 2000 is considered to be in that category. The flight which originated in Afghanistan ended up in England, where 74 of the passengers requested political asylum.

During the 1990's, the conditions for terrorists' seizing a U.S. airliner were less favorable than in the previous two decades. Arrests of key members and cells, restraints placed by state sponsors, and the lack of safe haven airports--all may have contributed to the decline. However, in light of the successful Indian Airlines hijacking, we believe that the environment has changed and that the terrorist threat to U.S. airliners has increased. The emergence of Usama bin Laden and his relocation to Afghanistan may offer a new safe haven for future hijacked aircraft. The use of a safe haven is important for a sustained terrorist hijacking to be successful, because the plane can be held in a controlled environment. The hijacking of flight 814 was successful because of this. At no time did the hijackers appear to feel threatened while on the around in Qandahar.

\*\*\*

## Slide 22

There's significant motivation for associates of bin Laden to conduct a terrorist hijacking. Successful intelligence and law enforcement operations around the world have led to the arrests and imprisonment of many individuals linked with his organization. Just in the United States alone we've jailed notable figures such as Ramzi Yousef and the Blind Sheik, as well as Mohammed al-Owahli and Mohammed Odeh for the Nairobi Embassy bombing. With the hijacking of Indian Airlines as a model, we're concerned that bin Laden's followers may look to duplicate that success by seizing a U.S. airliner to exchange hostages for the release of these prisoners and others.

\*\*\*

## Slide 23

This concern is not just based on idle speculation when viewed in light of events that began in Asia in the early part of 2000 and are continuing. In March, about 50 Filipino children and teachers were kidnapped on the island of Basilan in the Philippines y Islamic terrorists belonging to the Abu Sayyaf group, which is fighting to establish an independent homeland in the southern Philippines. In April, another faction of the group snatched 21 hostages, most of them foreign tourists, from a resort in Malaysia and took them to Jolo island in the Philippines. In May, the rebels on Basilan beheaded two of the hostages because their demands were not being met. The demands included the release of three terrorists, including Ramzi Yousef from jails in the United States. Some hostages are still being held and, on August 28, an American citizen was kidnapped by the group and threatened with death unless the United States frees Yousef.

A possible connection of Yousef to the Abu Sayyaf group goes back to 1994, when Yousef was in the Philippines plotting to bomb U.S. airliners. He tested one of his devices by placing it on Philippine Airlines flight 434 to Tokyo. It detonated en route,

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20691.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq.  No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

killing one passenger and injuring six others.  Curiously, an anonymous caller claimed that the Abu Sayyaf group was responsible for the attack.  Although the group denied the claim, the current demand for Yousef's release in exchange for the hostages reinforces our concern about a future hijacking by other Islamic terrorists for the same purpose.

\*\*\*

Slide 24

Considering everything, we assess that a terrorist hijacking of a U.S. airliner is more likely to occur overseas than in the United States.  A domestic hijacking would likely result in a greater number of American hostages, but would be operationally more difficult to accomplish.  We don't rule it out, but two factors are not in the hijackers' favor.  First, the terrorist support structure inside the United States is less developed than overseas, and second, if an aircraft is hijacked with the objective of flying it to a safe haven, it will probably need to be refueled.  Planes flying in Europe, Africa and Asia could conceivably reach a safe haven without refueling.

If, however, the intent of the hijackers is not to exchange hostages for prisoners, but to commit suicide in a spectacular explosion, a domestic hijacking would probably be preferable.  Fortunately, we have no indication that any group is currently thinking in that direction.

While FAA considers a suicide bombing of a U.S. airliner to be a low probability, a non-suicide bombing continues to be a major concern.  For example, convicted members of the Manila plot to bomb U.S. airliners in Asia had links to bin Laden and members of that bombing conspiracy are still at large.  Also, statements attributed to bin Laden following the U.S. missile attack on his camps specifically threatened to bring down and hijack U.S. and Israeli aircraft.

\*\*\*

Slide 25

The threats uncovered in connection with the millennium are troubling, especially the one in North America.  The apparent alliance of members of the GIA with bin Laden is an unwelcome surprise.  GIA members have never before targeted American interests outside Algeria and have never before attempted attacks in North America.

While the bin Laden network represents the most ominous terrorist threat we've ever faced, we've been fortunate so far that intensive law enforcement and intelligence efforts have interdicted or disrupted many operations.  But personnel responsible for security can't become complacent.  Bin Laden's recent lack of success is not the result of a lack of trying.

\*\*\*

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq.  No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

1000551

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

Slide 26

One possible explanation for bin Laden's relative lack of success may lie in the structure of his network and his current method of operation. His organization, if you can call it that, is a loose affiliation of like-minded extremists held together by his money and the force of his personality. Although still deadly, it lacks the organizational structure, discipline and cohesiveness of the Middle Eastern terrorist groups of the 70's and 80's which were often trained by the intelligence services of state sponsors of terrorism. Those groups maintained a military-style hierarchy, with tight central control. Typically, the operational cells were small--usually averaging less than five members--and contact between cells was limited. Compartmentalization and secrecy were emphasized. In other words, they practiced operational security which made them difficult to detect.

In contrast, bin Laden's network is running terrorist operations in a much looser, less organized and less disciplined fashion. Just the sheer numbers involved in operations are unprecedented. In the plot in Jordan, there were 28 conspirators identified, and there may be more. In the East Africa bombings, 17 conspirators have been identified and indicted, and at least nine others have been named as having involvement in the crime. Including these suspects, more than 130 persons have been arrested worldwide since August of 1998. Involving that many people, especially some who may not be well-trained, leaves them vulnerable to identification and infiltration.

FAA believes that, sooner or later, the unwieldiness of the network he's created will become apparent to bin Laden, and he may seek help from some "experts" to bring order and security to his operations. Unfortunately there are already indications that this has happened. According to the Justice Department, bin Laden has forged alliances with representatives of the government of Iran and Hizballah with the goal of working together against the West.

\*\*\*

Slide 27
(Tenet video)

In February of this year (2001) CIA Director George Tenet summarized the current threat to U.S. interests in his testimony before Congress.

\*\*\*

Slide 28

In conclusion, it is the assessment of the FAA Office of Civil Aviation Security Intelligence that U.S. aviation targets could be selected by the terrorist organizations mentioned in this presentation. The recent counterterrorist successes against the bin Laden network probably saved many lives, but the tenacity displayed by his followers

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et, seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

leads us to believe that more attacks will be attempted. We cannot assume that intelligence and law enforcement efforts will intercept all of these attacks. A strong security posture must be maintained to deter or prevent them.

In closing, we would do well to keep in mind the words of a spokesman for the Irish Republican Army in 1984 following an unsuccessful attempt to assassinate Prime Minister Margaret Thatcher with a bomb: "Today we were unlucky. But remember, we only have to be lucky once--you will have to be lucky always."

\*\*\*

Slide 29

The preceding presentation was current as of September 2000. The following update reviews disturbing events that occurred in the Middle East in October.

On October 12th in Aden, Yemen, two men in a small boat executed a bombing attack against the USS Cole which was refueling there. The powerful explosion killed 17 sailors and injured 39 others. While no evidence linking bin Laden to this attack has been made public, Islamic extremists affiliated with him are high on the list of suspects.

Further raising the specter of additional terrorist attacks against U.S. interests are the events currently unfolding in Israel. On September 28th, Israeli Minister Ariel Sharon and a delegation of hard-line lawmakers visited a site in Jerusalem sacred to both Muslims and Jews. Sharon affirmed the Jewish claim to the site and his conviction that all of Jerusalem must remain under Israeli sovereignty. The next day violent clashes erupted between Palestinians and Israelis in Jerusalem and quickly spread to the West Bank and the Gaza Strip. Some Palestinian leaders have referred to the violence as an "intifada," the Arabic word for shaking, recalling the civil disorders which rocked the Occupied Territories from 1987 into the early 1990's. The impact of the violence on the Middle East peace process has been severe. The perception that the United States has always steadfastly supported Israel has been highlighted persistently throughout this crisis and could provide the motivation for a terrorist backlash against U.S. interests.

Additional updates to this presentation will be provided as appropriate.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1 et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

## WARNING

The following presentation is a product of the Office of Civil Aviation Security Intelligence of the Federal Aviation Administration. It is FOR OFFICIAL USE ONLY. It is exempt from public availability and is a record subject to the provisions of 14 CFR 191.1. Release of information contained herein is prohibited without the express written authority of the Associate Administrator for Civil Aviation Security.



### Federal Aviation Administration
### Office of Civil Aviation Security Intelligence

*The Transnational Threat to Civil Aviation*



### Office of Civil Aviation Security Intelligence

#### Note:

Any adverse mention in the following presentation of individual members of any political, social, religious, or national group is not meant to imply that all members of that group are terrorists. Indeed, terrorists represent a small minority of dedicated, often fanatical, individuals in most such groups. It is those small groups - and their actions - that are the subject of the major points of this presentation.

### Office of Civil Aviation Security Intelligence



KOREAN AIR 858

ELN

### Office of Civil Aviation Security

The Transnational Threat



### Office of Civil Aviation Security Intelligence

- Iran...
  - Opposes Middle East Peace Process
  - Objects to US Military in Persian Gulf
  - Reformists vs. Hardliners






FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1 et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191. 1st. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.







Office of Civil Aviation Security Intelligence

- Hizballah...
  - Worldwide Presence
  - Previous Attacks
  - Extremely Capable

Office of Civil Aviation Security Intelligence

- Usama bin Laden
  - Clear and Present Danger
  - FBI Most Wanted
  - $5,000,000 Reward







Office of Civil Aviation Security Intelligence

Middle East Millennium Plot

- Jordanian Arrests
  - US and Israeli Targets
  - US Citizens Suspect
  - More than 27 Conspirators

Khalil Deek

Office of Civil Aviation Security Intelligence

- Terrorist Infiltration From Canada
  - Growing Concern
  - NY Subway Plot




Office of Civil Aviation Security Intelligence

- U.S. Millennium Plot

Daoumane                          Ressam

Office of Civil Aviation Security Intelligence

Potential Targeting

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191. 1st. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.













FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191. tet. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.



Office of Civil Aviation Security
Intelligence



Office of Civil Aviation Security
Intelligence

- Indian Airlines Flight 814
  - Nepal - India - Pakistan - United
    Arab Emirates - Afghanistan
  - One Passenger Killed

Office of Civil Aviation Security
Intelligence

- Indian Airlines Flight 814
  - Demanded Release of Prisoners
    and $200 million
  - India Capitulated
  - Hijackers Escaped




Office of Civil Aviation Security
Intelligence

- Harakat al-Mujaheddin (HUM)
  - Based in Pakistan
  - International Islamic Front
    for Jihad Against Crusaders
    and Jews





Office of Civil Aviation Security
Intelligence

- Terrorist Hijackings
  - Will There be More?
  - Will U.S. Airliners be Targeted?
  - New Safehavens




Office of Civil Aviation Security
Intelligence

- Hijacking Motivations
  - Free Incarcerated Terrorists
  - Overseas vs. Domestic




FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191, et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.



### Office of Civil Aviation Security Intelligence

- Hostages in the Philippines
  - Abu Sayyaf Group Demands Yousef's Release
  - Philippine Airlines Bombing

  

Basilan          Jolo



### Office of Civil Aviation Security Intelligence

- Hijacking Threat
  - Overseas vs. Domestic
  - Hostages vs. Flying Bomb

 

Indian Airlines - 1999     Air France - 1994



### Office of Civil Aviation Security Intelligence

- Current Threat
  - Scope is Broadening
  - Failed Attempts Do Not Equate to Diminished Threat

  



### Office of Civil Aviation Security Intelligence

- Future Threat
  - Learning From Mistakes
  - Dangerous Alliances

  



### Office of Civil Aviation Security Intelligence

- CIA Director George Tenet:





### Office of Civil Aviation Security Intelligence

Deter and Prevent



FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.



## Continuing Conflict

- Intifada 2000
- USS Cole



Office of Civil Aviation Security
Intelligence

### *Note:*

Any adverse mention in the following presentation of individual members of any political, social, religious, or national group is not meant to imply that all members of that group are terrorists. Indeed, terrorists represent a small minority of dedicated, often fanatical, individuals in most such groups. It is those small groups - and their actions - that are the subject of the major points of this presentation.

Duplication Prohibited

Narration: Pat McDonnell
Presentation Software: Microsoft PowerPoint
Build: 1.2
Date: March 22, 2008

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

Exhibit 21

Exhibit 21 has been filed in hard-copy format pursuant to ¶7.3 of the March 30, 2004 Confidentiality Order in this litigation.

Exhibit 22

Exhibit 22 has been filed in hard-copy format pursuant to ¶7.3 of the March 30, 2004 Confidentiality Order in this litigation.

Exhibit  23

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# United States District Court

## DISTRICT OF COLUMBIA

IN RE SEPTEMBER 11TH LITIGATION
IN RE SEPTEMBER 11TH PROPERTY DAMAGE AND
BUSINESS LOSS LITIGATION

V.

Federal Aviation Administration
800 Independence Avenue, SW
To: Washington, DC 20591

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER: 21 MC 97 (AKH)
21 MC 101 (AKH)
SOUTHERN DISTRICT OF NEW YORK

☐    YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION United States District Court for the SDNY, 500 Pearl Street, New York, NY; See attached 30(b)(6) Deposition Notice. | DATE AND TIME September 12, 2006 - 10:00 a.m. |
|---|---|

☑    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE  Condon & Forsyth LLP, 7 Times Square, New York, NY 10036; See Document Requests attached hereto as Schedule A. | DATE AND TIME August 14, 2006 - 10:00 a.m. |
|---|---|

☐    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) *Desmond T. Barry - HH*    Aviation Defendant's Liaison Counsel* | DATE July 14, 2006 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER
Des Barry, Aviation Defendants' Liaison Counsel, Condon & Forsyth LLP, 7 Times Square, New York, NY 10036, (212) 894-6770.

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

1 If action is pending in district other than district of issuance, state district under case number.

*Requesting Aviation Defendants consist of American Airlines, Inc., AMR Corp., United Airlines, Inc., UAL Corporation, Colgan Air, Inc., US Airways, Inc., US Airways Group, Argenbright Security, Inc., Globe Aviation Services Inc., and Huntleigh USA Corp., Inc. US Airways Group, Inc. and US Airways, Inc. join in these demands solely with respect to the PI/WD and PD/BLclaimants who have signed the stipulation entered in their bankruptcy cases. The Plan Injunction remains in effect for any and all remaining claims.

AO 88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| | | |
|---|---|---|
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____            _____
                    Date                                Signature of Server

                                                        _____
                                                        Address of Server

---

RULE 45, Federal Rules of Civil Procedure, Part C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)     A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)     (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition. hearing or trial.

(B)     Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may. within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service. serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. if objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. if objection has been made, the party Serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)     (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, Is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may In order to attend trial be commanded to travel from any such place within the state in which the trial Is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies. or

(vi) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial Information, or

(ii) requires disclosure of an un-retained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena. quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that Cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1)     A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories In the demand.

(2)     when information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

Exhibit 24



**U.S. Department of Justice**
Civil Division, Federal Programs Branch

**Via First-Class Mail**          **Via Overnight Delivery**
P.O. Box 883                       20 Massachusetts Ave., NW
Washington, D.C. 20044             Washington, D.C. 20001

Jeffrey M. Smith                                          Tel: 202/514-5751
Trial Attorney                                           Fax: 202/616-8202

July 28, 2006

**Via Federal Express and First Class Mail**

Desmond T. Barry, Jr., Esq.
Condon & Forsyth LLP
7 Times Square
New York, NY 10036

Re:    District of Columbia Subpoenas to the Transportation Security Administration and
       Federal Aviation Administration in <u>In re: September 11, 2001 Litigation</u>, 21 MC 97 and
       21 MC 101 (S.D.N.Y.)

Dear Counsel:

I write in response to subpoenas issued by your firm in the above-referenced case to the
Transportation Security Administration ("TSA") and the Federal Aviation Administration ("FAA")
(collectively, "Agencies"). The United States Department of Justice represents the Agencies for
purposes of these subpoenas. The Agencies would like to arrange a meeting to discuss ways of
meeting your need for information, without unduly burdening the Agencies or permitting the improper
dissemination of classified, sensitive, privileged, or other confidential information. In the meantime,
this letter serves to inform you of the applicable regulations and of the Agencies' objections to the
subpoenas pursuant to Federal Rule 45(c)(2)(B).

**The Applicable *Touhy* Procedures**

Discovery against federal agencies is governed by federal regulations, known as *Touhy*
regulations after the case of *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), in which the
Supreme Court upheld the validity of such regulations for processing subpoenas. *See id.* at 468
(holding that the head of an agency has the authority to promulgate regulations to govern the
processing of subpoenas to the agency). The rationale for such regulations was stated by the Supreme
Court as follows: "When one considers the variety of information contained in the files of any
government department and the possibilities of harm from unrestricted disclosure in court, the
usefulness, indeed the necessity, of centralizing determination as to whether subpoenas *duces tecum*
will be willingly obeyed or challenged is obvious." *Id.*

The *Touhy* regulations for the Department of Homeland Security, which includes TSA, may be
found at 6 C.F.R. § 5.41 through 6 C.F.R. § 5.49. The *Touhy* regulations for the Department of
Transportation, which includes FAA, may be found at 49 C.F.R. § 9.1 through 49 C.F.R. § 9.19. The

applicability of these regulations to your demands for testimony and documents is discussed below.

### The Subpoenas *Ad Testificandum*

To the extent that the Requesting Defendants' Rule 45 subpoenas seek testimony from employees of TSA and FAA, the subpoenas are objectionable. Requests for testimony are handled pursuant to the Agencies' *Touhy* regulations.

In order to request testimony from TSA, the requestor must "set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought." 6 C.F.R. § 5.45(a); *see also* 6 C.F.R. § 5.44(a) (prohibiting unauthorized testimony). The Department of Homeland Security will then determine whether it will provide testimony on any of the topics sought, weighing the factors set forth in 6 C.F.R. § 5.48.

In order to request testimony from FAA, a requestor must submit a written request to the Department of Transportation providing the information set forth in 49 C.F.R. § 9.15. This information includes "[a] statement setting forth the basic facts of the proceeding," "[a] summary of the unresolved issues applicable to the testimony sought," "[a] summary of the testimony sought and its relevan[ce] to the proceeding," "[a] certification with support, that the information desired is not reasonably available from other sources," and "[a] declaration that the party will not seek expert or opinion testimony from the witness or seek the testimony of the witness at a hearing or trial in the proceeding." *Id.*

Absent compliance with the *Touhy* regulations, government employees are not authorized to testify and therefore cannot appear for, or be compelled to attend, depositions. *See Houston Bus. J., Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208, 1212 n.4 (D.C. Cir. 1996); *Ho v. United States*, 374 F. Supp. 2d 82, 83 (D.D.C. 2005).

### The Subpoenas *Duces Tecum*

Rule 45 subpoenas for documents are also subject to the procedural requirements of the Agencies' respective *Touhy* regulations. *See Touhy*, 340 U.S. at 468; *Yousuf v. Samantar*, 451 F.3d 248, 257 (D.C. Cir. 2006) (*Touhy* regulations permit the "centralizing [of an agency's] response to [a document] subpoena"). The Agencies thus will process your document subpoenas pursuant to their respective *Touhy* regulations as well as Rule 45 considerations, including, without limitation, those set below.

## Rule 45 Objections

In addition to the issues raised above, the Requesting Defendants' subpoenas are objectionable under Rule 45. The Agencies object to all instructions, definitions, and requests to the extent that they exceed the requirements of the Federal Rules of Civil Procedure. For example, your attempt to incorporate provisions from the Local Rules for the Southern District of New York is objectionable, as the subpoenas have issued out of the District for the District of Columbia.

The Agencies also object to the subpoenas because they are vague and extremely overbroad, and impose an undue burden on the Agencies. *See* Fed. R. Civ. P. 45(c)(1) ("A party or attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena."). For example, in general, the requests have no date restrictions, (*see* Instruction & Definition B), and are therefore burdensome for that reason alone. *See Linder v. Calero-Portocarrero*, 183 F.R.D. 314, 319 & n.6 (D.D.C. 1998). To the extent that certain requests can be read as seeking all documents generated prior to September 11, 2001, they are still overly broad as they do not contain a reasonable beginning date restriction for the search. Additionally, the vast majority of the requests seek "[a]ll Documents" that "concern[ ]" broad categories, providing little guidance as to what documents you seek, and presenting the Agencies with onerous burdens. Indeed, these 62 requests (plus numerous subparts) would require the production of massive amounts of documents and would impose excessive search and production burdens on the Agencies in violation of Rule 45.

A number of your requests appear to seek documents that are in the possession of the Requesting Defendants. *See, e.g.*, Requests 11, 33, 35, 38, 40, 42, 43, 46, 58. The Agencies object to your requests to the extent that they seek documents that are already in the possession of one or more of the parties. Additionally, much of the information that you seek is available from public sources. The Agencies object to each request to the extent that it seeks information that is already in the public domain.

A large number of your requests also appear to seek inter- or intra-agency communications. Such requests implicate a host of governmental privileges such as the deliberative process privilege and law enforcement privileges. The Agencies object to any request for material that is subject to these or any other privileges.

The Agencies object to each of your requests because they call for the production of Sensitive Security Information ("SSI") and/or classified national security information. Classified information will not be produced under any circumstances. Any documents that may contain SSI must be reviewed and redacted by the Transportation Security Administration. SSI is "information obtained or developed in the conduct of security activities . . . which TSA has determined would . . . be detrimental to the security of transportation." 49 C.F.R. § 1520.5(a)(3). TSA's regulations restrict disclosure of SSI to those persons with a regulatory need to know the information. 49 C.F.R. §§ 1520.7, 1520.11; *cf.* 49 U.S.C. § 114(s)(1)(C). To the extent that TSA determines that SSI is present, that information cannot be released. Information designated SSI is privileged and may not be released in the civil discovery process, and district courts lack jurisdiction to review SSI designations or to order the disclosure of SSI in civil discovery. 49 U.S.C. § 46110; *see, e.g., Chowdhury v. Northwest Airlines Corp.*, 226 F.R.D. 608 (N.D. Cal. 2004).[1]

---

[1] The Agencies recognize that the Requesting Defendants are entities that have access to SSI in the course of their businesses. However, other parties to this litigation are not entitled to access to SSI, and it appears that the discovery that you seek would become available to all parties. *See* Letter from Desmond T. Barry, Jr. to Beth E. Goldman & Sarah S. Normand, at 1 (July 14, 2006) (suggesting a meeting relating to these subpoenas be open "to all parties to the litigation who wish to attend"); Fed.

The Agencies also object that the subpoenas do not provide sufficient time for compliance. As the discussion above illustrates, the breadth of these sixty-two requests (plus subparts) is substantial and implicates numerous privilege issues. The time required to locate and review responsive documents would be substantially more than the one month allotted in the subpoena.

The Agencies also object to your designation of document production and deposition sites in New York, when the subpoenas were issued from the District for the District of Columbia and the Agencies are located in the D.C. area. *See* Fed. R. Civ. P. 45(a)(2), (b)(1).

For all of these reasons, the Agencies object to your subpoenas. The foregoing concerns and objections are not exhaustive, and the Agencies reserve the right to assert further objections in response to your requests for information, as appropriate.

* * *

The Agencies would like to work with the Requesting Defendants to reach an agreement that will provide the Requesting Defendants with the information that is appropriate for use in the September 11 Litigation, while protecting the Agencies from undue burden and preventing the dissemination of privileged, classified, and sensitive information. To that end, we look forward to meeting with you at a mutually convenient date to discuss these issues. We propose a meeting on the afternoon of August 9th in Washington, D.C. If that date is unworkable for you, then we would be available the following week. We request that you take into account the objections stated above and narrow your requests accordingly, in order to facilitate an agreement that is acceptable to both the Requesting Defendants and the Agencies.

Sincerely,

JEFFREY M. SMITH
Trial Attorney
Federal Programs Branch

cc:    All Liaison Counsel (by e-mail)

---

R. Civ. P. 30(b)(1) (stating that all parties are entitled to attend each deposition and to designation of documents produced by witnesses).

- 4 -

Exhibit 25



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street, Third Floor*
*New York, New York 10007*

April 10, 2007

BY FACSIMILE AND ELECTRONIC MAIL

Hon. Alvin K. Hellerstein
United States District Judge
United States Courthouse
500 Pearl Street, Room 1050
New York, NY 10007

          Re:  In re September 11 Litigation
               21 MC 97 & 101 (AKH)

Dear Judge Hellerstein:

          We write respectfully to advise the Court of the
Government's position regarding the motion filed by plaintiffs
and cross-claim plaintiffs (collectively, "plaintiffs") on April
4, 2007, to quash the Rule 30(b)(6) deposition of the Federal
Aviation Administration ("FAA"), and to request that the Court
set an expedited schedule for resolution of plaintiffs' motion.

          Principally, plaintiffs request that the Court adjourn
the deposition pending (1) their review of documents that will be
made available in the Sensitive Security Information ("SSI")
reading room upon the completion of the attorney clearance
process, and (2) the Court's disposition of the forthcoming
motion by the aviation defendants' concerning the scope of
government discovery.  Alternatively, plaintiffs request that the
Court limit the scope of the Notice of Deposition served by the
aviation defendants.

Plaintiffs' Request for an Adjournment

          The Government has no objection to plaintiffs' request
for an adjournment of the Rule 30(b)(6) deposition.  As we stated
in our letter dated March 30, 2007, a copy of which is attached
to plaintiffs' memorandum of law, the FAA and TSA are prepared to
provide a Rule 30(b)(6) deposition on certain limited topics, but
in accordance with the applicable <u>Touhy</u> regulations, the FAA and
TSA will only make a witness (or witnesses) available for a
single Rule 30(b)(6) deposition in this proceeding.  <u>See</u> 49

C.F.R. § 9.9(d).[1]  Accordingly, if parties require additional
time to review documents, or if the outcome of the aviation
defendants' motion may bear on issues that the parties
(plaintiffs or defendants) wish to explore in the deposition, the
Government does not oppose an adjournment for those purposes.

Plaintiffs note that they did not participate in the
meet and confer between the aviation defendants and the
Government regarding the scope of the aviation defendants'
request for deposition testimony.  See Pl. Mem. at 2.  The
purpose of that meeting was to discuss the aviation defendants'
Touhy request and to narrow defendants' proposed list of topics.
We have had similar informal discussions with plaintiffs
regarding their various Touhy requests.  To the extent plaintiffs
wish to meet with us to discuss the scope of the Rule 30(b)(6)
deposition, or any other outstanding request for Government
discovery, we are willing to do so.  Again, because the FAA and
TSA are only willing to provide a single Rule 30(b)(6)
deposition, any such discussions must take place reasonably in
advance of the commencement of the deposition.

<u>Plaintiffs' Alternative Request to Limit the Notice of Deposition</u>

Plaintiffs alternatively request that the Court limit
the Notice of Deposition by excluding certain topics that seek to
elicit from the FAA opinion testimony, legal conclusions, or
interpretations of regulatory requirements.  See Pl. Mem. at 6.
As noted in our March 30 letter, the FAA and TSA have not yet
issued a formal decision authorizing testimony under the
applicable Touhy regulations.[2]  The agencies may not authorize
testimony on all of the topics listed in the Notice of
Deposition, and they may not authorize testimony on the topics as
framed in the Notice of Deposition, particularly where we have
previously advised the aviation defendants that particular topics

---

[1]     We do not agree with plaintiffs' apparent suggestion,
see Pl. Mem. at 4, that the United States' intervention in this
matter on behalf of the Transportation Security Administration
("TSA") for the limited purpose of protecting SSI renders the
Government a party for purposes of discovery.  FAA and TSA have
agreed to provide a Rule 30(b)(6) deposition pursuant to their
Touhy regulations governing requests for discovery in litigation
to which the Government is not a party.  See 6 C.F.R. §§ 5.41 et
seq.; 49 C.F.R. §§ 9.1 et seq.

[2]     The agencies' final decision will be reviewable by this
Court in a separate action filed pursuant to the Administrative
Procedure Act and designated as related to this litigation.

are objectionable.  With regard to the specific objections noted
in plaintiffs' motion, we have previously advised the aviation
defendants that the FAA and TSA are unlikely to authorize a
witness to testify concerning expert opinions, legal conclusions,
or interpretations that go beyond the specific regulatory
requirements at issue.  <u>See</u> 49 C.F.R. § 9.9(b)-(c).

<u>Request for Expedited Treatment of Plaintiffs' Motion to Quash</u>

     The Government is concerned about the timing for
resolution of plaintiffs' motion to quash.  It is enormously
time-consuming and burdensome to prepare for a Rule 30(b)(6)
deposition of the FAA.  Further, the preparation of such a
witness or witnesses (and, in some instances, identifying them)
initially depends on the areas of inquiry and their scope.  We
are concerned about having to undertake the effort to prepare a
witness to testify during the first week of May, only to have the
deposition adjourned to a later date, thus requiring duplication
of effort and compounding the burdens associated with the
deposition.

     We therefore respectfully request that the Court set an
expedited schedule for resolution of plaintiffs' motion, so that
the Government will know how to proceed no later than April 17.
Alternatively, if a normal briefing schedule will apply to the
pending motion to quash, then the Government respectfully
requests that the deposition be adjourned until at least fifteen
days after the motion is decided.

     We thank the Court for its consideration of this
submission.

                         Respectfully,


PETER D. KEISLER                MICHAEL J. GARCIA
Assistant Attorney General      United States Attorney


DOUGLAS N. LETTER           By: _____
JEFFREY SMITH                   BETH E. GOLDMAN
U.S. Department of Justice      SARAH S. NORMAND
                                JEANNETTE A. VARGAS
LOIS B. OSLER                   Assistant U.S. Attorneys
CAROLYN G. MCKEE                Telephone: (212) 637-2732/2709
AMY A. RUGGERI                  Facsimile: (212) 637-2730/2702
KEVIN G. HOULIHAN
Transportation Security Administration

RICHARD SALTSMAN
Federal Aviation Admininistration

Page 4 of  4

cc (by electronic mail):

    Desmond T. Barry, Jr., Esq.
    Condon & Forsyth LLP

    Marc S. Moller, Esq.
    Kreindler & Kreindler

    Robert A. Clifford, Esq.
    Clifford Law Offices, P.C.

    Richard Williamson, Esq.
    Flemming, Zulack, Williamson & Zauderer LLP

    Beth Jacob, Esq.
    Schiff Hardin LLP

Exhibit 26

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street*
*New York, New York 10007*

March 21, 2007

<u>By Electronic Mail</u>
The Honorable Alvin K. Hellerstein
United States District Judge
United States Courthouse
Southern District of New York
500 Pearl Street
New York, New York  10007

   Re: In Re September 11 Tort Litigation
     <u>21 MC 97 (AKH) & 21 MC 101 (AKH)</u>

Dear Judge Hellerstein:

   In anticipation of the conference scheduled for March 22, 2007, we write to provide the Court with a status report detailing the progress made by the Government in discovery in this case.

<u>SSI Review</u>

   Since October 6, 2006, TSA has reviewed 68,675 pages for Sensitive Security Information, of which 66,583 were released in full.  Those documents included American and United Third Wave documents, and documents subpoenaed from third parties.

   The TSA/DOJ team has attended 50 depositions and reviewed more than 11,000 pages of deposition transcripts.  In addition, TSA has accommodated requests from the parties for review or re-review of approximately 3000 pages for use at the depositions.  Many of these requests for re-review have come on one or two days' notice, and TSA has nevertheless completed the review – often involving hundreds of pages – in time for the depositions.

Hon. Alvin K. Hellerstein
March 21, 2007
Page 2

<u>Reading Room</u>

        We have established a reading room at 26 Federal Plaza,
29th Floor, for use by the parties for review of SSI.  We have
also submitted for the Court's signature a Stipulated Protective
Order Governing Access to, Handling of, and Disposition of
Potential Sensitive Security Information.  This Stipulated
Protective Order is the result of a cooperative effort among the
plaintiffs, cross-claim plaintiffs, aviation defendants and TSA
to establish a mechanism by which cleared attorneys can review
and use SSI during discovery.  We are in the process of placing
documents in the reading room, and expect to open the reading
room immediately upon clearance of the lawyers designated by the
parties.

        Under the Stipulated Protective Order and pursuant to
Section 525(d) of the Department of Homeland Security Act, 2007,
Pub. L. No. 109-295, 120 Stat. 1355, access to SSI is restricted
to those who have undergone a clearance procedure.  The
Stipulated Protective Order provides that each group of parties
in the litigation – the plaintiffs, the aviation defendants and
the cross-claim plaintiffs – must designate lawyers to be cleared
for access to the reading room in accordance with the formula set
forth in paragraph 5.  The parties have indicated that they will
shortly provide a list of their designations (and in some cases
they already have), and accordingly, we have arranged for
investigators from the United States Attorney's Office to be
available on March 22, beginning at 10 a.m., to collect clearance
materials and fingerprints.  We anticipate that the clearance
process itself will be completed in a brief time-period, and that
the reading room will be populated in the next few weeks.

<u>Discovery Requests of Other Government Agencies</u>

        In July 2006, the aviation defendants served voluminous
requests for documents on TSA and FAA.[1]  In response, TSA has

---

        [1]  Defendants' portion of the joint letter submitted
yesterday stated that the government has only recently begun to
produce documents in response to requests propounded in February
2005 and July 2006.  Defendants have since clarified that the
reference to discovery requests in February 2005 was in error.
In fact, no party propounded any discovery on the government
until July 2006.  After a period of negotiation in which TSA
provided an index of documents submitted to the 9/11 Commission

Hon. Alvin K. Hellerstein
March 21, 2007
Page 3

gathered and produced more than 8000 pages to date, including
pages designated for the reading room.

In addition to the requests made by defendants for
documents from TSA and FAA, plaintiffs and defendants have sought
documents from numerous other federal agencies and depositions of
current and former government officials and persons in United
States custody.

First, plaintiffs, cross-claim plaintiffs, and the
aviation defendants have made numerous requests for documents
from the FBI. The investigation of the terrorist attacks of
September 11, 2001, is the largest investigation in the history
of the FBI and comprises millions of pages of documents, many of
which contain classified national security information and/or
information protected by the law enforcement or other privileges.
The FBI's investigation is continuing, and prosecutions of
individuals involved in the attacks are contemplated.
Accordingly, the requested information must be reviewed by the
FBI and other components of the Department of Justice ("DOJ"),
and in some cases other agencies, prior to production. The
process of gathering responsive documents, reviewing them for
privileged and classified information, and making judgments about
what information can and cannot be produced is tremendously time-
consuming and diverts FBI and other DOJ personnel from their
primary duties in investigating and prosecuting the underlying
matters.

For all of these reasons, the requests for FBI document
discovery pose enormous logistical and resource concerns for the
government, as well as serious concerns about protection of
classified and privileged information. Nevertheless, the FBI is
prepared to work with the parties in an effort to provide
reasonably available, unclassified, non-privileged information
that is relevant and material to the litigation. The FBI has
already spent more than 1100 hours on the process of gathering
and reviewing responsive documents. In an effort to streamline
the process, prevent piecemeal requests, reduce the burden on FBI
and DOJ of searching for and reviewing responsive documents, and
facilitate more efficient responses to the requests, by letter
dated March 16, 2007, we outlined a procedure for the parties to
obtain document discovery from the FBI. Among other things, we

---

and the defendants requested documents from that list, TSA began
producing documents in January 2007.

Hon. Alvin K. Hellerstein
March 21, 2007
Page 4

have asked that any further requests be made by April 16, 2007,
that they be specific and narrowly tailored, and that the parties
make every effort to avoid duplicative requests.

Second, the aviation defendants have made <u>Touhy</u>
requests for the depositions of several former high-level
government officials: George Tenet, Louis Freeh, Richard Clarke,
and Jane Garvey. We have agreed with the defendants to put aside
the request for Ms. Garvey, former head of the FAA, and instead
focus on their request for a 30(b)(6) witness from the FAA. We
are in the process of discussing appropriate topics for such a
deposition, and as reflected in Mr. Barry's March 20 letter to
the Court, we have indicated a target date of the first week of
May for the deposition.

As for former Directors Freeh and Tenet, the
appropriate government agencies have responded to the <u>Touhy</u>
requests and stated their objections to those depositions
proceeding. These objections include the fact that defendants
have not adequately demonstrated the relevance of the proposed
testimony, as well as concerns regarding classified information
and other applicable privileges, among other things. As for Mr.
Clarke, <u>Touhy</u> is inapplicable because the National Security
Council does not have <u>Touhy</u> regulations. Nevertheless, by letter
dated March 14, 2007, the government has stated its objections to
a deposition of Mr. Clarke, including concerns over relevance,
classified information and other privileges. In his letter, Mr.
Barry accurately describes our agreement with the aviation
defendants to proceed before Your Honor on any challenges to the
government's position with respect to these three requests for
depositions.

Third, during the last two weeks, we have received
numerous requests from the aviation defendants for additional
depositions. On March 6, 2007, the defendants provided a list of
witnesses they seek to depose consisting of various current and
former FBI and CIA agents who testified at the Moussaoui trial.
On March 15, 2007, the defendants also requested the depositions
of Khalid Sheik Mohammed and Ramzi Binalshibh, who are detained
at the United States Naval Base at Guantanamo Bay, Cuba. On
March 20, 2007, Massport served additional requests to depose two
FAA employees. All of these requests are under review.

Hon. Alvin K. Hellerstein
March 21, 2007
Page 5

<u>Fourth Circuit Decision in Moussaoui</u>

As Your Honor is aware, plaintiffs in this action sought to obtain in the criminal proceeding pending in the Eastern District of Virginia against Zacarias Moussaoui non-public discovery material that the government had provided to Moussaoui's defense team in the course of the criminal case against him.  In a decision dated March 14, 2007, the United States Court of Appeals for the Fourth Circuit reversed the lower court ruling granting plaintiffs access to such materials.

The Fourth Circuit found that neither the Crime Victims Rights Act, 18 U.S.C. § 3771, nor the Air Transportation Safety and System Stabilization Act (ATSSSA), Pub. L. No. 107-42, 115 Stat. 230, 237 (2001), nor the district court's inherent authority supported an order allowing plaintiffs access to non-public materials produced to a defendant in a criminal proceeding.  Thus, the court ruled that plaintiffs here may not obtain discovery through the criminal proceeding against Moussaoui, but rather must rely on the normal civil discovery process in this proceeding.  <u>See United States v. Moussaoui</u>, – F.3d –, 2007 WL 755276, at *14 (4th Cir. Mar. 14, 2007).  As discussed above, the government has been working cooperatively with the parties to facilitate appropriate discovery in this matter, while limiting the burden on government resources and protecting sensitive information.

Respectfully,

PETER D. KEISLER                    MICHAEL J. GARCIA
Assistant Attorney General          United States Attorney

DOUGLAS N. LETTER                   By: _Beth Go_____
ALEXANDER HAAS                      BETH E. GOLDMAN
U.S. Department of Justice          SARAH S. NORMAND
                                    JEANNETTE A. VARGAS
                                    Assistant U.S. Attorneys
                                    Telephone: (212) 637-2732
                                    Facsimile: (212) 637-2730

cc:  Marc S. Moller, Esq.
     Desmond T. Barry, Jr., Esq.
     Richard Williamson, Esq.
     Robert A. Clifford, Esq.
     Beth D. Jacob, Esq.